UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br>AND ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>HECTOR MELGAR, P.T.,<br>HECTOR MELGAR, PT, P.C. d/b/a EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, and BRENTWOOD PHYSICAL REHABILITATION,<br>DAVID TUBENS, D.C.,<br>BRENTWOOD REGIONAL CHIROPRACTIC, P.C.,<br>EASTERN SUFFOLK CHIROPRACTIC, P.C.,<br>FRONT ST. CHIROPRACTIC, P.C.,<br>HEMPSTEAD REGIONAL CHIROPRACTIC, P.C.,<br>HUNTINGTON REGIONAL CHIROPRACTIC, P.C.,<br>LIBERTY REGIONAL CHIROPRACTIC, P.C.,<br>PATCHOGUE REGIONAL CHIROPRACTIC, P.C.,<br>MAXIM TYORKIN, M.D. d/b/a MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE,<br>TIMOTHY MOSOMILLO, D.O.,<br>PAVILION MEDICAL, P.C.,<br>ALEXIOS APAZIDIS, M.D.,<br>ALEXIOS APAZIDIS, M.D., P.C. d/b/a ADVANCED SPINE CARE and TOTAL SPINE & SPORTS CARE,<br>WILLIAM B. JONES, M.D.,<br>PHOENIX MEDICAL SERVICES, P.C. d/b/a ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION,<br>RICHARD SELDES, M.D.,<br>DEER PARK ORTHOPEDICS, P.C.,<br>STATION MEDICAL SERVICES, P.C.,<br>RANDALL EHRLICH, M.D. d/b/a ORTHOCARE SURGICAL,<br>ELLA MATATOV, L.AC.,<br>EAST POINT ACUPUNCTURE, P.C.,<br>DIANA ABRAMCHAYEVA, L.AC.,<br>DA ACUPUNCTURE, P.C.,<br>MAITTES ROMERO, L.AC.,<br>PONCE ACUPUNCTURE, P.C., AND<br>ISLAND REGIONAL MANAGEMENT, LLC,<br><br>Defendants. | C.A. No. |

**PLAINTIFFS' COMPLAINT**

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I. INTRODUCTION

1. This case is about a physical therapist, Hector Melgar, P.T. ("Melgar"), and a chiropractor, David Tubens, D.C. ("Tubens"), that teamed together as business partners to orchestrate a complex scheme to defraud Allstate by (i) operating and controlling a team of healthcare providers, including physicians, and (ii) providing medically unnecessary and excessive healthcare services from a number of locations in the Eastern District of New York.

2. Melgar and Tubens, as a physical therapist and chiropractor licensed in the State of New York, respectively, schemed to unlawfully profit from the provision of an array of healthcare services, including chiropractic treatment, physical therapy, orthopedic services, pain management services, diagnostic testing, and acupuncture treatment, by seeking payment for such healthcare services even though they were excessive and medically unnecessary.

3. Melgar and Tubens each owned professional corporations organized under New York law to provide physical therapy and chiropractic treatment, respectively.

4. Specifically, Melgar is the sole record shareholder, officer, and/or director of Hector Melgar, PT, P.C., which does business under the names Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation (hereinafter, "Melgar PT").

5. Tubens is the sole record shareholder, officer, and/or director of Brentwood Regional Chiropractic, P.C. ("Brentwood Regional Chiropractic"), Eastern Suffolk Chiropractic,

P.C. ("Eastern Suffolk Chiropractic"), Front St. Chiropractic, P.C. ("Front St. Chiropractic"), Hempstead Regional Chiropractic, P.C. ("Hempstead Regional Chiropractic"), Huntington Regional Chiropractic, P.C. ("Huntington Regional Chiropractic"), Liberty Regional Chiropractic, P.C. ("Liberty Regional Chiropractic"), and Patchogue Regional Chiropractic, P.C. ("Patchogue Regional Chiropractic") (collectively, the "Tubens PCs").

6. As alleged herein, Melgar and Tubens intentionally devised a scheme whereby they recruited and induced a variety of professional healthcare providers to incorporate professional medical corporations and then operate from various multi-disciplinary healthcare facilities that were managed and controlled by Melgar and Tubens, from which Melgar and Tubens operated Melgar PT and one or more of the Tubens PCs.

7. The collection of entities managed and/or controlled by Melgar and Tubens allowed them to accomplish the main objective of this scheme, which was to take advantage of the generous benefits available under New York's No-Fault insurance laws.

8. To attain their unlawful goals without detection, Tubens and Melgar purposely and knowingly conspired with the licensed healthcare professionals Maxim Tyorkin, M.D. ("Tyorkin") d/b/a/ Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O. ("Mosomillo"), Alexios Apazidis, M.D. ("Apazidis"), William B. Jones, M.D. ("Jones"), Richard Seldes, M.D. ("Seldes"), Randall Ehrlich, M.D. ("Ehrlich") d/b/a OrthoCare Surgical, Ella Matatov, L.Ac. ("Matatov"), Diana Abramchayeva, L.Ac. ("Abramchayeva"), and Maittes Romero, L.Ac. ("Romero") (collectively, the "Healthcare Provider Defendants").

9. Tubens and Melgar recruited the Healthcare Provider Defendants to participate in the scheme and had the Healthcare Provider Defendants utilize the following entities – which were organized and/or billed under the providers' names – as vehicles to submit No-Fault benefit claims

to Allstate: Brentwood Regional Chiropractic, P.C. ("Brentwood Regional Chiropractic"), Eastern Suffolk Chiropractic, P.C. ("Eastern Suffolk Chiropractic"), Front St. Chiropractic, P.C. ("Front St. Chiropractic"), Hempstead Regional Chiropractic, P.C. ("Hempstead Regional Chiropractic"), Huntington Regional Chiropractic, P.C. ("Huntington Regional Chiropractic"), Liberty Regional Chiropractic, P.C. ("Liberty Regional Chiropractic"), Patchogue Regional Chiropractic, P.C. ("Patchogue Regional Chiropractic"), Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation ("Melgar PT"), Maximum Orthopaedics and Sports Medicine, Pavilion Medical, P.C. ("Pavilion Medical"), Alexios Apazidis, M.D., P.C. d/b/a Advances Spine Care and Total Spine & Sports Care ("Apazidis P.C."), Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix Medical Services"), Deer Park Orthopedics, P.C. ("Deer Park Orthopedics"), Station Medical Services, P.C. ("Station Medical Services"), OrthoCare Surgical, East Point Acupuncture, P.C. ("East Point Acupuncture"), DA Acupuncture, P.C. ("DA Acupuncture"), and Ponce Acupuncture, P.C. ("Ponce Acupuncture") (collectively, the "PC Defendants").

10. By recruiting the Healthcare Provider Defendants, Melgar and Tubens caused the PC Defendants to be organized using the Healthcare Provider Defendants' licensing credentials to create the false impression that the entities were separately owned and operated by qualified licensees.

11. At all relevant times, however, the Healthcare Provider Defendants had no actual power or control over the entities registered under their names, including the ability to manage payroll, to participate in employee hiring and firing, to control corporate expenses, or to bill insurance providers.

12. In reality, Melgar and Tubens were the true beneficiaries and decision makers of the PC Defendants.

13. As a licensed physical therapist, Melgar is prohibited under New York law from owning, controlling, or profiting from professional corporations organized under New York law to provide professional physician, chiropractic, or acupuncture healthcare services.

14. As a licensed chiropractor, Tubens is prohibited under New York law from owning, controlling, or profiting from professional corporations organized under New York law to provide professional physician, physical therapy, or acupuncture healthcare services.

15. To conceal their control over, and profits from, the PC Defendants, Melgar and Tubens utilized lease agreements that purported to rent office space at several locations that housed one or more of the PC Defendants.

16. Moreover, another entity owned by Tubens, Island Regional Management, LLC ("Island Regional Management"), owned certain property that served as locations for the multi-disciplinary healthcare facilities that were central to this scheme and subleased to Melgar PT.

17. These layers of lease agreements and subleases were intentionally crafted as a means to conceal Melgar's and Tubens' control over one or more of the PC Defendants, and their unlawful splitting of the professional fees and profits collected by these entities in violation of New York law, by disguising the payments—which represented the professional fees and profits of the PC Defendants— as "rent", which was to Melgar and Tubens for their personal benefit.

18. Specifically, Melgar owns the property at 21 Washington Avenue, Brentwood, New York, which has served as the epicenter of the defendants' scheme during the relevant period, and leases portions of the office space located at this location to certain members of the PC Defendants.

19. Similarly, Island Regional Management holds an ownership interest in the property located at 1801 Brentwood Road, Brentwood, New York and 500 Front Street, Hempstead, New York and leases the office space at these locations to Melgar PT.

20. Moreover, Island Regional Management also subleases space at other locations used in this scheme, including 15 Walt Whitman Road, Huntington Station, New York, which is subleased to Melgar PT.

21. In a further manner to conceal this scheme, Melgar recruited Carlos Alvarez ("Alvarez") to incorporate the management company, G&A Office Management, Inc. ("G&A Office Management") to sublease office space, in place of Melgar PT, to certain healthcare providers that were recruited by Melgar and Tubens to provide treatment to patients at one or more location in Melgar's and Tubens' network of multi-disciplinary healthcare facilities.

22. Upon information and belief, Alvarez is a family member of Melgar.

23. Upon information and belief, G&A Office Management was used merely to create the false impression that Melgar was not controlling, and profiting from, one or more PC Defendant.

24. G&A Office Management was used to unlawfully funnel the professional fees and proceeds of one or more of the PC Defendants to Melgar and Tubens.

25. As explained herein, throughout the course of this scheme, the defendants (or those working under their direction and control) purposely induced Allstate to pay the PC Defendants for excessive and medically unnecessary tests and healthcare services purportedly provided to Allstate claimants while knowing that the charges for these tests and healthcare services were not compensable under New York law.

26. These No-Fault benefit claims were further not compensable under New York law as the PC Defendants were not legally incorporated or operated in accordance with New York law.

27. The success of the defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law.

28. Allstate reasonably relied on the facial validity of the PC Defendants' documents—and representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

29. By this Complaint, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

30. Through this action, Allstate seeks to recover all monies wrongfully paid to Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture.

31. Specifically, Allstate seeks to recover actual damages totaling over $3,218,838.65, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the defendants during the course of this scheme.

32. Allstate also seeks a declaration that it has no legal obligation to make any payments on any No-Fault claims that have been submitted by (or on behalf of) Melgar PT,

Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture because the treatments and services purportedly provided to Allstate-covered patients were rendered in direct violation of one or more New York State licensing requirement necessary to provide such treatments and services, thus rendering Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

33. All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

34. Each defendant named herein conspired with at least one other defendant to accomplish and to further the objectives of their scheme to defraud.

35. The defendants purposely designed and executed this scheme with the express aim of eliciting payments of automobile insurance contract proceeds from Allstate to Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point

Acupuncture, DA Acupuncture, and Ponce Acupuncture for the benefit of each and all of the defendants named herein.

36. In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetuated their scheme to defraud.

37. The defendants knew that the patients identified in this Complaint were eligible for insurance coverage under automobile insurance policies issued by Allstate.

38. Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted to Allstate hundreds of bills on behalf of the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II. THE PARTIES

### A. PLAINTIFFS

39. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

40. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

41. At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

## B. DEFENDANTS

### 1. "Management" Defendants

#### a. Hector Melgar, P.T.

42. Melgar resides in and is a citizen of the State of New York.

43. At all relevant times, Melgar has been licensed to provide physical therapy services in the State of New York.

44. However, at no time has Melgar been licensed or otherwise authorized to practice acupuncture, chiropractic, or medicine in the State of New York or elsewhere.

45. According to records on file with the New York Department of State, Melgar is the sole record shareholder, officer, and/or director of Melgar PT.

46. When patients sought tests and healthcare services from Melgar PT, they were caused to enter into assignment of benefits agreements with Melgar PT, thus giving Melgar PT the right to seek No-Fault payments directly from insurers.

47. As an assignee of its patients' benefits, Melgar PT sought and collected No-Fault benefit payments directly from insurers, including Allstate.

48. During the relevant period, Melgar exerted control over the day-to-day operation and management of the Melgar PT and the PC Defendants by, among other things, controlling the companies' finances, and by intentionally submitting, or causing the submission of, claims to Allstate that contained false information.

49. As detailed herein, Melgar participated in the operation and management of Melgar PT and the PC Defendants during the entirety of this scheme, and also conducted the affairs of these enterprises through a pattern of mail fraud racketeering activity.

50. Melgar furthered the objectives of this scheme by (a) causing the fraudulent incorporation of the PC Defendants under New York law, (b) seizing control over the PC Defendants despite not being authorized to provide, or manage the provision of, medical, chiropractic, and acupuncture treatment and services, (c) exerting control over the operation and management of Melgar PT and the PC Defendants, (d) devising and implementing a routine protocol of medically unnecessary and excessive tests, treatments, prescriptions, and referrals to be followed at the multi-disciplinary healthcare facilities at which Melgar PT, the Tubens PCs, and one or more of the PC Defendants treated patients, (e) submitting, or causing the submission of No-Fault benefit claims to Allstate that contained false information about Melgar PT's and the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (f) causing Melgar PT and the PC Defendants to collect payments that they were not lawfully entitled to collect, (g) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit, (h) facilitating unneeded patient referrals for diagnostic tests and other healthcare services, (i) providing unnecessary healthcare services through Melgar PT, (j) administering unnecessary diagnostic tests through Melgar PT, and (k) demanding and collecting payment for these unnecessary tests and healthcare services.

51. Because he directly participated in the operation and management of the Melgar PT Defendant enterprises throughout the course of this scheme, Melgar is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**b. David Tubens, D.C.**

52. Tubens resides in and is a citizen of the State of New York.

53. At all relevant times, Tubens has been licensed to provide chiropractic treatment in the State of New York.

54. However, at no time has Tubens been licensed or otherwise authorized to practice acupuncture, physical therapy, or medicine in the State of New York or elsewhere.

55. According to records on file with the New York Department of State, Tubens is the sole record shareholder, officer, and/or director of Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic.

56. In fact, Tubens incorporated five (5) of these seven (7) chiropractic PCs on the very same day (i.e., September 29, 2011), namely, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic.

57. When patients sought tests and healthcare services from Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic, they were caused to enter into assignment of benefits agreements with Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic, thus giving Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic,

Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic the right to seek No-Fault payments directly from insurers.

58. As an assignee of their patients' benefits, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, and Patchogue Regional Chiropractic sought and collected No-Fault benefit payments directly from insurers, including Allstate.

59. During the relevant period, Tubens exerted control over the day-to-day operation and management of the Tubens PCs and the PC Defendants by, among other things, controlling the companies' finances, and by intentionally submitting, or causing the submission of, claims to Allstate that contained false information.

60. As detailed herein, Tubens participated in the operation and management of the Tubens PCs and the PC Defendants during the entirety of this scheme, and also conducted the affairs of the Tubens PCs and the PC Defendants through a pattern of mail fraud racketeering activity.

61. Tubens furthered the objectives of this scheme by (a) causing the fraudulent incorporation of the PC Defendants under New York law, (b) seizing control over the PC Defendants despite not being authorized to provide, or manage the provision of, medical, physical therapy, and acupuncture treatments and services, (c) exerting control over the operation and management of the Tubens PCs and the PC Defendants, (d) devising and implementing a routine protocol of unnecessary and excessive tests, treatments, prescriptions, and referrals to be followed at the multi-disciplinary healthcare facilities at which Melgar PT, the Tubens PCs, and one or more of the PC Defendants treated patients, (e) submitting No-Fault benefit claims to Allstate that

contained false information about the Tubens PCs' and the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (f) causing the Tubens PCs and PC Defendants to collect payments that they were not lawfully entitled to collect, and (g) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit.

62. Because he directly participated in the operation and management of the Tubens PC and PC Defendant enterprises throughout the course of this scheme, Tubens is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**c. Island Regional Management, LLC**

63. Island Regional Management is organized under New York law as a limited liability company.

64. Island Regional Management maintains its principal place of business at 15 Turnberry Court, Dix Hills, New York.

65. According to records on file with the New York Department of State, Tubens is the sole member and/or manager of Island Regional Management.

66. During the relevant period, Tubens participated in the operation and management of Island Regional Management.

67. Tubens used Island Regional Management to lease or sublease certain property to one or more of the PC Defendants during the relevant period as a means to facilitate and conceal his unlawful receipt of professional fees and profits from one or more professional healthcare corporation, including, but not necessarily limited to, the PC Defendants.

### 2. Healthcare Provider Defendants

#### a. Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine

68. Tyorkin resides in and is a citizen of the State of New York.

69. At all relevant times, Tyorkin has been licensed to practice medicine in the State of New York.

70. At all relevant times, Melgar and Tubens directed Tyorkin to perform excessive and medically unnecessary services for Tyorkin's patients at 21 Washington Avenue, Brentwood, New York.

71. When patients sought tests and healthcare services from Tyorkin, they were caused to enter into assignment of benefits agreements with Tyorkin, thus giving Tyorkin the right to seek No-Fault payments directly from insurers.

72. As an assignee of his patients' benefits, Tyorkin sought and collected No-Fault benefit payments directly from insurers, including Allstate.

73. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Tyorkin was not lawfully eligible to seek or collect such payments.

74. Tyorkin is responsible for the fraudulent and non-compensable tests and treatments rendered to his patients, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to him.

#### b. Timothy Mosomillo, D.O.

75. Mosomillo resides in and is a citizen of the State of New York.

76. At all relevant times, Mosomillo has been licensed to practice medicine in the State of New York.

77. According to records on file with the New York Department of State, Mosomillo was the sole record shareholder, officer and/or director of Pavilion Medical until May 2, 2018.

78. During the relevant period, the Management Defendants—and not Mosomillo—unlawfully managed, controlled, and operated Pavilion Medical.

79. At all relevant times, Melgar and Tubens directed Mosomillo and/or his agents at Pavilion Medical to perform excessive and medically unnecessary services for patients of Pavilion Medical.

80. When patients sought tests and healthcare services from Pavilion Medical, they were caused to enter into assignment of benefits agreements with Pavilion Medical, thus giving Pavilion Medical the right to seek No-Fault payments directly from insurers.

81. As an assignee of its patients' benefits, Pavilion Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

82. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Pavilion Medical was not lawfully eligible to seek or collect such payments.

83. Because he directly participated in the operation and management of the Pavilion Medical enterprise during the course of this scheme, Mosomillo is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**c. Alexios Apazidis, M.D.**

84. Apazidis resides in and is a citizen of the State of New York.

85. At all relevant times, Apazidis has been licensed to practice medicine in the State of New York.

86. According to records on file with the New York Department of State, Apazidis is the sole record shareholder, officer and/or director of Apazidis P.C.

87. At all relevant times, the Management Defendants—and not Apazidis—unlawfully managed, controlled, and operated Apazidis P.C.

88. At all relevant times, Melgar and Tubens directed Apazidis and/or his agents at Apazidis P.C. to perform excessive and medically unnecessary services for patients of Apazidis P.C.

89. When patients sought tests and healthcare services from Apazidis P.C., they were caused to enter into assignment of benefit agreements with Apazidis P.C., thus giving Apazidis P.C. the right to seek No-Fault payments directly from insurers.

90. As an assignee of its patients' benefits, Apazidis P.C. sought and collected No-Fault benefit payments directly from insurers, including Allstate.

91. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Apazidis P.C. was not lawfully eligible to seek or collect such payments.

92. Because he directly participated in the operation and management of the Apazidis P.C. enterprise throughout the course of this scheme, Apazidis is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**d. William B. Jones, M.D.**

93. Jones resides in and is a citizen of the State of New York.

94. At all relevant times, Jones has been licensed to practice medicine in the State of New York.

95. According to records on file with the New York Department of State, Jones is the sole record shareholder, officer and/or director of Phoenix Medical Services.

96. At all relevant times, the Management Defendants—and not Jones—unlawfully managed, controlled, and operated Phoenix Medical Services.

97. At all relevant times, Melgar and Tubens directed Jones and/or his agents at Phoenix Medical Services to perform excessive and medically unnecessary services for patients of Phoenix Medical Services.

98. When patients sought tests and healthcare services from Phoenix Medical Services, they were caused to enter into assignment of benefits agreements with Phoenix Medical Services, thus giving Phoenix Medical Services the right to seek No-Fault payments directly from insurers.

99. As an assignee of its patients' benefits, Phoenix Medical Services sought and collected No-Fault benefit payments directly from insurers, including Allstate.

100. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Phoenix Medical Services was not lawfully eligible to seek or collect such payments.

101. Because he directly participated in the operation and management of the Phoenix Medical Services enterprise throughout the course of this scheme, Jones is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**e. Richard Seldes, M.D.**

102. Seldes resides in and is a citizen of the State of New Jersey.

103. At all relevant times, Seldes has been licensed to practice medicine in the State of New York.

104. According to records on file with the New York Department of State, Seldes is the sole record shareholder, officer and/or director of Deer Park Orthopedics and Station Medical Services.

105. At all relevant times, the Management Defendants—and not Seldes—unlawfully managed, controlled, and operated Deer Park Orthopedics and Station Medical Services.

106. At all relevant times, Melgar and Tubens directed Seldes and/or his agents at Deer Park Orthopedics and Station Medical Services to perform excessive and medically unnecessary services for patients of Deer Park Orthopedics and Station Medical Services.

107. When patients sought tests and healthcare services from Deer Park Orthopedics and Station Medical Services, they were caused to enter into assignment of benefits agreements with Deer Park Orthopedics and Station Medical Services, thus giving Deer Park Orthopedics and Station Medical Services the right to seek No-Fault payments directly from insurers.

108. As an assignee of its patients' benefits, Deer Park Orthopedics and Station Medical Services sought and collected No-Fault benefit payments directly from insurers, including Allstate.

109. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Deer Park Orthopedics and Station Medical Services were not lawfully eligible to seek or collect such payments.

110. Because he directly participated in the operation and management of the Deer Park Orthopedics and Station Medical Services enterprises throughout the course of this scheme, Seldes is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of

these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**f. Randall Ehrlich, M.D.**

111. Ehrlich resides in and is a citizen of the State of New York.

112. At all relevant times, Ehrlich has been licensed to practice medicine in the State of New York.

113. According to records on file with the New York Department of State, Ehrlich is the sole record shareholder, officer and/or director of OrthoCare Surgical.

114. At all relevant times, the Management Defendants—and not Ehrlich—unlawfully managed, controlled, and operated OrthoCare Surgical.

115. At all relevant times, Melgar and Tubens directed Ehrlich and/or his agents at OrthoCare Surgical to perform excessive and medically unnecessary services for patients of OrthoCare Surgical.

116. When patients sought tests and healthcare services from OrthoCare Surgical, they were caused to enter into assignment of benefits agreements with OrthoCare Surgical, thus giving OrthoCare Surgical the right to seek No-Fault payments directly from insurers.

117. As an assignee of its patients' benefits, OrthoCare Surgical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

118. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that OrthoCare Surgical was not lawfully eligible to seek or collect such payments.

119. Because he directly participated in the operation and management of the OrthoCare Surgical enterprise throughout the course of this scheme, Ehrlich is responsible for the fraudulent

and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**g. Ella Matatov, L.Ac.**

120. Matatov resides in and is a citizen of the State of New York.

121. At all relevant times, Matatov has been licensed to practice acupuncture in the State of New York.

122. According to records on file with the New York Department of State, Matatov is the sole record shareholder, officer and/or director of East Point Acupuncture.

123. At all relevant times, the Management Defendants—and not Matatov—unlawfully managed, controlled, and operated East Point Acupuncture.

124. At all relevant times, Melgar and Tubens directed Matatov and/or her agents at East Point Acupuncture to perform excessive and medically unnecessary acupuncture treatment for patients of East Point Acupuncture.

125. When patients sought acupuncture treatment from East Point Acupuncture, they were caused to enter into assignment of benefits agreements with East Point Acupuncture, thus giving East Point Acupuncture the right to seek No-Fault benefit payments directly from insurers.

126. As an assignee of its patients' benefits, East Point Acupuncture sought and collected No-Fault benefit payments directly from insurers, including Allstate.

127. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that East Point Acupuncture was not lawfully eligible to seek or collect such payments.

128. Because she directly participated in the operation and management of the East Point Acupuncture enterprise throughout the course of this scheme, Matatov is responsible for the

fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**h. Diana Abramchayeva, L.Ac.**

129. Abramchayeva resides in and is a citizen of the State of New York.

130. At all relevant times, Abramchayeva has been licensed to practice acupuncture in the State of New York.

131. According to records on file with the New York Department of State, Abramchayeva is the sole record shareholder, officer and/or director of DA Acupuncture.

132. At all relevant times, the Management Defendants—and not Abramchayeva—unlawfully managed, controlled, and operated DA Acupuncture.

133. At all relevant times, Melgar and Tubens directed Abramchayeva and/or her agents at DA Acupuncture to perform excessive and medically unnecessary acupuncture treatment for patients of DA Acupuncture.

134. When patients sought acupuncture treatment from DA Acupuncture, they were caused to enter into assignment of benefits agreements with DA Acupuncture, thus giving DA Acupuncture the right to seek No-Fault payments directly from insurers.

135. As an assignee of its patients' benefits, DA Acupuncture sought and collected No-Fault benefit payments directly from insurers, including Allstate.

136. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that DA Acupuncture was not lawfully eligible to seek or collect such payments.

137. Because she directly participated in the operation and management of the DA Acupuncture enterprise throughout the course of this scheme, Abramchayeva is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**i. Maittes Romero, L.Ac.**

138. Romero resides in and is a citizen of the State of New York.

139. At all relevant times, Romero has been licensed to practice acupuncture in the State of New York.

140. According to records on file with the New York Department of State, Romero is the sole record shareholder, officer and/or director of Ponce Acupuncture.

141. At all relevant times, the Management Defendants—and not Romero—unlawfully managed, controlled, and operated Ponce Acupuncture.

142. At all relevant times, Melgar and Tubens directed Romero and/or her agents at Ponce Acupuncture to perform excessive and medically unnecessary acupuncture treatment for patients of Ponce Acupuncture.

143. When patients sought acupuncture treatment from Ponce Acupuncture, they were caused to enter into assignment of benefits agreements with Ponce Acupuncture, thus giving Ponce Acupuncture the right to seek No-Fault benefit payments directly from insurers.

144. As an assignee of its patients' benefits, Ponce Acupuncture sought and collected No-Fault benefit payments directly from insurers, including Allstate.

145. As detailed herein, the Defendants purposely sought No-Fault benefit payments from Allstate knowing that Ponce Acupuncture was not lawfully eligible to seek or collect such payments.

146. Because she directly participated in the operation and management of the Ponce Acupuncture enterprise throughout the course of this scheme, Romero is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### 3. PC Defendants

#### a. Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation

147. Melgar PT is organized as a physical therapist-owned professional medical corporation under New York law with a principal place of business located at 21 Washington Street, Brentwood, New York.

148. At all relevant times, Melgar has purported to be the sole shareholder, officer, and/or director of Melgar PT.

149. As alleged herein, Melgar PT furnished, or was caused to furnish, physical therapy treatment to patients which were: (a) falsely billed; (b) rendered pursuant to an unlawful referral and financial agreement; (c) rendered as part of a predetermined treatment protocol; (d) excessive and medically unnecessary; and/or (e) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

150. Accordingly, as alleged herein, Melgar PT (and/or persons working on behalf of Melgar PT, including but not limited to, Melgar) purposely caused Melgar PT to seek No-Fault

benefit payments from Allstate knowing that Melgar PT was not lawfully eligible to seek or collect such payments.

**b. Brentwood Regional Chiropractic, P.C.**

151. Brentwood Regional Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 1799 Brentwood Road, Brentwood, New York.

152. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Brentwood Regional Chiropractic.

153. As alleged herein, Brentwood Regional Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

154. Accordingly, as alleged herein, Brentwood Regional Chiropractic (and/or persons working on behalf of Brentwood Regional Chiropractic, including but not limited to, Tubens) purposely caused Brentwood Regional Chiropractic to seek No-Fault benefit payments from Allstate knowing that Brentwood Regional Chiropractic was not lawfully eligible to seek or collect such payments.

**c. Eastern Suffolk Chiropractic, P.C.**

155. Eastern Suffolk Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 21 Washington Avenue, Brentwood, New York.

156. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Eastern Suffolk Chiropractic.

157. As alleged herein, Eastern Suffolk Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

158. Accordingly, as alleged herein, Eastern Suffolk Chiropractic (and/or persons working on behalf of Eastern Suffolk Chiropractic, including but not limited to, Tubens) purposely caused Eastern Suffolk Chiropractic to seek No-Fault benefit payments from Allstate knowing that Eastern Suffolk Chiropractic was not lawfully eligible to seek or collect such payments.

**d. Front St. Chiropractic, P.C.**

159. Front St. Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 73 South Ocean Avenue, Patchogue, New York.

160. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Front St. Chiropractic.

161. As alleged herein, Front St. Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

162. Accordingly, as alleged herein, Front St. Chiropractic (and/or persons working on behalf of Front St. Chiropractic, including but not limited to, Tubens) purposely caused Front St. Chiropractic to seek No-Fault benefit payments from Allstate knowing that Front St. Chiropractic was not lawfully eligible to seek or collect such payments.

**e. Hempstead Regional Chiropractic, P.C.**

163. Hempstead Regional Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 500 Front Street, Hempstead, New York.

164. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Hempstead Regional Chiropractic.

165. As alleged herein, Hempstead Regional Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

166. Accordingly, as alleged herein, Hempstead Regional Chiropractic (and/or persons working on behalf of Hempstead Regional Chiropractic, including but not limited to, Tubens) purposely caused Hempstead Regional Chiropractic to seek No-Fault benefit payments from Allstate knowing that Hempstead Regional Chiropractic was not lawfully eligible to seek or collect such payments.

**f. Huntington Regional Chiropractic, P.C.**

167. Huntington Regional Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 15 Walt Whitman Road, Huntington Station, New York.

168. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Huntington Regional Chiropractic.

169. As alleged herein, Huntington Regional Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

170. Accordingly, as alleged herein, Huntington Regional Chiropractic (and/or persons working on behalf of Huntington Regional Chiropractic, including but not limited to, Tubens) purposely caused Huntington Regional Chiropractic to seek No-Fault benefit payments from Allstate knowing that Huntington Regional Chiropractic was not lawfully eligible to seek or collect such payments.

**g. Liberty Regional Chiropractic, P.C.**

171. Liberty Regional Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 17 Walt Whitman Road, Huntington Station, New York.

172. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Liberty Regional Chiropractic.

173. As alleged herein, Liberty Regional Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

174. Accordingly, as alleged herein, Liberty Regional Chiropractic (and/or persons working on behalf of Liberty Regional Chiropractic, including but not limited to, Tubens) purposely caused Liberty Regional Chiropractic to seek No-Fault benefit payments from Allstate knowing that Huntington Regional Chiropractic was not lawfully eligible to seek or collect such payments.

**h. Patchogue Regional Chiropractic, P.C.**

175. Patchogue Regional Chiropractic is organized as a chiropractor-owned professional medical corporation under New York law with a principal place of business located at 73 South Ocean Avenue, Patchogue, New York.

176. At all relevant times, Tubens has purported to be the sole shareholder, officer, and/or director of Patchogue Regional Chiropractic.

177. As alleged herein, Patchogue Regional Chiropractic furnished, or was caused to furnish, chiropractic treatment to patients, which was: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; and/or (c) provided for the sole purpose of maximizing the profits of the defendants rather than improving the condition of each patient.

178. Accordingly, as alleged herein, Patchogue Regional Chiropractic (and/or persons working on behalf of Patchogue Regional Chiropractic, including but not limited to, Tubens)

purposely caused Patchogue Regional Chiropractic to seek No-Fault benefit payments from Allstate knowing that Patchogue Regional Chiropractic was not lawfully eligible to seek or collect such payments.

**i. Pavilion Medical, P.C.**

179. Pavilion Medical is organized as a physician-owned professional medical corporation under New York law with a principal place of business located at 17 Walt Whitman Road, Suite 1, Huntington Station, New York.

180. At all relevant times, Mosomillo has falsely purported to be the sole officer, director, and shareholder of Pavilion Medical.

181. As set out below, Tubens and Melgar participated in the operation and management of the Pavilion Medical enterprise by exerting unlawful control over Mosomillo and Pavilion Medical, including Pavilion Medical's professional fees and profits.

182. As part of this scheme, Pavilion Medical was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Pavilion Medical was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar).

183. Because Pavilion Medical was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar), Pavilion Medical was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**j. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care**

184. Apazidis P.C. is organized as a physician-owned professional medical corporation under New York law with a principal place of business located at 200-01 Linden Boulevard, St. Albans, New York.

185. At all relevant times, Apazidis has falsely purported to be the sole officer, director, and shareholder of Apazidis P.C.

186. As set out below, Tubens and Melgar participated in the operation and management of the Apazidis P.C. enterprise by exerting unlawful control over Apazidis and Apazidis P.C., including Apazidis P.C.'s professional fees and profits.

187. As part of this scheme, Apazidis P.C. was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Apazidis P.C. was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar).

188. Because Apazidis P.C. was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar), Apazidis P.C. was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**k. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation**

189. Phoenix Medical Services is organized as a physician-owned professional medical corporation under New York law with a principal place of business located at 165 North Village Avenue, Suite 5, Rockville Centre, New York.

190. At all relevant times, Jones has falsely purported to be the sole officer, director, and shareholder of Phoenix Medical Services.

191. As set out below, Tubens and Melgar participated in the operation and management of the Phoenix Medical Services enterprise by exerting unlawful control over Jones and Phoenix Medical Services, including Phoenix Medical Services' professional fees and profits.

192. As part of this scheme, Phoenix Medical Services was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Phoenix Medical Services was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar).

193. Because Phoenix Medical Services was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar), Phoenix Medical Services was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### l. Deer Park Orthopedics, P.C.

194. Deer Park Orthopedics is organized under New York law as a professional service corporation.

195. Deer Park Orthopedics is organized as a physician-owned professional medical corporation under New York law with a principal place of business located at 21 Washington Avenue, Brentwood, New York.

196. At all relevant times, Seldes has falsely purported to be the sole officer, director, and shareholder of Deer Park Orthopedics.

197. As set out below, Tubens and Melgar participated in the operation and management of the Deer Park Orthopedics enterprise by exerting unlawful control over Seldes and Deer Park Orthopedics, including Deer Park Orthopedics' professional fees and profits.

198. As part of this scheme, Deer Park Orthopedics was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Deer Park Orthopedics was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar).

199. Because Deer Park Orthopedics was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar), Deer Park Orthopedics was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**m. Station Medical Services, P.C.**

200. Station Medical Services is organized as a physician-owned professional medical corporation under New York law with a principal place of business located at 15 Walt Whitman Road, Huntington Station, New York.

201. At all relevant times, Seldes has falsely purported to be the sole officer, director, and shareholder of Station Medical Services.

202. As set out below, Tubens and Melgar participated in the operation and management of the Station Medical Services enterprise by exerting unlawful control over Seldes and Station Medical Services, including Station Medical Services' professional fees and profits.

203. As part of this scheme, Station Medical Services was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Station Medical Services was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar).

204. Because Station Medical Services was unlawfully operated and controlled by one or more non-physician (i.e., Tubens and/or Melgar), Station Medical Services was operated in

direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**n. East Point Acupuncture, P.C.**

205. East Point Acupuncture is organized as an acupuncturist-owned professional medical corporation under New York law with a principal place of business located at 156-11 Aguilar Avenue, Apt 7M, Flushing, New York.

206. At all relevant times, Matatov has falsely purported to be the sole officer, director, and shareholder of East Point Acupuncture.

207. As set out below, Tubens and Melgar participated in the operation and management of the East Point Acupuncture enterprise by exerting unlawful control over Matatov and East Point Acupuncture, including East Point Acupuncture's professional fees and profits.

208. As part of this scheme, East Point Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though East Point Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar).

209. Because East Point Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar), East Point Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**o. DA Acupuncture, P.C.**

210. DA Acupuncture is organized as an acupuncturist-owned professional medical corporation under New York law with a principal place of business located at 1352 East 2nd Street, Brooklyn, New York.

211. At all relevant times, Abramchayeva has falsely purported to be the sole officer, director, and shareholder of DA Acupuncture.

212. As set out below, Tubens and Melgar participated in the operation and management of the DA Acupuncture enterprise by exerting unlawful control over Abramchayeva and DA Acupuncture, including DA Acupuncture's professional fees and profits.

213. As part of this scheme, DA Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though DA Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar).

214. Because DA Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar), DA Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**p. Ponce Acupuncture, P.C.**

215. Ponce Acupuncture is organized as an acupuncturist-owned professional medical corporation under New York law with a principal place of business located at 94-09 Jamaica Avenue, Queens, New York.

216. At all relevant times, Romero has falsely purported to be the sole officer, director, and shareholder of Ponce Acupuncture.

217. As set out below, Tubens and Melgar participated in the operation and management of the Ponce Acupuncture enterprise by exerting unlawful control over Romero and Ponce Acupuncture, including Ponce Acupuncture's professional fees and profits.

218. As part of this scheme, Ponce Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Ponce Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar).

219. Because Ponce Acupuncture was unlawfully operated and controlled by one or more individual that was not a licensed acupuncturist (i.e., Tubens and/or Melgar), Ponce Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

## III. JURISDICTION AND VENUE

220. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

221. Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

222. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) whereas one or more defendant resides in the Eastern District of New York and the majority of the defendants are residents of the State of New York.

223. Venue also is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

224. At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

225. The Defendants' activities and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

226. As the allegations and causes of action in the within Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV. APPLICABLE LAWS AND REGULATIONS

### A. NEW YORK NO-FAULT LAWS

227. Allstate underwrites motor vehicle insurance in the State of New York.

228. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

229. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, the "No-Fault Laws"), motor vehicle insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

230. Under New York No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

231. "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. *See* N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

232. These necessary expenses include physical therapy that is rendered pursuant to a referral from a physician. *See* N.Y. INS. LAW § 5102(a)(1).

233. The No-Fault benefits include up to $50,000.00 per claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

234. A claimant may assign his or her No-Fault benefits to third parties, such as healthcare service providers.

235. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

236. Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

237. The NF-3 and CMS-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. *See* 11 N.Y.C.R.R. § 65-3.-11(a); N.Y. INS. LAW § 403(d).

238. Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

239. It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

### B. New York Education Law

240. New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. Educ. Law § 6522.

241. Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

242. Pursuant to New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

243. Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

244. The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

245. New York law prohibits anyone from engaging in the practice of physical therapy unless they are licensed to practice physical therapy. *See* N.Y. EDUC. LAW §§ 6731-6732.

246. The practice of physical therapy includes rendering treatment pursuant to a referral from "a licensed physician, dentist, podiatrist, nurse practitioner or licensed midwife" who is acting within their own lawful scope of practice and in accordance with their own diagnosis. *See* N.Y. EDUC. LAW § 6731(c).

247. New York law prohibits anyone from engaging in the practice of chiropractic treatment unless they are licensed to practice as a chiropractor. *See* N.Y. EDUC. LAW §§ 6551-6552.

248. New York law prohibits anyone from engaging in the practice of acupuncture unless they are licensed or authorized to practice acupuncture. *See* N.Y. EDUC. LAW §§ 8211-8212.

249. Additionally, physical therapists and chiropractors are generally prohibited from dividing or sharing professional fees with non-licensees. *See* N.Y. EDUC. LAW § 6509-a.

### C. NEW YORK BUSINESS CORPORATION LAW

250. In New York, professional service corporations are governed by §§ 1501-1516 of the Business Corporation Law.

251. Under Business Corporation Law § 1504, professional service corporations cannot render professional services except through individuals authorized by law to render such professional services.

252. Moreover, under Business Corporation Law § 1507, a professional service corporation cannot issue shares to individuals unless they are "engaged in the practice of such profession in such [a] corporation." It also prohibits each shareholder(s) from entering into any

agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service corporation is authorized to practice.

253. Pursuant to Business Corporation Law § 1508, each director or officer of a professional service corporation must be authorized by law to practice in New York the profession that such corporation is authorized to practice.

254. Taken together, the restrictions set forth under the No-Fault Laws, the Education Law, and the Business Corporation Law are designed to ensure that professional service entities are operated and controlled by individuals that are authorized to practice in the professional discipline(s) offered by the entity.

255. New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet ***any*** applicable New York State or local licensing requirements necessary to perform such service in New York." 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

256. In *State Farm Mut. Auto. Ins. Co. v. Mallela*, the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (N.Y. 2005).

257. As such, a professional service corporation is lawfully eligible to seek or receive No-Fault benefit payments if the entity, or any of its members, fails to meet any applicable licensing requirement necessary to perform a service. 11 N.Y.C.R.R. § 65-3.16(a)(12).

258. Under prevailing law, an insurer may maintain a cause of action to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)) to healthcare providers that are organized, operated, and/or controlled in violation of New York law. *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006).

## D. APPLICABLE NEW YORK LAW PROHIBITING CERTAIN REFERRAL ARRANGEMENTS

259. A practitioner who is authorized to order "clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services" is prohibited from making a referral for such services to a healthcare provider who is authorized to provide such services where the practitioner or immediate family member of said practitioner has a financial relationship with the healthcare provider. *See* N.Y. PUB. HEALTH LAW § 238-a(1)(a).

260. A financial relationship is defined as an ownership interest, investment interest or compensation arrangement. *See* N.Y. PUB. HEALTH LAW § 238(3).

261. A compensation arrangement includes "any arrangement involving any remuneration between a practitioner, or immediate family member, and a healthcare provider. The term remuneration includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *See* N.Y. PUB. HEALTH LAW § 238-a(5)(a).

262. Pursuant to Section 238-a(1)(b) of the New York Public Health Law, neither a healthcare provider nor a referring practitioner may present a claim, bill or any other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical

therapy services or x-ray or imaging services when furnished pursuant to a prohibited referral arrangement.

263. Any such claims, bills or other demands made in connection with an illegal referral arrangement that results in payment to the referring practitioner or healthcare provider shall result in the referring practitioner and healthcare provider being jointly and severally liable for any amount collected. *See* N.Y. PUB. HEALTH LAW § 238-a(7).

264. With respect to referrals not prohibited under Section 238-a, a practitioner may not make a referral to a healthcare provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has a financial relationship with the healthcare provider (i.e., ownership or investment interest or a compensation arrangement that is in excess of fair market value or that providers for compensation that varies directly or indirectly based on the volume or value of any referrals of business between the parties) without disclosing the financial relationship to the patient, which disclosure must provide notice of the financial relationship as well as inform the patient of his or her right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonable available. *See* N.Y. PUB. HEALTH LAW § 238-d(1)-(2).

265. Additionally, New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

266. Likewise, under Rule 29.1(b)(3) of the Board of Regents, applicable to "the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law"—which includes physical therapy, chiropractic, and acupuncture—practitioners are prohibited from

"directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 11 N.Y.C.R.R. § 29.1(b)(3).

267. Accordingly, New York law prohibits any licensed physician, physical therapist, chiropractor, or acupuncturist from giving and/or receiving payment to and/or from another licensee or third party in exchange for the referral of a patient.

### E. GUIDELINES FOR CHIROPRACTORS IN A MULTIDISCIPLINARY PRACTICE

268. In 2012, the New York Office of the Professions published a "Practice Alert" entitled "Multidisciplinary Practices," which provides guidance to chiropractors working in a multidisciplinary setting alongside a physician. *See* Exhibit 1.

269. According to the Office of the Professions, chiropractors should not employ individuals licensed to practice medicine, nor should they service as the "controlling entity in a practice with licensees in medicine or any other profession authorized to perform procedures beyond the scope of [the] chiropractic license, which includes physical therapy" and other healthcare disciplines.

270. Chiropractors are also advised against "making direct referrals to physical therapists since [physical therapists] are authorized to practice only on referrals from physicians, dentists, podiatrists or nurse practitioners." Instead, chiropractors are encouraged to help their patients locate a physician who can lawfully make the referral.

271. Further, chiropractors are prohibited from working for physicians as consultants—as such an arrangement is deemed fee splitting.

272. The Office of the Professions also advises chiropractors that they can neither "direct patient care" nor assume "complete control" over patients in a medical practice, as doing so would go beyond the scope of the practice of chiropractic.

273. As detailed below, the Defendants violated one or more of these New York statutes and regulations cited above through the operation and management of Melgar PT, Eastern Suffolk Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Patchogue Regional Chiropractic, Front St. Chiropractic, Brentwood Regional Chiropractic, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture.

## V. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. GENERAL OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD

274. The Defendants knowingly and intentionally schemed to defraud insurers through the submission of false and fraudulent No-Fault claims.

275. Allstate was and is one of the No-Fault insurance providers victimized by this scheme.

276. New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of professional healthcare services, and is also designed to require prompt payment of patient claims.

277. As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

278. As it applies to professional healthcare services providers in the State of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance

Law § 5102 if they fail to meet **<u>any</u>** New York state or local licensing requirement necessary to perform such services in New York.

279. Melgar and Tubens were well aware of these conditions of reimbursement when they decided to take advantage of New York's No-Fault system and defraud Allstate by creating and controlling multiple entities that provided physical therapy, chiropractic, pain management, and acupuncture services to patients.

280. At all times relevant to this action, Melgar and Tubens conspired to recruit the Healthcare Provider Defendants, cause the fraudulent incorporation of the PC Defendants, and then control the operation and management of the professional medical corporations.

281. By controlling both the Healthcare Provider Defendants and the PC Defendants, Melgar and Tubens were able to dictate and coordinate the treatment, tests, and services rendered through the PC Defendants as a means to maximize the excessive and medically unnecessary treatments provided to Allstate claimants—and billed to Allstate—through each of the multi-disciplinary healthcare facilities operated and controlled by Melgar and Tubens.

282. Throughout the course of this scheme, the Defendants have taken advantage of Allstate by demanding and collecting No-Fault benefit payments in connection with (a) tests, treatments, and services that were not medically necessary, (b) tests, treatments, and services that were excessive, (c) tests, treatments, and services that were rendered pursuant to a pre-determined protocol designed to enrich the provider, and (d) tests, treatments, and services that were not provided in the manner represented in the bills submitted to Allstate.

283. Such conduct is not only prohibited under New York law, but it was also dangerous to the patients who were subjected to these clinically unwarranted and unneeded tests, treatments, and services.

284. As alleged herein, because the Defendants caused Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture to operate in violation of New York law throughout the relevant period, Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture are not—and never were—eligible to seek or collect No-Fault benefits from Allstate under New York's No-Fault laws.

285. The Defendants knowingly and purposely extracted No-Fault benefit payments from Allstate by (a) misrepresenting the conditions and diagnoses of their patients, (b) providing unnecessary tests, treatments, and services based on these misrepresented conditions and diagnoses, and (c) misrepresented the nature and extent of certain tests and treatments.

286. The defendants knew (or should have known) that this conduct was improper, yet they persisted in submitting No-Fault benefit claims to Allstate seeking payment in connection with claimants who were treated by the Defendants (or those persons working under their direction or control) in the manner described herein.

### B. FRAUDULENT OPERATION, MANAGEMENT, AND CONTROL OF THE PC DEFENDANTS

#### 1. Melgar's and Tubens' Business Partnership and Creation of a Network of Multi-Disciplinary Healthcare Facilities

287. Before joining forces to create a network of multi-disciplinary healthcare facilities through which to provide excessive and medically unnecessary treatment across a variety of specialties, Melgar and Tubens each independently operated their respective physical therapy and chiropractic businesses.

288. As business partners, however, Melgar and Tubens would be able to reap profits from the provision of these treatments and services that Melgar and Tubens could not realize on their own through their discrete practices.

289. Therefore, as explained in further detail below, over the course of their scheme, Melgar and Tubens created a network of at least five (5) multi-disciplinary healthcare facilities at various locations (collectively referred to as the "Melgar and Tubens Healthcare Facilities"),which were deliberately designed to tap into pools of patients in different geographic areas.

290. Melgar and Tubens installed a variety of providers at each of these locations and ensured that patients were provided with a battery of medically unnecessary and excessive treatments, tests, and services across a variety of disciplines alongside Melgar's and Tubens' own professional healthcare service corporations.

291. By using a variety of locations and healthcare providers through which to profit from false and fraudulent healthcare treatments, Melgar and Tubens were able to conceal the full scope of their scheme to defraud.

292. In order to maximize the number of patients that could be treated at each of the five (5) multi-disciplinary healthcare facilities, Melgar and Tubens utilized a number of referral

sources, including personal injury attorneys, a "Director of Client Relations" at a regional law firm, tow truck operators, repair shops, and motor vehicle accident "investigators" who steered patients to these facilities.

293. Notably, the "Director of Client Relations" was previously linked to a separate No-Fault insurance scheme to defraud, in which patients were referred for medical treatment in return for payments for purported "public relations" services.

294. In numerous cases, Allstate claimants testified under oath that their attorneys not only directly referred them for treatment with Melgar and/or Tubens but also provided transportation, and in some cases, scheduled the appointments on their client's behalf.

295. Several Allstate claimants testified that they were provided with transportation to the multi-disciplinary healthcare facility by an employee of Melgar, who utilized his personal motor vehicle rather than a company car or professional taxi/ride-share service.

296. In certain instances, Allstate claimants testified that this employee provided additional transportation to Examinations Under Oath that were conducted by Allstate's counsel.

297. The provision of transportation to and from an Examination Under Oath is not only highly irregular but demonstrates at the very least an attempt to influence the claimants' testimony.

298. Recently, Melgar and Tubens have sought to further expand the scope of their business partnership beyond their multi-disciplinary healthcare facilities to an Article 28 diagnostic and treatment center.

299. Melgar and Tubens are both members and managers of Sunrise Med Plus, LLC ("Sunrise Med Plus"), which submitted a Certificate of Need Application to the New York State Department of Health seeking approval to establish and construct an Article 28 facility.

300. In the materials submitted by Melgar and Tubens in support of their Certificate of Need Application, each described their responsibilities at the multi-disciplinary healthcare facilities.

301. Melgar boasts that he has been "running" Melgar PT for thirteen years, and under his leadership, Melgar PT "expanded to 4 locations" and "has been profitable every single year and growing exponentially."

302. A true and accurate image from the New York State Department of Health Certificate of Need Application, Schedule 2A for Sunrise Med Plus is depicted below:

**b. Affirmative Statement of Qualifications** succeed

For individuals who have not previously served as a director/officer nor have had managerial experience with a health facility/agency, please provide in the space below an affirmative statement explaining why you are qualified to operate the proposed facility/agency. This statement should include, but not be limited to, any relevant community/volunteer background and experience.

I stablished and have been running my own Personal Corporation, Hector Melgar PT PC, for the last 13 years. I have developed and polished great managerial skills that has let to great success.
My PC has expanded to 4 locations.
Under my leadership as CEO and CFO, the PC has been profitable every single year and growing exponentially.
Patient acquisition continues to grow organically.
Community relationship is stronger than ever.
I know how to stablish and enforce policies and procedures.
Team building has been my forte, and compliance has been my business foundation.

The great success that the PC currently enjoys, is a testament that I have the managerial skills to run and succeed with an article 28 facility.

303. According to Melgar, he has been responsible, since the "inception" of Melgar PT, for the "[e]stablishment and maintenance of all clinical policies and procedures" and "[m]anagement of clinical and clerical daily operations."

304. Melgar also underscored his significant role in controlling nearly every aspect of the operation and management of Melgar PT by representing that he serves as Melgar PT's Chief Chief Financial Officer, as well as its "[c]linical director of all therapeutic processes and

procedures," "[l]iason for branding, marketing, and growth-development in the community," and "[d]irector of billing and collections departments."

305. A true and accurate image from the New York State Department of Health Certificate of Need Application, Schedule 2A for Sunrise Med Plus is depicted below:

**New York State Department of Health**
**Certificate of Need Application** **Schedule 2A**

| | | |
|---|---|---|
| BRENTWOOD | NY | 11717 |
| POSITION/RESPONSIBILITIES AND HOW IT CONTRIBUTES TO COMPETENCY | | |

I am the founder and president of Hector Melgar PT PC
From its inception, I have been responsible for:

- Establishment and maintenance of all clinical policies and procedures.
- Clinical director of all therapeutic processes and procedures.
- Management of clinical and clerical daily operations.
- Liaison for branding, marketing, and growth-development in the community.
- Director of billing and collections departments.
- Director of philanthropic activities in the community.
- Chief financial officer.

306. According to Tubens, he has "owned and operated 6 multi disciplinary practices" since 1996 even though, as a chiropractor, Tubens cannot employ or supervise individuals licensed to practice medicine or serve as the "controlling entity in a practice with licensees in medicine or any other profession authorized to perform procedures beyond the scope of [the] chiropractic license, which includes physical therapy" and other healthcare disciplines. *See* Exhibit 1.

307. Tubens further represents that his duties at these multi-disciplinary practices "have included facility operations, employee scheduling, compliance, and billing," as well as "oversee[ing] the day to day operations of both professional and nonprofessional staff" even

though, as a chiropractor, Tubens is prohibited under New York law from supervising any non-chiropractor. *See id.*

308. A true and accurate image from the New York State Department of Health Certificate of Need Application, Schedule 2A for Sunrise Med Plus is depicted below:

I have been in private practice since 1996. I have owned and operated 6 multi disciplinary practices since then.
My duties have included facility operations, employee scheduling, compliance, and billing.
I have overseen the day to day operations of both professional and non professional staff.

**a. The Washington Avenue Facility**

309. One of the first locations introduced by Melgar into this scheme was 21 Washington Avenue, Brentwood, New York (hereinafter, the "Washington Avenue Facility").

310. The Washington Avenue Facility has served as the hub of the Defendants' scheme to defraud Allstate throughout the relevant period.

311. Indeed, the Washington Avenue Facility sits at the geographic center of the network of clinics with four spokes emanating from this nucleus to the other clinics comprising the network.

312. Melgar, along with his wife, purchased the property located at the Washington Avenue Facility in or about 2008.

313. Melgar has set about building the Washington Avenue Facility into a multi-disciplinary healthcare facility that he could operate and control as a means to capture No-Fault benefit payments across several different disciplines, including professional physician services, acupuncture, and chiropractic.

314. As evidenced by the Brentwood Physical Rehabilitation Facebook page, the Washington Avenue Facility "provides quality – personalized multi-discipline health services for a wide variety of musculoskeletal and neurological conditions."

315. Although the Washington Avenue Facility purports to offer "multi-discipline health services,", each of the Healthcare Provider Defendants were provided with limited office space, as the Washington Avenue Facility has only 1,313 square feet of designated "Patient Care Area" outside of the 897 square feet of office space allotted for physical therapy treatment.

316. In or about December 2014, Melgar recruited Matatov to provide professional acupuncture services through East Point Acupuncture at the Washington Avenue Facility.

317. Melgar and Diosalma Melgar entered into a "Facilities Use and Rent Agreement" with Matatov on behalf of East Point Acupuncture on or about December 1, 2014 for East Point Acupuncture's exclusive use of 200 square feet and shared use of 150 square feet of the medical office space located at 21 Washington Avenue in exchange for $1,000.00 per month in rent, which amount included $312.50 for "administrative services" to be provided by Melgar (i.e., reception and translation services and paper and general office supplies).

318. Matatov rendered acupuncture services to patients who also were receiving simultaneous physical therapy treatment through Melgar PT, chiropractic treatment through Eastern Suffolk Chiropractic, and therapeutic treatment with David Dynof, M.D. ("Dynof") through DRD Medical, P.C. ("DRD Medical") at the Washington Avenue Facility.

319. Subsequently, Melgar and Tubens recruited Romero in or about June 2017 to begin providing acupuncture services to patients at the Washington Avenue Facility through Ponce Acupuncture in East Point Acupuncture's place.

320. Melgar and Diosalma Melgar also entered into a "Facilities Use and Rent Agreement" with Tubens, through Island Regional Management, on behalf of Eastern Suffolk Chiropractic on or about February 1, 2017 for Eastern Suffolk Chiropractic's "assigned" use of

224 square feet and shared use of 160 square feet of the medical office space located at the Washington Avenue Facility in exchange for $800.00 per month in rent.

321. This agreement between Melgar and Tubens was purposely used to create the false impression that Melgar and Tubens maintained an arm's-length relationship, when, in reality, Melgar and Tubens both exerted control over the operation and management of the multi-disciplinary healthcare facility located the Washington Avenue Facility.

322. Melgar and Tubens also required physicians to treat the patients at the Washington Avenue Facility to provide necessary physical therapy referrals and to provide justification for continued, medically unnecessary treatments and services rendered through this multi-disciplinary healthcare facility.

323. In or about November 2015, Melgar and Tubens recruited Tyorkin to treat patients at 21 Washington Avenue one or two days per week.

324. Melgar caused Tyorkin to enter into a "Facilities Use and Rent Agreement" on or about November 1, 2015 on behalf of "Maximum Orthopedics PC" (even though no such professional corporation has ever been established in New York) for exclusive use of 150 square feet and shared use of 150 square feet of the medical office space located at 21 Washington Avenue in exchange for $2,000.00 per month in rent, which amount included $1,375.00 in "administrative services" to be provided by Melgar (i.e., secretarial, reception, clerical, and translation services, paper and general office supplies, and use of photocopier, fax machine, and internet).

325. Tyorkin began treating patients at the Washington Avenue Facility approximately one day per week in or about the first week of November 2015.

326. The reports of patient examinations and consultations purportedly authored by Tyorkin for patients treated by him at the Washington Avenue Facility bear the letterhead of "Maximum Orthopaedics and Sports Medicine."

327. The website www.drmaximtyorkin.com also holds Tyorkin out to the public as practicing under "Maximum Orthopaedics and Sports Medicine."

328. Tyorkin also publicly represents himself as the "founder/owner" of Maximum Orthopaedics and Sports Medicine.

329. Many of Tyorkin's initial consultation reports state that his consultation with the particular patient was "requested by Dr. Melgar."

330. Indeed, Tyorkin routinely recommended "continued therapy" for the majority, if not all, of his patients, which therapy was performed by Melgar PT.

331. Another physician, Apazidis, also was recruited by Melgar and Tubens to treat patients at 21 Washington Avenue during the relevant period.

332. According to Apazidis, he rented space at 21 Washington Avenue beginning in approximately September 2015.

333. As of approximately February 1, 2017, Apazidis P.C. represented in an employment agreement with Apazidis' physician assistant that its principal place of business was 21 Washington Avenue, Brentwood, New York.

334. As explained in further detail below, Apazidis and Melgar shared a mutually beneficial relationship whereby Melgar would supply Apazidis with patients who Apazidis would in turn refer for medically unnecessary diagnostic testing to be performed by Melgar. Melgar performed this testing in a manner that was below the standard of care and the results of this testing,

were, in many instances, useless, and not actually used in any meaningful way by any provider in creating or modifying the patients' treatment plans.

335. Apazidis and Tyorkin treated patients, including some of the same patients, at the Washington Avenue Facility for a number of months over 2016 to 2017 until yet another physician, Mosomillo, purportedly began treating patients at this location through Pavilion Medical.

336. As advertised through his LinkedIn profile, Mosomillo, who was retiring, was in the market for an arrangement whereby he could serve as a "behind the scenes, silent partner…in a medical corporation."

337. According to Mosomillo, he was "[n]ot interested in the daily billing, running, authorizations, hiring and firing, patients' consults, direct medical care, testing, peer reviews etc."

Experience

**Physician**
DAC Medical PC
September 2000 – Present • 18 years 5 months

Retiring licensed New York State Physician, Doctor of Osteopathic Medicine. Timothy Mosomillo D.O.

Retiring licensed New York State medical doctor (Doctor of Osteopathic Medicine), with active medical license, looking for a business opportunity to be a, behind the scenes, silent partner, in a medical corporation or other entrepreneur business endeavor.

Not interested in the daily billing, running, authorizations, hiring and firing, patients' consults, direct medical care, testing, peer reviews etc.

https://www.linkedin.com/in/timothy-mosomillo-d-o-aba1a6125

338. Therefore, the arrangement in place with the various PC Defendants, including the clinic at 21 Washington Avenue, presented such a business opportunity for Mosomillo to cede all

major responsibilities in the operation and management of a professional medical corporation to Melgar and Tubens, while Mosomillo could offer his "active medical license" and serve as a figurehead of Pavilion Medical.

339. As part of this arrangement, Mosomillo also referred patients to Melgar for medically unnecessary electrodiagnostic testing and physical therapy treatment during the relevant period.

340. Several months later, a fourth physician, Jones, joined the ranks of providers purportedly treating patients from at the Washington Avenue Facility.

341. Jones, through Phoenix Medical Services, entered into a "Facilities Use and Rent Agreement" with Melgar and Diosalma Melgar on or about July 1, 2017 for the use of 116 square feet of the medical office space located at the Washington Avenue Facility for up to two days per week in exchange for rent in the amount of $2,256.00 per month.

342. Jones also referred patients for electrodiagnostic testing and further physical therapy with Melgar PT during the relevant period.

343. Jones, Apazidis, Tyorkin, and Mosomillo all treated patients, and in some instances, the same patients, at the Washington Avenue Facility during the relevant period.

344. In or about June 2017, Melgar caused Alvarez to incorporate G&A Office Management in the State of New York for the purpose of subleasing portions of medical office space located at the Washington Avenue Facility to chiropractic, acupuncture, orthopedic, and pain management providers.

345. Indeed, in or about November 2017, Alvarez purportedly engaged the services of an accounting firm to calculate the fair market value of the monthly rental cost for leases of

portions of office space located at the Washington Avenue Facility between G&A Office Management and certain healthcare providers.

346. The fair market value report for the lease of certain medical office space located at 21 Washington Avenue dated December 5, 2017 describes a lease of office space not used by Melgar at 21 Washington Avenue to the sublessor, G&A Office Management.

347. This fair market value reports calculates the estimated amounts for G&A Office Management to charge a chiropractic provider, an acupuncture provider, an orthopedic provider, and a pain management provider per month for the use of certain medical office space at the Washington Avenue Facility.

348. However, in January 2018, Melgar himself—and not Alvarez or G&A Office Management—was still acting as "landlord" with respect to at least one PC Defendant, Phoenix Medical Services, as to the lease of medical office space at the Washington Avenue Facility, despite G&A Office Management purportedly subleasing the space at this location and independently commissioning a fair market value report regarding such subleases.

349. Indeed, the "Facilities Use and Rent Agreement" between Melgar and Diosalma Melgar and Jones on behalf of Phoenix Medical Services dated July 1, 2017 provides that "Landlord [i.e., Melgar and Diosalma Melgar] is in the process of getting a fair market analysis," and thus desired to wait until the report was issued "to determine the proper amount of rent."

350. Therefore, it is clear that G&A Office Management merely was a sham entity used to facilitate and conceal Melgar's continued control over the operation and management of the PC Defendants at 21 Washington Avenue during the relevant period.

**b. The South Ocean Avenue Facility**

351. Meanwhile, Patchogue Regional Chiropractic, owned by Tubens, was operating from 73 South Ocean Avenue, Patchogue, New York (hereinafter, the "South Ocean Avenue Facility") since at least 2013.

352. In or about 2017, Melgar PT joined Patchogue Regional Chiropractic at the South Ocean Avenue Facility and began providing physical therapy to patients at this location.

353. In or about 2018, Tubens replaced Patchogue Regional Chiropractic with another of his professional medical corporations, Front St. Chiropractic.

354. In furtherance of this scheme, Tubens and Melgar recruited the licensed physicians Apazidis and Ehrlich to provide professional medical services to one or more patient at the South Ocean Avenue Facility.

355. Akin to the Washington Avenue Facility, these physicians were purposely recruited to provide referrals for physical therapy and medical justification for the ongoing chiropractic treatment that was being rendered at this location during the relevant period.

**c. The Walt Whitman Road Facility**

356. Melgar PT also began operating from another location at 15 Walt Whitman Road, Huntington Station, New York (hereinafter, the "Walt Whitman Road Facility") alongside another Tubens chiropractic entity, Huntington Regional Chiropractic.

357. Melgar PT subleased the office space at the Walt Whitman Road Facility from Island Regional Management, which location Melgar and Tubens used to unlawfully profit from the provision of professional acupuncture and physicians services as well.

358. On or about September 1, 2016, Melgar, on behalf of Melgar PT, entered into a "Commercial Sublease Agreement" with Tubens, on behalf of Island Regional Management, for

the use of a portion of the premises located at the Walt Whitman Road Facility in exchange for rent in the amount of $2,000.00 per month (which amount was later decreased by addendum to the agreement to $1,780.00 per month beginning in April of 2017).

359. This agreement was purposely used by Melgar and Tubens to create the false impression that Melgar and Tubens were parties to an arm's length relationship, when, in truth, they were working together to execute a scheme to defraud through the operation of several multi-disciplinary healthcare facilities, including the clinic at the Walt Whitman Road Facility.

360. Melgar PT seamlessly continued to provide physical therapy treatment at the Walt Whitman Road facility by employing the same physical therapist that had previously provided physical therapy treatment at this location through a separate professional medical corporation.

361. In an effort to maximize the fraudulent billing that was submitted for each patient, Melgar and Tubens recruited Apazidis to begin providing professional medical services at this location. Accordingly, Apazidis began providing professional medical services at the Walt Whitman Road Facility through Apazidis P.C. in or about September 2016.

362. Like Melgar PT, Apazidis employed a physician that had previously provided professional medical services at this location through a separate professional medical corporation to render treatment to patients of Apazidis P.C.

363. Several months later, in or about January 2017, Melgar and Tubens recruited Abramchayeva to provide acupuncture services to patients of the Walt Whitman Road Facility through DA Acupuncture in addition to the physical therapy, chiropractic, and orthopedic treatments already being provided to patients treating at this location.

364. Melgar and Tubens also recruited Mosomillo, Seldes, Jones, and Ehrlich to treat one or more patient from the Walt Whitman Road Facility during the relevant period.

365. In or about April 2018, Melgar and Tubens caused Alvarez, through G&A Office Management, to purport to obtain from an accounting firm a calculation of the fair market value of the monthly rental cost for lease between G&A Office Management and certain healthcare providers for the use of office space at the Walt Whitman Road Facility.

366. As evidenced by the April 26, 2018 fair market value report, G&A Office Management is identified as the "lessor" of the office space located at the Walt Whitman Road Facility.

367. However, as with the fair market value report obtained by G&A Office Management regarding the lease of office space located at the Washington Avenue Facility, discussed *supra*, G&A Office Management was caused to obtain this calculation merely as a means to conceal Melgar's and Tubens' continued control over the operation and management of certain healthcare providers operating from the Walt Whitman Road Facility during the relevant period.

**d. The Brentwood Road Facility**

368. Melgar PT entered into a sham sublease agreement for office space at 1801 Brentwood Road, Brentwood, New York from Island Regional Management during the relevant period, which property abuts office space used by Tubens entity Brentwood Regional Chiropractic at 1799 Brentwood Road, Brentwood, New York.

369. The multi-disciplinary healthcare facility located at 1799-1801 Brentwood Road, Brentwood, New York (hereinafter, the "Brentwood Road Facility") is less than half a mile straight down the road from the hub of the network of multi-disciplinary healthcare facilities at the Washington Avenue Facility, thus serving as an extension of the epicenter of this scheme as Melgar and Tubens' operations expanded.

370. On or about December 1, 2016, Island Regional Management and Melgar PT entered into a "Facilities Use and License Agreement" for the sublease of a portion of the medical office space located at 1801 Brentwood Road "for the purpose of conducting [Melgar PT's] independent Physical Therapy Services and clinical electrophysiology business at such location" in exchange for a licensing fee of $2,441.00 per month, which amount was increased by addendum to the agreement in September 2017 to $3,045.00 purportedly due to an increase in common area maintenance charges.

371. The sham sublease agreement that Melgar PT entered into with Island Regional Management for the use of the office space located at the Brentwood Road Facility was purposely designed to allow Melgar and Tubens to manage and control another multi-disciplinary healthcare facility at this location, as Tubens was already operating his professional medical corporation, Brentwood Regional Chiropractic, at the abutting property located at 1799 Brentwood Road, Brentwood, New York.

372. The Brentwood Road Facility is located less than one half mile directly down the street from the hub of the defendants' scheme, the Washington Avenue Facility.

373. The Brentwood Road Facility was thus utilized as an extension of the epicenter of this scheme, which allowed Melgar and Tubens to further expand their operation and the number of patients they were able to treat.

374. Melgar and Tubens recruited Apazidis, Mosomillo, Seldes, and Jones to provide professional physician services at the Brentwood Road Facility during the relevant period.

375. In or about April 2017, Melgar and Tubens also recruited Romero to provide acupuncture services at the Brentwood Road Facility during the relevant period.

**e. The Front Street Facility**

376. In furtherance of this scheme, Melgar PT expanded its operation to an additional location that was not only leased by Island Regional Management but was also the operating location of Tubens' professional medical corporations, Hempstead Regional Chiropractic and Liberty Regional Chiropractic during the relevant period.

377. On or about September 1, 2016, Island Regional Management and Melgar PT entered into a "Facilities Use and License Agreement" for Melgar PT's use of a portion of medical office space at 500 Front Street, Hempstead, New York (hereinafter, the "500 Front Street Facility") "for the purpose of conducting [Melgar PT's] independent Physical Therapy Services business at such location" in exchange for rent in the amount of $2,542.15 per month, which amount was to increase by 7.3% in April 2017, by 20.52% in the second year, and by 5% each year thereafter and certain additional amounts for "ground-keeping fees."

378. The agreement also provided that Island Regional Management was to pay "for the custom build-out cost for the physical therapy suite totaling $8,316," but Melgar PT was to reimburse Island Regional Management for this amount within six months.

379. On its face, this agreement was purposely designed to create the false impression that Melgar PT and Island Regional Management were parties to an arm's length relationship, when in reality, the Facilities Use and License Agreement was utilized only as a means to conceal Melgar's and Tubens' partnership and their unlawful operation and control over the Front Street Facility.

380. To further their scheme, Melgar and Tubens recruited Apazidis to provide professional medical services to patients of the Front Street Facility during the relevant period.

## C. Fraudulent Provision of Healthcare Treatments, Tests, and Services

381. The success of the Defendants' scheme to defraud Allstate depended on their ability to submit numerous requests for No-Fault reimbursement for treatments, tests, and services purportedly rendered to patients.

382. Melgar and Tubens intentionally designed this scheme to revolve around so-called multi-disciplinary healthcare facilities to ensure that patients were subjected to numerous treatments for prolonged periods regardless of whether the patients needed—or even wanted—these services.

383. As such, the PC Defendants were not entitled to No-Fault reimbursement for these treatments tests, and services because they were excessive, medically unnecessary, and rendered pursuant to a pre-determined protocol for the primary purpose of collecting payments from Allstate.

384. The documents and invoices created and submitted to Allstate by (or on behalf of) the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

385. In several instances, these documents and invoices misrepresented the identity of the treating physician as Melgar, when in reality numerous Allstate claimants testified under oath that Melgar did not in fact render the billed-for services and/or that they were not familiar with this individual.

386. As alleged herein, not only has this scheme injured Allstate, but the Defendants' purposeful provision of excessive and clinically unwarranted care also compromised and/or endangered the well-being of the patients that were subjected to these grossly unnecessary treatments, tests, and services.

387. Because of the misconduct described below, none of Melgar PT's, the Tubens PCs', and the PC Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

### 1. Fraudulent Electrodiagnostic Testing

388. Melgar, Apazidis, Seldes, and Jones intentionally include electrodiagnostic ("EDX") testing as a central component of the battery of tests and treatments to patients of the Melgar and Tubens Healthcare Facilities.

389. However, as explained below, Melgar and/or Apazidis fraudulently provided—and billed for—this unnecessary, excessive, and fraudulently performed EDX testing through Melgar PT and Apazidis P.C.

390. Since in or about 2014, Melgar has been a "partner" of a business called "Hands On Diagnostics" or "HODS," which was founded by a physical therapist who performed EDX testing for Allstate claimants during the relevant period through Melgar PT.

391. Apazidis—who refers many of his patients for EDX testing that is ultimately performed by Melgar through Melgar PT or Apazidis P.C.—is identified as a member of the "HODS Faculty & Medical Advisory Board."

392. HODS advertises to its clients "higher insurance reimbursement rates" through billing for diagnostic CPT codes that "can dramatically increase cash flow."

393. Current Proecural Terminology ("CPT") codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors. Providers subject to the Health Insurance Portability and Accountability Act are required to use CPT codes when submitting bills.

394. HODS purports to also offer better patient outcomes as a consequence of the EDX testing performed by physical therapists and to "help the referring physicians develop proper patient diagnoses that lead to effective patient management."

395. However, as explained below, in addition to being excessively used and medically unnecessary in the first instance, Melgar's EDX testing results and interpretations were conducted below the standard of care and contain a multitude of inaccuracies and misrepresentations that actually served to hinder his patients' treatment and progress and were not actually used by the referring physicians to develop proper patient diagnoses.

396. Therefore, the EDX testing performed by Melgar was solely incentivized by the possibility of receiving increased insurance payments from No-Fault insurers such as Allstate, rather than the provision of any therapeutic or clinical benefit to patients.

397. Indeed, HODS holds out Melgar as an exemplar of how a physical therapist can increase revenue through incorporating EDX testing into their practice. HODS' website proclaims in a blog post dated December 17, 2017 that, "A franchise partner in NY, Hector Melgar, generated $137k in revenue in 9 months."

398. In a video uploaded by HODS to YouTube.com on October 15, 2015, Melgar discusses his receipt of the HODS "Practice of the Year" award and proclaims that he "made $137,000" in his first year.

399. In another video uploaded by HODS to YouTube.com on October 15, 2015 titled "HODS Business Opportunity, Interview Hector Melgar Reimbursements," Melgar appears in a "HODS Clinician Spotlight" in which he praises HODS as "giving [him] the tools that…can bring more money to my clinic."

400. Indeed, Melgar PT and Apazidis P.C. billed between $1,000 and $2,000 for each instance of EDX testing purportedly performed by Melgar (or someone acting under his direction or control) during the relevant period.

401. To permit him to perform—and bill for—this EDX testing, Melgar caused licensed physicians, including Apazidis, Mosomillo, and Jones, to refer patients to Melgar PT or Apazidis P.C. to undergo EDX testing at a clinic in the Melgar and Tubens Healthcare Facilities, purportedly to rule out "radiculopathic process vs. plexopathic process" or "plexopathic process vs. peripheral nerve neuropathy."

402. In all instances, Melgar (or someone acting under his direction and control) performed and interpreted the EDX testing for these patients purportedly referred by a licensed physician, including Apazidis, Mosomillo, and Jones, as illustrated in the examples contained in the chart below:

| Claimant Initials | Claim No. | Referring Provider | Date of EDX Testing | Entity Billing for Testing | Provider Performing EDX Testing | Clinic Location |
|---|---|---|---|---|---|---|
| A.G. | 0433126315 | Alexios Apazidis, M.D. | 1/18/2017 | Alexios Apazidis, MD, PC | Hector Melgar, P.T.; Alexios Apazidis, M.D. | 15 Walt Whitman Road |
| E.J. | 0430599794 | Alexios Apazidis, M.D. | 11/21/2016 | Alexios Apazidis, MD, PC | Hector Melgar, P.T.; Alexios Apazidis, M.D. | 21 Washington Avenue |
| G.B. | 0432383529 | Alexios Apazidis, M.D. | 1/11/2017 | Alexios Apazidis, MD, PC | Hector Melgar, P.T.; Alexios Apazidis, M.D. | 500 Front Street |

| Claimant Initials | Claim No. | Referring Provider | Date of EDX Testing | Entity Billing for Testing | Provider Performing EDX Testing | Clinic Location |
|---|---|---|---|---|---|---|
| S.K. | 0435256607 | Alexios Apazidis, M.D. | 2/23/2017 | Alexios Apazidis, MD, PC | Hector Melgar, P.T.; Alexios Apazidis, M.D. | 21 Washington Avenue |
| M.D. | 0438352668 | Timothy Mosomillo, DO | 5/22/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 1801 Brentwood Road |
| M.M. | 0440380475 | Alexios Apazidis, M.D. | 3/13/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| J.S. | 0443951421 | Alexios Apazidis, M.D. | 4/26/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 1801 Brentwood Road |
| V.G. | 0433951421 | Alexios Apazidis, M.D. | 4/26/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 1801 Brentwood Road |
| W.A. | 0444273064 | Alexios Apazidis, M.D. | 5/2/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| C.L. | 0448813989 | Timothy Mosomillo, DO | 6/13/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| R.T. | 0453133936 | Timothy Mosomillo, DO | 6/7/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 1801 Brentwood Road |
| A.P. | 0468533070 | William Jones, M.D. | 10/24/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| P.J. | 0469811151 | William Jones, M.D. | 11/14/2017 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| N.B. | 0481819191 | William Jones, M.D. | 1/30/2018 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| C.B. | 0483443099 | William Jones, M.D. | 2/20/2018 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |
| C.G. | 0492779939 | William Jones, M.D. | 4/17/2018 | Hector Melgar, P.T., PC | Hector Melgar, P.T. | 21 Washington Avenue |

403. Physical therapists licensed in the State of New York are permitted to administer and interpret EDX tests as long as the physical therapist is properly trained to conduct such testing. *See* Letter from the Office of the New York State Board for Physical Therapy, May 6, 2006, attached hereto as Exhibit 2. However, although physical therapists may *interpret* the results of EDX testing, "it is the ultimate responsibility of the referring practitioner to determine an appropriate medical *diagnosis*." *Id.* (emphasis added).

404. However, the results of this EDX testing was not used in any meaningful way by the referring physician, including Apazidis, Mosomillo, Tyorkin, Jones, and Seldes, to alter the treatment plan for any of these patients or to make diagnoses.

405. Indeed, even where the results of this testing were acknowledged by the physician, it was merely to provide justification for further medically unnecessary and excessive treatment.

**a. Overview of Electrodiagnostic Testing**

406. EDX testing involves multiple studies performed by a healthcare provider, such as (a) electromyography studies ("EMGs") and (b) nerve conduction studies ("NCSs").

407. EDX testing is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system because the testing can help a practitioner evaluate symptoms, generate a proper diagnosis, and monitor patient response to treatments.

408. EDX testing should not be administered uniformly across a provider's patient population.

409. Because proper EDX testing should involve the use of a dynamic (i.e., patient-specific) approach, the nature and scope of the testing should change and evolve as the testing is administered to a patient.

410. Here, the EDX testing provided by Melgar (or those employees acting under Melgar's direction and control) through Melgar PT violated the standard of care for EDX testing whereas Melgar purported to perform such testing as a matter of course regardless of actual patient need.

411. In addition to being excessive, the EDX testing administered by Melgar (or someone acting on his behalf) was below the standard of care, and, as a result, yielded incorrect interpretations and/or diagnoses, which highlights the dangerous consequences of performing EDX testing in this manner.

412. Indeed, diagnostic testing reports—including the data, interpretations, and diagnoses they contain—are vital because important clinical decisions depend on their integrity and quality.

413. Overall, the EDX testing performed by Melgar (or someone acting under his direction or control) was not only medically unnecessary, but it also posed a serious risk of harm to patients because (a) patients were needlessly subjected to invasive tests and possible infection, (b) the tests yielded incorrect or inaccurate findings, impressions, and/or diagnoses, and (c) Melgar often disregarded or ignored the results of the tests meaning that his patients did not receive proper care.

i. Fraudulent Nerve Conduction Studies

414. In a legitimate clinical setting, NCSs are administered to measure nerve conduction by stimulating the nerves with a small electrical current.

415. NCSs involve both F-Wave ("F-Wave") and H-Reflex ("H-Reflex") studies.

416. The amount of electricity subsequently transmitted by the nerve is measured by this stimulation that, in turn, creates the nerve response platform, which is displayed on a screen. The

screen displays the latency, amplitude area, and duration of the nerve response through a graphic display of the waveforms for each nerve.

417. NCSs typically confirm whether or not the nerves are functioning properly.

418. NCSs should be applied in a dynamic rather than protocol manner; in other words, the format and application of these studies should vary from patient to patient and should also be based on the patient's symptoms, findings, and suspect diagnosis.

419. Here, Melgar administered NCSs without regard to his patient's symptoms, findings or suspect diagnoses; rather, he applied an excessive number of NCSs in the majority of cases not including H-Reflex or F-Wave studies.

420. According to the American Medical Association ("AMA"), the utilization of dynamic decision-making in EDX testing is a prerequisite to properly use and bill for EDX CPT coding.

421. Dynamic decision making regarding each individual test is required by the provider to properly administer EDX testing such as NCSs.

422. Here, Melgar failed to tailor his EDX testing to each individual patient and instead followed a protocol approach to the utilization of NCSs, which resulted in both overutilization of NCS and the administration of the same studies to most of Melgar's patients.

423. Indeed, virtually all of the NCSs administered to Melgar PT and Apazidis P.C. patients by Melgar (or someone acting under his direction or control) involved the same set of nerves, including the following:

- Upper limb studies: bilateral median and ulnar motor nerves; bilateral median, ulnar, and radial sensory nerves; and bilateral median H-Reflexes; and
- Lower limb studies: bilateral tibial and peroneal motor nerves; bilateral sural and superficial peroneal sensory nerves; and bilateral tibial H-Reflexes.

424. In the extremely unlikely event that every Melgar PT or Apazidis P.C. patient treated by Melgar actually required an NCS study, the odds that each patient's condition would warrant the same study of the same exact nerves every time is virtually impossible.

425. Melgar (or someone acting under his direction or control) administered NCSs to his patients as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and healthcare services, and (c) produce profits for Melgar PT and Apazidis P.C.

426. In many instances, Melgar (or someone acting under his direction or control) failed to notice, explain, or otherwise account for abnormal NCS parameters produced by the NCS studies, which displays a complete disregard for the actual results of these studies.

427. Further, certain of the NCS waveforms produced by Melgar (or someone acting under his direction or control) were below the technical standard of care and were not addressed or corrected, and thus lack credibility and reliability.

428. The use of NCS waveforms that are below the standard of care may result in data that appears to be abnormal, but is just the result of poor technique, which subsequently may lead to an incorrect diagnosis, or a failure to accurately identify an existing problem.

429. In other instances, Melgar (or someone acting under his direction or control) failed to identify and/or correct NCS results that did not make physiologic sense, which is indicative of an error in NCS technique.

430. Indeed, the NCSs performed by Melgar (or someone acting under his direction or control) nearly always reflect one or more error in technique or interpretation.

431. Where NCSs are performed and/or interpreted below the standard of care, the NCSs are invalid and cannot be used for any medical purpose, and certainly cannot be considered medically reasonable or necessary, much less compensable.

432. As a direct result of Melgar's protocol approach to NCSs—including (a) his overutilization of the studies, (b) administration of the studies in a manner that was below the standard of care, and (c) misinterpretation of the results—the charges submitted to Allstate by Melgar PT and Apazidis P.C. for NCSs were excessive and not compensable under New York No-Fault law.

433. The studies listed in Exhibits 40 and 43 (i.e., the nerve conduction studies billed by Melgar PT and Apazidis P.C. under CPT codes 95900, 95904, and 95913) demonstrate Melgar's intentional and grossly irresponsible pattern and practice of misusing NCSs in connection with his patients.

434. Because the NCSs administered to Melgar PT and Apazidis P.C. patients were excessive and unwarranted, each charge submitted to Allstate by Melgar PT and Apazidis P.C. for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibits 40 and 43.

435. To the extent that Allstate paid Melgar PT and Apazidis P.C. in reliance on the documents created and submitted to Allstate by Melgar PT and Apazidis P.C. in connection with any NCSs administered to Melgar PT and Apazidis P.C. patients, Allstate is entitled to recover all payments made to Melgar PT and Apazidis P.C. in connection with any such NCSs, including, but not limited to, the studies listed in Exhibits 22 and 32.

436. Additionally, to the extent that any of Melgar PT's and Apazidis P.C.'s charges submitted in connection with NCSs remain unpaid (including, but not limited to, the studies listed

in Exhibits 40 and 43), Allstate is under no obligation to make any payments in connection with those transactions because those studies were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

ii. Fraudulent EMG Studies

437. EMGs measure electrical activity in specific muscles, and are often performed in conjunction with NCSs.

438. EMGs involve the insertion of a needle into various muscles, and the studies can be performed on any muscle accessible to an EMG needle. If the muscles are found to be functioning normally, then an inference is created that the connection between the motor nerve and the spinal cord is normal.

439. An abnormal result from an EMG study indicates, among other possibilities, the presence of problems with the nerve root near the spinal cord, or with the peripheral nerve near the muscle.

440. Similar to NCSs, the utilization of EMGs should vary from patient-to-patient; otherwise, the testing provider risks reaching an incorrect diagnosis if the same muscles are being tested in the same number and sequence across the patient population.

441. As such, EMGs should be utilized with a dynamic rather than protocol approach.

442. Because each patient should be evaluated based upon their individual needs, EMGs should be limited and reserved for when specific outcomes are being investigated, such as when a single limb's muscles are being reviewed for radiculopathy.

443. Furthermore, the muscles selected for EMGs should present the least amount of pain possible for the patient. As such, the testing provider should know how to test each muscle, and know how to best limit the amount of pain for his patient.

444. Apazidis, Mosomillo, and Jones purportedly referred patients to Melgar for EDX testing, including EMGs, to rule out "radiculopathic process," or radiculopathy.

445. However, EMG-confirmed cervical or lumbar radiculopathy is rarely caused by a motor vehicle accident.

446. Despite this fact, Melgar (or someone working under his direction or control) found EMG-confirmed radiculopathy, including multi-level and bilateral radiculopathy, at a rate higher than that expected for EMG-confirmed radiculopathy following a motor vehicle accident, which demonstrates a disregard for the welfare of patients as this misrepresentation could result in unnecessary treatments, including other diagnostic testing and invasive procedures.

447. Indeed, in a number of instances, Melgar (or someone working under his direction or control) reported impressions that could not be justified by the reported findings in the studies.

448. Melgar subjected Melgar PT and Apazidis P.C. patients to needless and unwarranted (and sometimes painful) EMGs to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and healthcare services, and (c) produce profits for Melgar PT and Apazidis P.C.

449. As a direct result of Melgar's misinterpretation of the results and misrepresentation of the impressions of these studies, the charges submitted to Allstate for EMGs by Melgar PT and Apazidis P.C. were not compensable under New York No-Fault Law.

450. The studies listed in Exhibits 41 and 44 (i.e., the electromyography studies billed by Melgar PT and Apazidis P.C. under CPT codes 95885 and 95886) demonstrate Melgar's intentional and grossly irresponsible pattern and practice of misusing EMGs in connection with Melgar PT and Apazidis P.C. patients.

451. Because the EMGs administered to Melgar PT and Apazidis P.C. patients were unwarranted and performed below the standard of care, each charge submitted to Allstate by Melgar PT and Apazidis P.C. for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibits 41 and 44.

452. To the extent that Allstate paid Melgar PT and Apazidis P.C. in reliance on the documents created and submitted to Allstate by Melgar PT and Apazidis P.C. in connection with any EMGs administered to Melgar PT and Apazidis P.C. patients, Allstate is entitled to recover all payments made to Melgar PT and Apazidis P.C. in connection with any such EMGs, including, but not limited to, the studies listed in Exhibits 22 and 32.

453. Additionally, to the extent that any of Melgar PT's and Apazidis P.C.'s charges submitted in connection with EMGs remain unpaid (including, but not limited to, the studies listed in Exhibits 41 and 44), Allstate is under no obligation to make any payments in connection with those transactions because those studies were not warranted and were performed below the standard of care, and therefore not compensable under New York's No-Fault laws.

iii. Fraudulent H-Reflex Tests

454. Submaximal stimulation of select mixed nerves (i.e., nerves containing both motor and sensory fibers) causes an H-Reflex to occur.

455. In cases where a C-6, C-7, or S-1 radiculopathy is clinically suspected, the H-Reflex may be performed.

456. The H-Reflex is always performed bilaterally to compare the H-Reflex latency in the symptomatic limb to the H-Reflex in the non-symptomatic limb.

457. H-Reflex testing of the tibial nerve, recorded from the calf, is an excellent technique for finding evidence of unilateral S-1 radiculopathy.

458. For instance, a latency difference of 2.0 milliseconds or more between the two sides indicates a problem in the slower side's H-Reflex arc, with S-1 radiculopathy being the most frequent cause of the slowing.

459. Although the H-Reflex can be performed in other mixed nerves, it is most practical clinically at S-1 using the tibial nerve.

460. H-Reflex testing is only rarely practiced on additional mixed nerves and even then it is mainly for research purposes.

461. The use of H-Reflex testing in the tibial nerve is not medically necessary for lower limb EDX studies despite its practicality, as EMG and NCS are more than adequate in diagnosing radiculopathy in the lower limbs.

462. Additionally, H-Reflex testing in the tibial nerve should only be performed when there is a suspicion for S-1 radiculopathy based on the patient's symptoms and clinical exam findings.

463. As such, H-Reflex testing dictates that a dynamic approach, rather than a set protocol, is needed for its diagnosis and utilization.

464. Melgar used H-Reflex testing on both the upper limbs and lower limbs for virtually every patient for whom he performed (or purported to perform) EDX testing through Melgar PT or Apazidis P.C. during the relevant period.

465. Melgar also never made any attempt to consider the needs or symptoms of his patients in using H-Reflex testing.

466. The provision of H-Reflex testing in this manner provides further evidence that Melgar simply followed a pre-determined protocol of treatment that blatantly ignored age, gender, prior medical history, and the individualized needs of his patients.

467. Additionally, Melgar (or someone acting under his direction or control) inaccurately performed the H-Reflex testing purportedly performed for patients of Melgar PT and/or Apazidis P.C., which yielded invalid results.

468. To measure the H-Reflex latency, the provider must review the cursor at the onset of the H-Reflex and make certain that it is correctly and accurately positioned.

469. In many cases, the provider must manually move the cursor to the correct onset latency.

470. In many instances, Melgar inaccurately placed the H-Reflex cursor, which resulted in the H-Reflex latencies being identified as exactly the same bilaterally in certain studies.

471. However, it is unusual for H-Reflexes to be exactly the same, as there is an expected variation of up to 1.0-2.0 milliseconds between the two limbs within a study.

472. Such results are indicative of a lack of proper training, at best, or a knowing manipulation, at worst. In either scenario, the H-Reflexes for these patients were intentionally misrepresented as performed according to the standard level of care when, in fact, they were not.

473. By failing to ensure that the results of each of the H-Reflex studies were valid, Melgar demonstrated a disregard for patient welfare.

474. Additionally, in a number of instances, Melgar reported impressions that did not take into account the H-Reflex findings or were contrary to the H-Reflex findings.

475. Specifically, Melgar reported radiculopathy despite symmetric H-Reflex latencies without addressing this incompatibility of findings.

476. By failing to account for the incompatibility of H-Reflex data with the stated impression, Melgar (or those acting under his direction and control) potentially endangered patients by providing the wrong or inaccurate impression and/or diagnosis, which usually leads to

incorrect or inappropriate treatments, some of which can result in significant morbidity (i.e., epidural steroid injections, lumbar spine surgery, etc.).

477. Overall, Melgar subjected Melgar PT and Apazidis P.C. patients to needless and unwarranted (and sometimes painful) H-Reflex tests as a part of a pre-determined protocol that was intentionally employed to (a) generate billing for other unnecessary services, (b) create a false foundation for the provision of additional tests and healthcare services, and (c) produce profits for Melgar PT and Apazidis P.C.

478. In this case, the H-Reflex testing administered by Melgar (or those individuals working under his direction and control) to patients of Melgar PT and Apazidis P.C. was excessive and not medically necessary, and the results were materially misrepresented.

479. As a direct result of Melgar's protocol approach to H-Reflex tests—including (a) his overutilization of these studies, (b) his failure to accurately administer these studies, and (c) his misinterpretation of the results—the charges submitted to Allstate for H-Reflex tests were excessive and not compensable under New York No-Fault Law.

480. The services listed in Exhibits 42 and 45 (i.e., the H-Reflex tests billed by Melgar PT and Apazidis P.C. under CPT codes 95934 and 95936) demonstrate Melgar's intentional pattern and practice of misusing H-Reflex tests in connection with Melgar PT and Apazidis P.C. patients.

481. Because the H-Reflex tests administered to Melgar PT and Apazidis P.C. patients were excessive and unwarranted, each charge submitted to Allstate by Melgar PT and Apazidis P.C. for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibits 42 and 45.

482. To the extent that Allstate paid Melgar PT and Apazidis P.C. in reliance on the documents created and submitted to Allstate by Melgar PT and Apazidis P.C. in connection with any H-Reflex tests administered to Melgar PT and Apazidis P.C. patients, Allstate is entitled to recover all payments made to Melgar PT and Apazidis P.C. in connection with any such H-Reflex tests, including, but not limited to, the studies listed in Exhibits 22 and 32.

483. Additionally, to the extent that any of Melgar PT's and Apazidis P.C.'s charges submitted in connection with H-Reflex tests remain unpaid (including, but not limited to, the studies listed in Exhibits 42 and 45), Allstate is under no obligation to make any payments in connection with those transactions because those tests were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

iv. Specific Examples of the Fraudulent Provision of Healthcare Tests and Services

*(i) Example No. 1 (Failure to Account Diagnostically for Abnormal NCS Parameters)*

484. In more than half of the NCS, the Melgar PT physicians failed to diagnostically account for abnormal NCS parameters.

485. When NCS are performed, the results are compared to normal standards for that EDX laboratory, which are often included on the NCS data table.

486. When a result falls outside of the normal expected value, it must be noted and addressed.

487. However, the Melgar PT physicians frequently failed to note and account for abnormal NCS parameters.

488. For example, an upper limb study of the patient M.D. (Claim No. 0438352668) was performed on May 22, 2017, wherein three (3) abnormal parameters were ignored.

489. These abnormalities included (i) Sensory: Left Ulnar written velocity of 39 below the written norm of 40 meters per second; (ii) H-Reflex: Left Median – Actual Latency of 23.60 is above the range of normal (12.9 to 18.9); and (iii) H-Reflex: Right Median – Actual Latency of 22.97 is above the range of normal (12.9 to 18.9).

490. Despite these abnormal findings, the report that was generated for the patient M.D. notes:

**NCS SUMMARY FINDINGS:**

1. Using surface electrodes and percutaneous electrical stimulations, selected upper extremity motor and sensory nerves were tested. Evaluation of the **left median motor** and the **right median motor** nerves showed prolonged distal onset latency (Wrist, L6.3, R6.3 ms) and decreased conduction velocity (Wrist-Palm, L12, R10 m/s).
2. The **left ulnar motor**, the **right ulnar motor**, the **left Median D2 Antidromic Palm antidromic sensory**, the **right Median D2 Antidromic Palm antidromic sensory**, the **left radial antidromic sensory**, the **right radial antidromic sensory**, the **left ulnar (digit 5) antidromic sensory**, and the **right ulnar (digit 5) antidromic sensory** nerves were unremarkable.

491. Ultimately, the Melgar PT physician failed to address the three (3) abnormal parameters, as noted in their Impressions:

**IMPRESSIONS:**

This is an abnormal study. There is electrophysiologic evidence suggestive of a moderate sensorimotor demyelinating and axonal neuropathic process affecting the bilateral median nerves at or about the wrists (Carpal Tunnel). There is no electrophysiologic evidence suggestive of a radiculopathic, polyneuropathic or myopathic process.

492. Here, the Melgar PT physician failed to notice, explain, or otherwise account for the abnormal NCS parameters in the EDX study, which is indicative of either gross incompetence or a complete disregard for the actual results of the study. As such, the report for the patient M.D. is evidence that that the NCS were performed and interpreted below the standard level of care.

*(ii) Example No. 2 (Failure to Provide a Diagnostic Explanation for a Marked Difference in Side to Side Sensory and Motor Nerve Amplitudes)*

493. When NCS are performed, certain parameters are evaluated to determine if the NCS result is normal or abnormal.

494. One of the most important parameters is the amplitude of the evoked response.

495. The amplitude is proportional to the number of functioning nerve fibers within the nerve.

496. To determine if a sensory or motor never amplitude is normal for a given nerve, it is often compared to normative data, or reference values.

497. However, comparing a nerve's amplitude to the same nerve on the contralateral, asymptomatic side is considered a more accurate way to determine if, and to what extent, axonal loss has occurred.

498. Given the normal variability (30-50%) in motor and sensory nerve amplitudes, it is generally accepted that motor and sensory never amplitudes should be within 50% of each other.

499. A side-to-side compound muscle action potential ("CMAP") amplitude difference for the same nerve and comparable stimulus sites may reach 20-33% normally and possibly just under 50%.

500. In both side-to-side and interstimulus nerve locations for the same limb, an amplitude difference exceeding 50% may be considered pathologic.

501. In other words, if a specific nerve's amplitude is less than half of the amplitude of the same nerve on the opposite side, when stimulated at the same site, this is considered an important finding. If the findings are accurate, this may be indicative of nerve pathology.

502. In the absence of true nerve pathology, a side-to-side amplitude difference of greater than 50% indicates that one or both of the NCS were performed in a technically substandard fashion.

503. In either event, when this significant variation in amplitude is identified, the EDX physician must identify and address the apparent abnormality.

504. With regard to Melgar PT, there are numerous instances where motor or sensory never amplitudes demonstrated a greater than 50% difference when comparing the same nerve side-to-side (e.g., right and left ulnar sensory nerves).

505. For example, the patient W.A. (Claim No. 044273064) underwent an NCS on May 2, 2017.

**Nerve Conduction Studies**
**Motor Summary Table**

| Stim Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (mV) | Norm O-P Amp | Neg Dur (ms) | Full Dur (ms) | Neg Area (mVms) | Site1 | Site2 | Delta-0 (ms) | Dist (cm) | Vel (m/s) | Norm Vel (m/s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Left Peroneal Motor (Ext Dig Brev)** | | | | | | | | | | | | | | |
| Ankle | | 5.2 | <6.0 | 3.2 | >1.5 | 3.13 | 25.63 | 6.59 | Ankle | Ext Dig Brev | 5.2 | 8.0 | | |
| B Fib | | 12.0 | | 2.4 | | 6.88 | 10.16 | 9.36 | B Fib | Ankle | 6.8 | 36.5 | 54 | >40 |
| Poplt | | 12.3 | | 3.8 | | 6.09 | 30.78 | 11.13 | Poplt | B Fib | 0.3 | 10.0 | 333 | >40 |
| **Right Peroneal Motor (Ext Dig Brev)** | | | | | | | | | | | | | | |
| Ankle | | 3.0 | <6.0 | 7.9 | >1.5 | 5.78 | 24.06 | 22.47 | Ankle | Ext Dig Brev | 3.0 | 8.0 | | |
| B Fib | | 10.5 | | 7.1 | | 5.31 | 32.34 | 20.10 | B Fib | Ankle | 7.5 | 36.5 | 49 | >40 |
| Poplt | | 11.1 | | 7.6 | | 5.94 | 29.84 | 25.00 | Poplt | B Fib | 0.6 | 10.0 | 167 | >40 |

506. The report for the NCS identified the amplitude of the Left Peroneal Motor Nerve as 3.2 mV, which is only 41% of the same nerve on the opposite side (Right Peroneal Motor nerve amplitude is 7.9 mV).

507. Despite these findings, the Melgar PT physician noted:

**NCS SUMMARY FINDINGS:**

1. Using surface electrodes and percutaneous electrical stimulations, selected upper extremity motor and sensory nerves were tested. Evaluation of the **left peroneal motor,** the **right peroneal motor,** the **left tibial motor,** the **right tibial motor,** the **left superficial peroneal antidromic sensory,** the **right superficial peroneal antidromic sensory,** the **left sural antidromic sensory,** and the **right sural antidromic sensory** nerves were unremarkable.

508. The report does not include any mention at all of the reduced Left Peroneal Motor amplitude, and no mention that this finding might be indicative of a Left Peroneal Motor neuropathy, which is negligent.

509. A licensed physician assuming the role of and billing as an EDX consultant has a responsibility to make certain that the nerve conduction tests are performed correctly, at a standard level of care, and that the study is valid and therefore medically meaningful.

510. When a NCS reveals a reduced amplitude, it is the EDX physician's responsibility to determine whether the reduced amplitude is due to technical factors, improper cursor placement, or if it is a meaningful finding, indicative of nerve pathology.

511. If the reduced amplitude is due to technical reasons, the study must be repeated.

512. If the amplitude cannot be improved, then the physician should note the abnormalities in the final interpretation and their impact on the final diagnosis.

513. By failing to note or correct these findings, Melgar PT knowingly misrepresented the NCS rendered and failed to act at the minimum standard of care.

*(iii) Example No. 3 (Failure to Give Diagnostic Explanations for Marked Drops in the Proximal Versus Distal Responses)*

514. In certain studies, the medical records documented instances where a motor never demonstrated a significant (at least 50%) drop in the proximally evoked response as compared to the distal response on nerve conduction studies.

515. This is called conduction block, which is a potentially very serious medical problem.

516. One of the potentially most important findings in nerve conduction studies is the presence of impulse conduction blocks.

517. A conduction block is the failure of an action potential to propagate normally throughout the length of a nerve fiber (known as the axon).

518. If an electrical impulse began to travel down a nerve fiber, but suddenly stopped because the nerve fiber beyond that point could not conduct the impulse, this would be a conduction block.

519. Some of the most common causes of conduction block include pressure on the nerve (from tumor, disc, blood clot, ligament, etc.), and local damage to the nerve at the site of the block.

520. A conduction block is also typical of autoimmune neuropathies such as Guillain-Barre Syndrome, chronic inflammatory demyelinating polyneuropathy, and multifocal motor neuropathy with persistent conduction block.

521. The principal finding in conduction block is the blockage of the impulse across a local nerve segment without much or even any generalized axonal damage.

522. Stimulation of the nerve bundle distal to the block gives a normal motor impulse, whereas a proximal stimulation of the nerve above the conduction block results in decreased amplitude.

523. When a conduction block is detected, the EDX consultant is required to immediately address this finding.

524. No electrodiagnostic physician can reasonably accept amplitude values that suggest conduction block without repeating the NCS to make certain of the accuracy and validity of the results.

525. An example of a conduction block can be seen in the report that was generated for the patient V.G. (Claim No. 0443951421).

526. The image below shows the motor nerve study waveforms of the Left Tibial motor nerve that was examined on April 26, 2017.

527. Opposite the red arrow on the top tracing is the response to distal stimulation of this nerve at the ankle.

528. The smaller response on proximal stimulation at the knee (Poplit) seen inside the circled area is a clear indication of a conduction block.




529. The data table generated by these responses is seen in the graphic below:

| Stim Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (mV) | Norm O-P Amp | Neg Dur (ms) | Full Dur (ms) | Neg Area (mVms) | Site1 | Site2 | Delta-0 (ms) | Dist (cm) | Vel (m/s) | Norm Vel (m/s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Left Peroneal Motor (Ext Dig Brev)** | | | | | | | | | | | | | | |
| Ankle | | 4.4 | <6.0 | 7.0 | >1.5 | 7.81 | 34.69 | 27.31 | Ankle | Ext Dig Brev | 4.4 | 8.0 | | |
| B Fib | | 10.3 | | 6.3 | | 7.34 | 11.72 | 24.02 | B Fib | Ankle | 5.9 | 30.5 | 52 | >40 |
| Poplt | | 12.0 | | 4.9 | | 7.19 | 11.41 | 18.55 | Poplt | B Fib | 1.7 | 10.0 | 59 | >40 |
| **Right Peroneal Motor (Ext Dig Brev)** | | | | | | | | | | | | | | |
| Ankle | | 4.8 | <6.0 | 4.5 | >1.5 | 7.50 | 39.53 | 18.19 | Ankle | Ext Dig Brev | 4.8 | 8.0 | | |
| B Fib | | 10.3 | | 4.1 | | 7.81 | 11.41 | 16.94 | B Fib | Ankle | 5.5 | 31.5 | 57 | >40 |
| Poplt | | 11.7 | | 5.4 | | 8.13 | 32.66 | 24.36 | Poplt | B Fib | 1.4 | 10.0 | 71 | >40 |
| **Left Tibial Motor (Abd Hall Brev)** | | | | | | | | | | | | | | |
| Ankle | | 3.4 | <6 | 14.9 | >4.0 | 6.09 | 37.81 | 40.05 | Ankle | Abd Hall Brev | 3.4 | 8.0 | | |
| Poplit | | 12.5 | | 6.4 | | 5.63 | 26.41 | 17.11 | Poplit | Ankle | 9.1 | 35.5 | 39 | >39.0 |

530. The amplitude of the distal response and the much smaller proximal response are noted in the added red rectangle.

531. The amplitude of the response to stimulation at the ankle is much larger than the amplitude seen on stimulation at the knee and provides evidence of a conduction block.

532. Although a neophyte electrodiagnostic physician would have no difficulty identifying the conduction block found in this patient, Melgar made the following interpretation:

**NCS SUMMARY FINDINGS:**

1. Using surface electrodes and percutaneous electrical stimulations, selected upper extremity motor and sensory nerves were tested. Evaluation of the **left peroneal motor**, the **right peroneal motor**, the **left tibial motor**, the **right tibial motor**, the **left superficial peroneal antidromic sensory**, the **right superficial peroneal antidromic sensory**, and the **left sural antidromic sensory** nerves were unremarkable.

533. Despite its potential seriousness, Melgar did not mention that a conduction block was present in V.G.'s study nor in certain other instances where conduction blocks were identified.

534. The standard of care requires that all conduction blocks must be cited and taken into account in the interpretation of the study.

535. Melgar, however, did not incorporate the findings of the conduction blocks into his diagnoses and further did not document whey he ignored the potentially important findings in these studies.

536. In failing to identify, interpret, and report these conduction blocks, Melgar PT not only misrepresented the services that were purportedly rendered but further risked the health and well-being of it patients by failing to diagnose the potentially serious conditions that could cause the conduction blocks.

*(iv) Example No. 4 (The Obtained and Utilized NCS Wavelengths Were Technically Below the Standard of Care)*

537. When performing NCS, it is the duty of the provider to insure optimal conditions for obtaining the best possible waveforms.

538. Common examples of steps that may need be taken include washing off any skin lotions that may have been applied to the patient, wiping away perspiration, gently debriding thick skin, and/or replacing worn electrodes.

539. Failure to take these steps may result in NCS waveforms that are contaminated by excessive stimulus artifact or external electrical interference.

540. If these steps are unsuccessful, further attempts to obtain a good, stable NCS baselines must be made.

541. However, if good testing conditions are not achieved, the resulting NCS waveforms may be very difficult to properly interpret and, in some cases, the electrical artifact may obscure the physiologic waveform.

542. For example, the following sensory waveform for the patient M.O. (Claim No. 0357751338) was obtained on May 22, 2015.




543. The waveform has a generally stable, flat (horizontal) baseline. This makes it very easy, even to the novice eye, to identify the physiological waveform, which is correctly labeled in this case.

544. In comparison, the following sensory waveform was obtained from the same patient, M.O., on the same date (i.e., May 22, 2015).



545. As evidenced by the second waveform, it would be a challenge for even an experienced electrodiagnostic physician to properly identify and accurately label the appropriate physiological nerve response in this case.

546. Such a result is based on the underlying testing conditions being suboptimal, which resulted in an unstable (not flat or horizontal) baseline.

547. By failing to attempt to address the testing conditions as noted above, these NCS results could not be relied upon to accurately portray the functional status of the nerves in question.

548. Although this may lead to NCS data that appears to be abnormal, it is actually the result of poor technique, which may lead to an incorrect diagnosis or a failure to accurately identify an existing problem.

*(v) Example No. 5 (Improperly Labeled NCS Waveforms)*

549. During the performance of an NCS, the machine uses an algorithm to place the cursors indicating the Onset (O), Peak (P), and Trough (T) of the evoked nerve responses.

550. However, the computer often places these cursors inaccurately, especially when the baseline is unstable.

551. Therefore, it is the duty of the provider performing the NCS to carefully observe the waveform labels and manually move the cursors to the most appropriate location.

552. If this is not done, it can result in NCS data that fails to identify a problem when one exists, or incorrectly indicates a potential problem when the results are actually normal.

553. For example, the patient V.G. (Claim No. 0443951421) underwent a NCS on May 10, 2017.

554. On that date, the following waveform for the Left Median sensory nerve was obtained:




555. As evidenced by this image, the Onset (O) and Peak (P) of displayed waveform are correctly labeled.

556. The problem, however, is that the waveform is not a physiological waveform; it is an electric artifact.

557. In fact, the values obtained from the (non-physiological) waveform do not make physiological sense.

| Stim Site | NR | Peak (ms) | Norm Peak (ms) | O-P Amp (μV) | Norm O-P Amp | Site1 | Site2 | Delta-P (ms) | Dist (cm) | Vel (m/s) | Norm Vel (m/s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Left Median D2 Sensory (2nd Digit) | | | | | | | | | | | |
| Wrist | | 1.1 | <3.5 | 51.7 | >10.0 | Wrist | 2nd Digit | 1.1 | 14.0 | 127 | >40.0 |

558. A Peak latency, at a distance of 14 centimeters, listed as 1.1 milliseconds, resulting in a calculated conduction velocity of 127 m/s is a physiological impossibility as the Median Sensory nerve does not conduct that quickly.

559. A provider properly trained in electrodiagnostic medicine would immediately note this, and would subsequently rectify the situation.

560. In the case of V.G., there was no mention of the abnormally short Peak latency, of abnormally fast conduction velocity:

**NCS SUMMARY FINDINGS:**

1. Using surface electrodes and percutaneous electrical stimulations, selected upper extremity motor and sensory nerves were tested. Evaluation of the **left median motor**, the **right median motor**, the **left ulnar motor**, the **right ulnar motor**, the **left median (digit 2) antidromic sensory**, the **left Median D2 Antidromic Palm antidromic sensory**, the **right Median D2 Antidromic Palm antidromic sensory**, the **left radial antidromic sensory**, and the **right radial antidromic sensory** nerves were unremarkable.

561. By failing to review NCS in real time for accurate cursor placement, and subsequently correcting any inappropriately placed cursors, the Melgar PT physicians frequently misrepresented that the NCS were performed at the standard level of care.

562. This lack of attention and lack of concerns for the accuracy of these studies potentially places patients at risk by producing false NCS data, which may result in a failure to identify real problems or in making a diagnosis that does not actually exist.

*(vi) Example No. 6 (Reported NSC Results That Do Not Make Physiological Sense)*

563. In a number of studies, the Melgar PT physicians reported NCS results that do not make physiological sense.

564. For example, the patient W.A. (Claim No. 0444273064) underwent a NCS on July 11, 2017, which revealed the following findings:

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Left Ulnar Motor (Abd Dig Minimi)** | | | | | | | | | | | | | | |
| Wrist | 2.7 | <3.6 | 11.0 | >4.0 | 5.63 | 26.41 | 34.77 | Wrist | Abd Dig Minimi | 2.7 | 8.0 | | |
| B Elbow | 6.1 | | 9.8 | | 5.78 | 32.03 | 32.25 | B Elbow | Wrist | 3.4 | 32.0 | 94 | >50.0 |
| A Elbow | 7.8 | | 10.3 | | 5.78 | 32.66 | 33.67 | A Elbow | B Elbow | 1.7 | 8.0 | 47 | >47.0 |
| **Right Ulnar Motor (Abd Dig Minimi)** | | | | | | | | | | | | | | |
| Wrist | 2.7 | <3.6 | 8.4 | >4.0 | 7.03 | 30.78 | 28.53 | Wrist | Abd Dig Minimi | 2.7 | 8.0 | | |
| B Elbow | 6.3 | | 7.6 | | 6.88 | 23.59 | 24.66 | B Elbow | Wrist | 3.6 | 32.0 | 89 | >50.0 |
| A Elbow | 8.0 | | 7.9 | | 6.56 | 34.53 | 26.84 | A Elbow | B Elbow | 1.7 | 8.0 | 47 | >47.0 |

565. The Left Ulnar Motor Nerve conduction velocity in the forearm (B Elbow to Wrist), which is enclosed in the top red box, is listed as 94 m/s.

566. Likewise, the Right Ulnar Motor Nerve conduction velocity is listed as 89 m/s.

567. However, the normal expected value for Ulnar motor nerve conduction velocity across the elbow 57.1 +/- 5.9 m/s.

568. In this case, the findings are 40-50% faster than the upper limits of the expected normal velocity.

569. Knowing that a nerve does not physiologically conduct this quickly, one has to conclude that there was an error in NCS technique.

570. This could be due to incorrect cursor placement denoting the onset of the motor response, incorrect measurement of the distance between the two stimulation points, or incorrect data entry by the provider.

571. In any event, it is the duty of the provider performing the NCS to identify results that do not make physiologic sense, and to address the underlying problem causing the result, prior to moving on to the next NCS.

572. As such, this is clearly a misrepresentation that the NCS were performed at the standard level of care.

*(vii) Example No. 7 (Diagnoses That Are Incompatible with H Reflex Data)*

573. The Tibial H reflex, recorded from the calf, is an excellent technique for finding evidence of unilateral S1 radiculopathy.

574. A latency difference of 2.0 milliseconds or more between the two sides indicates a problem in the slower side's H reflex ac, with S1 radiculopathy the most frequent cause of the slowing.

575. The Median H reflex, recorded from the forearm, is generally only performed for research purposes.

576. Here, Melgar PT frequently documented two patterns of incompatible H reflex data: (i) a diagnosis of radiculopathy (C6, C7, or S1) despite the H reflex latencies being normal, and (ii) a failure to diagnose radiculopathy (or otherwise explain) when the H reflex was abnormal.

577. The medical records for the Melgar PT electrodiagnostic studies revealed instances where a diagnosis of C6 or C7 radiculopathy was made despite symmetric H reflex latencies.

578. Likewise, the medical records further documented electrodiagnostic studies where a diagnosis of S1 radiculopathy was made, despite normal and symmetric H reflex studies.

579. For example, the patient B.R. (Claim No. 0352733885) underwent an electrodiagnostic study on March 23, 2015. The report for the study documented the following findings:

**H Reflex Studies**

| NR | H-Lat (ms) | L-R H-Lat (ms) | L-R Lat Norm |
|---|---|---|---|
| Left Tibial (Gastroc) | | | |
| | 25.42 | 0.09 | <2.0 |
| Right Tibial (Gastroc) | | | |
| | 25.51 | 0.09 | <2.0 |

580. As evidenced by the findings, the Tibial H reflex latencies are both normal for absolute value, as well as relative to each other.

581. Despite this, the Melgar PT records note the following impression:

**IMPRESSIONS:**
There is electrophysiologic evidence suggestive of sub-acute right S1 radiculopathic process. There is no electrophysiologic evidence suggestive of a peripheral nerve entrapment, polyneuropathic or myopathic process.

582. A prolonged H reflex may be the first, and only, abnormality in a C6, C7, or S1 radiculopathy.

583. Diagnosing a C6, C7, or S1 radiculopathy in the setting of a normal H reflex is an incompatibility that should be addressed by the EDX physician.

584. By failing to account for the incompatibility of the H reflex data with the stated diagnosis, Melgar PT potentially endangered its patients by providing wrong or inaccurate diagnoses, which leads to incorrect or inappropriate medical treatment.

585. As such, this is a misrepresentation that the H reflexes were performed and interpreted at the standard level of care.

*(viii) Example No. 8 (Failure to Accurately Label the H Reflex Minimal Latencies)*

586. In cases where a C6, C7, or S1 radiculopathy is clinically suspected, the H reflex may be performed.

587. This study is always performed bilaterally in order to compare the H reflex latency in the symptomatic limb to the H reflex latency in the non-symptomatic limb.

588. In cases where bilateral upper or lower limbs are symptomatic, the utility of the H reflex may be reduced.

589. To measure the H reflex latency, the provider must review the cursor (i.e., marker) at the onset of the H reflex and make certain that it is correctly positioned.

590. The computer places the cursor based on the programmed algorithm. However, it is the responsibility of the provider performing the H reflex to insure that the cursor is appropriately and accurately placed.

591. In many cases, the provider has to manually move the cursor to correct the onset latency.

592. For example, the study for the patient W.A. (Claim No. 0444273064) that was performed on July 11, 2017 contained the following tracing.




593. The latency cursor, indicated by the horizontal arrow, is inaccurately placed, giving the right Median H reflex a longer latency than it should have.

594. The H reflex waves in the oval and the vertical arrow indicates where the cursor should have been placed.

595. In many cases, the H reflex cursors were inaccurately placed, which resulted in situations where the H reflexes were noted to be exactly the same bilaterally.

596. It is unusual for H reflexes to be exactly the same, as there is an expected variation of up to 1.0-2.0 milliseconds between the two limbs within a study.

597. The only explanation for such an issue is that the physician performing the H reflexes were: (i) insufficiently trained in how to properly perform and interpret the H reflex studies; (ii) the physicians did not care about the accuracy of the results; or (iii) the H reflex latencies were knowingly manipulated.

598. As such, each of these conclusions represents a knowing misrepresentation that the H reflexes were performed according to the standard level of care.

v. Fraudulent Billing for NCS Studies

599. Melgar PT and Apazidis P.C. submitted false and fraudulent bills to Allstate seeking reimbursement for NCS studies that were not actually performed.

600. Specifically, in certain instances, Melgar PT and Apazidis P.C. billed for additional NCS studies than were not actually performed.

601. According to the CPT Assistant published by the AMA, a NCS "is counted only once when multiple sites on the same nerve are stimulated or recorded." *CPT Assistant*, p. 535 (2013).

602. In other words, billing for separate nerves is appropriate only when both the stimulating and recording electrodes are moved.

603. However, Melgar PT and Apazidis P.C. submitted bills to Allstate misrepresenting that certain nerves were tested even where the recording electrodes were not moved and only the stimulation site changed.

604. Therefore, in such instances, Melgar PT and Apazidis P.C. billed Allstate for two more NCS studies than were actually performed.

605. Similarly, Melgar PT also billed for NCS studies that duplicated a NCS already performed.

606. For example, in certain instances, Melgar (or someone acting under his direction and control) performed motor NCS on the left and right medial plantar motor nerves recorded from the abductor hallucis muscle and on the left and right tibial motor nerves, also recorded from the abductor hallucis muscle.

607. However, the tibial motor nerve recorded from the abductor hallucis muscle is actually the same NCS as the medial plantar motor nerve because the medial plantar branch of the tibial nerve supplies the abductor hallucis muscle.

608. Consequently, in these scenarios, Melgar PT billed for two additional NCS studies than were actually performed.

609. Because the charges for these NCSs that were not actually performed as represented were false and fraudulent, each charge submitted to Allstate by Melgar PT for these studies is not compensable under New York No-Fault Law, including, but not limited to, the NCSs billed by Melgar PT under CPT codes 95900 and 95904 that are listed in Exhibit 40.

610. To the extent that Allstate paid Melgar PT in reliance on the documents created and submitted to Allstate by Melgar PT in connection with these NCSs administered to Melgar PT patients, Allstate is entitled to recover all payments made to Melgar PT in connection with any such NCSs, including, but not limited to, the NCSs billed by Melgar PT under CPT codes 95900 and 95904 that are listed in Exhibit 22.

611. Additionally, to the extent that any of Melgar PT's charges submitted in connection with the NCSs remain unpaid (including, but not limited to, the NCSs billed by Melgar PT under CPT codes 95900 and 95904), Allstate is under no obligation to make any payments in connection with those transactions because the charges for those studies were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

612. Because the charges for these NCSs that were not actually performed as represented were false and fraudulent, each charge submitted to Allstate by Apazidis P.C. for these studies is not compensable under New York No-Fault Law, including, but not limited to, the NCSs billed by Apazidis P.C. under CPT code 95904 that are listed in Exhibit 43.

613. To the extent that Allstate paid Apazidis P.C. in reliance on the documents created and submitted to Allstate by Apazidis P.C. in connection with these NCSs administered to Apazidis P.C. patients, Allstate is entitled to recover all payments made to Apazidis P.C. in connection with any such NCSs, including, but not limited to, the NCSs billed by Apazidis P.C. under CPT code 95904 that are listed in Exhibit 32.

614. Additionally, to the extent that any of Apazidis P.C.'s charges submitted in connection with the NCSs remain unpaid (including, but not limited to, the NCSs billed by Apazidis P.C. under CPT code 95900), Allstate is under no obligation to make any payments in connection with those transactions because the charges for those studies were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

**2. Fraudulent Computerized Range of Motion Testing**

615. Apazidis regularly orders computerized range of motion ("ROM") testing for his patients, including Allstate Insureds.

616. Apazidis orders this ROM testing even though he already had purported to perform ROM evaluations of his patients as part and parcel of his initial evaluation.

617. Indeed, the standard of care for evaluation and treatment of a patient presenting with pain is to determine the active (or passive) ROM of any affected area such as the spine or extremity joints.

618. Apazidis purports to perform manual ROM evaluations of his patients, including Allstate Insureds, during his physical examinations, but often also orders computerized ROM testing despite his having already assessed the patients' ROM.

619. As justification for the computerized ROM testing, Apazidis states that the computerized ROM testing was medically necessary as a means "to objectively measure impairment" and "have a baseline."

620. However, there is no such thing as "objective" computerized ROM testing because the patient's cooperation is required to determine the active range of motion, regardless of whether it is done manually or is computerized.

621. Additionally, a baseline level can be established in the initial or follow-up examination, thus negating the "medical necessity" of this testing.

622. As a result, there is no medical necessity for the computerized ROM testing purportedly performed by Apazidis during the relevant period whereas Apazidis' manual determination of ROM of the affected areas in the initial evaluations is adequate to determine a clinical course.

623. Indeed, as evidence that this computerized ROM testing is merely part of a protocol of treatment that bears no relation to Apazidis' patients' actual individualized needs, Apazidis orders and performs this computerized ROM testing even where his patient's exhibit normal ROM during a physical examination.

624. For example, patient C.A. (claim no. 0419182597) was physically examined by Apazidis on October 28, 2016 for which Apazidis reported a "right shoulder normal exam" and normal range of motion in the cervical and lumbar spines.

625. Nonetheless, even though C.A. exhibited no restricted ROM during Apazidis' own physical exam, Apazidis ordered, "computerized ROM to all affected joints" and stated that this testing was "needed to objectively measure impairment [and] have a base line."

626. Apazidis performed computerized ROM testing to C.A.'s cervical and lumbar spine and left and right shoulders on October 28, 2016.

627. Unsurprisingly, as predicted from Apazidis' own physical exam that same day, C.A. passed this computerized ROM testing with results of 92% normal and above for the cervical and lumbar spine and both shoulders.

628. Likewise, Apazidis performed an initial evaluation for claimant E.Z. (claim no. 0422227538) on October 28, 2016 during which Apazidis performed a physical examination that included range of motion of the cervical and lumbar spine, which Apazidis recorded as having a normal range of motion.

629. However, Apazidis nonetheless ordered, "computerized ROM to all affected joints."

630. That same day, on October 28, 2016, Apazidis performed computerized ROM for E.Z.

631. Again, as foreshadowed by Apazidis' initial examination of E.Z., E.Z. passed this computerized ROM testing with a spinal range of motion of 91% normal or above.

632. There is no reason for patients who demonstrate normal ranges of motion during a physical examination to be subjected to redundant computerized ROM testing—sometimes on the very same day as this physical examination—that will only serve to confirm the results of Apazidis' own physical examination.

633. Moreover, there is no indication that Apazidis incorporated the results of his computerized ROM testing into his treatment plans for his patients, or otherwise relied on these results in any meaningful way.

634. Indeed, Apazidis never produces a separate report interpreting the computerized ROM findings or making recommendations for application of the findings to treatment.

635. Rather, it is clear that Apazidis ordered computerized ROM testing for his patients merely as a means to generate a bill to submit to No-Fault insurers, including Allstate.

636. Because the computerized ROM tests administered to Apazidis P.C. patients were medically unnecessary and part of a predetermined treatment protocol, each charge submitted to Allstate by Apazidis P.C. for these tests is not compensable under New York No-Fault Law, including, but not limited to, the ROM tests billed by Apazidis P.C. under CPT codes 97750 and 95851 that are listed in Exhibit 46.

637. To the extent that Allstate paid Apazidis P.C. in reliance on the documents created and submitted to Allstate by Apazidis P.C. in connection with any ROM tests administered to Apazidis P.C. patients, Allstate is entitled to recover all payments made to Apazidis P.C. in connection with any such ROM testing, including, but not limited to, the ROM tests billed by Apazidis P.C. under CPT codes 97750 and 95851 that are listed in Exhibit 32.

638. Additionally, to the extent that any of Apazidis P.C.'s charges submitted in connection with ROM tests remain unpaid (including, but not limited to, the tests listed in the ROM tests billed by Apazidis P.C. under CPT codes 97750 and 95851 that are listed in Exhibit 46), Allstate is under no obligation to make any payments in connection with those transactions because these tests were medically unnecessary and part of a pre-determined treatment protocol, and, therefore, not compensable under New York's No-Fault Laws.

## VI. SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

639. Throughout the course of this scheme, Melgar, Tubens, Apazidis, Mosomillo, Tyorkin, Jones, Seldes, Ehrlich, Matatov, Abramchayeva, and Romero created, prepared, and

submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

640. Unless otherwise plead to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

641. Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

### A. HECTOR MELGAR, PT, P.C. D/B/A EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, AND BRENTWOOD PHYSICAL REHABILITATION ENTERPRISE

642. Melgar, Tubens, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Mosomillo, Pavilion Medical, Apazidis, Apazidis P.C., Jones, Phoenix Medical Services, Seldes, Deer Park Orthopedics, Station Medical Services, Ehrlich, Matatov, East Point Acupuncture, Abramchayeva,

DA Acupuncture, Romero, Ponce Acupuncture, and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Melgar PT to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

643. Melgar and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Melgar PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Melgar PT mailed a demand for payment (i.e., invoice) to Allstate.

644. Melgar's (and/or his agents') provision of excessive and medically unnecessary services to patients of Melgar PT rendered Melgar PT completely ineligible for No-Fault reimbursement under New York law.

645. Because Melgar PT was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Melgar (and/or other persons working at his direction and/or on his behalf) purposely caused Melgar PT to make a misrepresentation each and every time that Melgar PT mailed a document to Allstate claiming eligibility for reimbursement.

646. Moreover, because (a) Melgar PT was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Melgar (and/or other persons working at his direction and/or on his behalf) caused Melgar PT to seek No-Fault reimbursement from Allstate (even though Melgar PT was not entitled to such reimbursement), and (c) Melgar PT used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Melgar PT.

647. At all relevant times, Melgar and these Defendants knew that Melgar PT, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would

use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Melgar PT.

648. Allstate estimates that the unlawful operation of the Melgar PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 3 and incorporated by reference as if set forth in its entirety.

### B. BRENTWOOD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE

649. Tubens, Melgar, Melgar PT, Apazidis, Apazidis P.C., Jones, Phoenix Medical Services, Seldes, Deer Park Orthopedics, Station Medical Services, Ehrlich, Romero, Ponce Acupuncture, and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Brentwood Regional Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

650. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Brentwood Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Brentwood Regional Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

651. Tubens' (and/or his agents') provision of excessive and medically unnecessary chiropractic treatment to patients of Brentwood Regional Chiropractic rendered Brentwood Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

652. Because Brentwood Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Brentwood Regional Chiropractic

to make a misrepresentation each and every time that Brentwood Regional Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

653. Moreover, because (a) Brentwood Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Brentwood Regional Chiropractic to seek No-Fault reimbursement from Allstate (even though Brentwood Regional Chiropractic was not entitled to such reimbursements), and (c) Brentwood Regional Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Brentwood Regional Chiropractic.

654. At all relevant times, Tubensand these Defendants knew that Brentwood Regional Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Brentwood Regional Chiropractic.

655. Allstate estimates that the unlawful operation of the Brentwood Regional Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 4 and incorporated by reference as if set forth in its entirety.

### C. EASTERN SUFFOLK CHIROPRACTIC, P.C. ENTERPRISE

656. Tubens, Melgar, Melgar PT, Huntington Regional Chiropractic, Tyorkin, Mosomillo, Pavilion Medical, Apazidis, Apazidis P.C., Jones, Phoenix Medical Services, Ehrlich, Matatov, East Point Acupuncture, Romero, Ponce Acupuncture, and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from

Eastern Suffolk Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

657. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Eastern Suffolk Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Eastern Suffolk Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

658. Tubens' (and/or his agents') provision of excessive and medically unnecessary services to patients of Eastern Suffolk Chiropractic rendered Eastern Suffolk Chiropractic completely ineligible for No-Fault reimbursement under New York law.

659. Because Eastern Suffolk Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Eastern Suffolk Chiropractic to make a misrepresentation each and every time that Eastern Suffolk Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

660. Moreover, because (a) Eastern Suffolk Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Eastern Suffolk Chiropractic to seek No-Fault reimbursement from Allstate (even though Eastern Suffolk Chiropractic was not entitled to such reimbursements), and (c) Eastern Suffolk Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Eastern Suffolk Chiropractic.

661. At all relevant times, Tubens and these Defendants knew that Eastern Suffolk Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider

and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Eastern Suffolk Chiropractic.

662. Allstate estimates that the unlawful operation of the Eastern Suffolk Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 5 and incorporated by reference as if set forth in its entirety.

### D. FRONT ST. CHIROPRACTIC, P.C. ENTERPRISE

663. Tubens, Melgar, Melgar PT, Patchogue Regional Chiropractic, Apazidis, Apazidis P.C., and Ehrlich used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Front St. Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

664. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Front St. Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Front St. Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

665. Tubens' (and/or his agents') provision of excessive and medically unnecessary services to patients of Front St. Chiropractic rendered Front St. Chiropractic completely ineligible for No-Fault reimbursement under New York law.

666. Because Front St. Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Front St. Chiropractic to make a misrepresentation each and every time that Front St. Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

667. Moreover, because (a) Front St. Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Front St. Chiropractic to seek No-Fault reimbursement from Allstate (even though Front St. Chiropractic was not entitled to such reimbursements), and (c) Front St. Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Front St. Chiropractic.

668. At all relevant times, Tubens and these Defendants knew that Front St. Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Front St. Chiropractic.

669. Allstate estimates that the unlawful operation of the Front St. Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

### E. HEMPSTEAD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE

670. Tubens, Melgar, Melgar PT, Liberty Regional Chiropractic, Apazidis, Apazidis P.C., and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Hempstead Regional Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

671. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Hempstead Regional Chiropractic to falsely certify that it was, in

all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Hempstead Regional Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

672. Tubens' (and/or his agents') provision of excessive and medically unnecessary services to patients of Hempstead Regional Chiropractic rendered Hempstead Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

673. Because Hempstead Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Hempstead Regional Chiropractic to make a misrepresentation each and every time that Hempstead Regional Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

674. Moreover, because (a) Hempstead Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Hempstead Regional Chiropractic to seek No-Fault reimbursement from Allstate (even though Hempstead Regional Chiropractic was not entitled to such reimbursements), and (c) Hempstead Regional Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Hempstead Regional Chiropractic.

675. At all relevant times, Tubens and these Defendants knew that Hempstead Regional Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Hempstead Regional Chiropractic.

676. Allstate estimates that the unlawful operation of the Hempstead Regional Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of

mailings made in furtherance of a scheme is annexed at Exhibit 7 and incorporated by reference as if set forth in its entirety.

### F. HUNTINGTON REGIONAL CHIROPRACTIC, P.C. ENTERPRISE

677. Tubens, Melgar, Melgar PT, Eastern Suffolk Chiropractic, Tyorkin, Mosomillo, Pavilion Medical, Apazidis, Apazidis P.C., Jones, Phoenix Medical Services, Seldes, Deer Park Orthopedics, Station Medical Services, Ehrlich, Matatov, East Point Acupuncture, Abramchayeva, DA Acupuncture, Romero, Ponce Acupuncture, and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Huntington Regional Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

678. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Huntington Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Huntington Regional Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

679. Tubens' (and/or his agents') provision (of excessive and medically unnecessary services to patients of Huntington Regional Chiropractic rendered Huntington Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

680. Because Huntington Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Huntington Regional Chiropractic to make a misrepresentation each and every time that Huntington Regional Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

681. Moreover, because (a) Huntington Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Huntington Regional Chiropractic to seek No-Fault reimbursement from Allstate (even though Huntington Regional Chiropractic was not entitled to such reimbursements), and (c) Huntington Regional Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Huntington Regional Chiropractic.

682. At all relevant times, Tubens and these Defendants knew that Huntington Regional Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Huntington Regional Chiropractic.

683. Allstate estimates that the unlawful operation of the Huntington Regional Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 8 and incorporated by reference as if set forth in its entirety.

**G. LIBERTY REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**

684. Tubens, Melgar, Melgar PT, Hempstead Regional Chiropractic, Apazidis, Apazidis P.C., and Island Regional Management used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Liberty Regional Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

685. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Liberty Regional Chiropractic to falsely certify that it was, in all

respects, eligible to be reimbursed under New York's No-Fault Laws each time that Liberty Regional Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

686. Tubens' (and/or his agents') provision of excessive and medically unnecessary services to patients of Liberty Regional Chiropractic rendered Liberty Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

687. Because Liberty Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Liberty Regional Chiropractic to make a misrepresentation each and every time that Liberty Regional Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

688. Moreover, because (a) Liberty Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Liberty Regional Chiropractic to seek No-Fault reimbursement from Allstate (even though Liberty Regional Chiropractic was not entitled to such reimbursements), and (c) Liberty Regional Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Liberty Regional Chiropractic.

689. At all relevant times, Tubens and these Defendants knew that Liberty Regional Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Liberty Regional Chiropractic.

690. Allstate estimates that the unlawful operation of the Liberty Regional Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings

made in furtherance of a scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

### H. Patchogue Regional Chiropractic, P.C. Enterprise

691. Tubens, Melgar, Melgar PT, Front St. Chiropractic, Apazidis, Apazidis P.C., and Ehrlich used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Patchogue Regional Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

692. Tubens and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Patchogue Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Huntington Regional Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

693. Tubens' (and/or his agents') provision of excessive and medically unnecessary services to patients of Patchogue Regional Chiropractic rendered Patchogue Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

694. Because Patchogue Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Patchogue Regional Chiropractic to make a misrepresentation each and every time that Patchogue Regional Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

695. Moreover, because (a) Patchogue Regional Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tubens (and/or other persons working at his direction and/or on his behalf) caused Patchogue Regional Chiropractic to seek No-Fault reimbursement from Allstate (even though Patchogue Regional Chiropractic was not entitled to

such reimbursements), and (c) Patchogue Regional Chiropractic used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Patchogue Regional Chiropractic.

696. At all relevant times, Tubens and these Defendants knew that Patchogue Regional Chiropractic, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Patchogue Regional Chiropractic.

697. Allstate estimates that the unlawful operation of the Patchogue Regional Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 10 and incorporated by reference as if set forth in its entirety.

### I. MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE ENTERPRISE

698. Tyorkin, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Maximum Orthopaedics and Sports Medicine to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

699. Tyorkin and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Maximum Orthopaedics and Sports Medicine to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Maximum Orthopaedics and Sports Medicine mailed a demand for payment (i.e., invoice) to Allstate.

700. Tyorkin's (and/or his agents') provision of excessive and medically unnecessary services to patients of Maximum Orthopaedics and Sports Medicine rendered Maximum Orthopaedics and Sports Medicine completely ineligible for No-Fault reimbursement under New York law.

701. Melgar's and Tubens' domination and control over Maximum Orthopaedics and Sports Medicine—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Maximum Orthopaedics and Sports Medicine completely ineligible for No-Fault reimbursement under New York law.

702. Because Maximum Orthopaedics and Sports Medicine was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Tyorkin, Melgar, and Tubens (and/or other persons working at his direction and/or on his behalf) purposely caused Maximum Orthopaedics and Sports Medicine to make a misrepresentation each and every time that Maximum Orthopaedics and Sports Medicine mailed a document to Allstate claiming eligibility for reimbursement.

703. Therefore, because (a) Tyorkin, through Maximum Orthopaedics and Sports Medicine, was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Tyorkin, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused Maximum Orthopaedics and Sports Medicine to seek No-Fault reimbursement from Allstate even though Maximum Orthopaedics and Sports Medicine was not entitled to such reimbursements, and (c) Maximum Orthopaedics and Sports Medicine used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Maximum Orthopaedics and Sports Medicine.

704. At all relevant times, Tyorkin, Melgar, Tubens, and Island Regional Management knew that Maximum Orthopaedics and Sports Medicine (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Maximum Orthopaedics and Sports Medicine.

705. Allstate estimates that the unlawful operation of the Maximum Orthopaedics and Sports Medicine enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 11 and incorporated by reference as if set forth in its entirety.

### J. PAVILION MEDICAL, P.C. ENTERPRISE

706. Mosomillo, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Pavilion Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

707. Mosomillo and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Pavilion Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Pavilion Medical mailed a demand for payment (i.e., invoice) to Allstate.

708. Mosomillo's (and/or his agents') provision of excessive and medically unnecessary services to patients of Pavilion Medical rendered Pavilion Medical completely ineligible for No-Fault reimbursement under New York law.

709. Melgar's and Tubens' domination and control over Pavilion Medical—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Pavilion Medical completely ineligible for No-Fault reimbursement under New York law.

710. Because Pavilion Medical was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Mosomillo, Melgar, and Tubens purposely caused Pavilion Medical to make a misrepresentation each and every time that Pavilion Medical mailed a document to Allstate claiming eligibility for reimbursement.

711. Therefore, because (a) Pavilion Medical was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Mosomillo, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused Pavilion Medical to seek No-Fault reimbursement from Allstate even though Pavilion Medical was not entitled to such reimbursements, and (c) Pavilion Medical used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Pavilion Medical.

712. At all relevant times, Mosomillo and these Defendants knew that Pavilion Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Pavilion Medical.

713. Allstate estimates that the unlawful operation of the Pavilion Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 12 and incorporated by reference as if set forth in its entirety.

### K. ALEXIOS APAZIDIS, M.D., P.C. D/B/A ADVANCED SPINE CARE AND TOTAL SPINE & SPORTS CARE ENTERPRISE

714. Apazidis, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Apazidis P.C. to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

715. Apazidis and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Apazidis P.C. to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Apazidis P.C. mailed a demand for payment (i.e., invoice) to Allstate.

716. Apazidis' (and/or his agents') provision of excessive and medically unnecessary services to patients of Apazidis P.C. rendered Apazidis P.C. ineligible for No-Fault reimbursement under New York law.

717. Melgar's and Tubens' domination and control over Apazidis P.C.—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Apazidis P.C. completely ineligible for No-Fault reimbursement under New York law.

718. Because Apazidis P.C. was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Apazidis, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused Apazidis P.C. to make a misrepresentation each and every time that Apazidis P.C. mailed a document to Allstate claiming eligibility for reimbursement.

719. Therefore, because (a) Apazidis P.C. was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Apazidis, Melgar, and Tubens (and/or other persons working at

their direction and/or on their behalf) caused Apazidis P.C. to seek No-Fault reimbursement from Allstate even though Apazidis P.C. was not entitled to such reimbursements, and (c) Apazidis P.C. used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these defendants committed mail fraud through Apazidis P.C.

720. At all relevant times, Apazidis and these Defendants knew that Apazidis P.C. (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Apazidis P.C.

721. Allstate estimates that the unlawful operation of the Apazidis P.C. enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 13 and incorporated by reference as if set forth in its entirety.

### L. PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE

722. Jones, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Phoenix Medical Services to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

723. Jones and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Phoenix Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Phoenix Medical Services mailed a demand for payment (i.e., invoice) to Allstate.

724. Jones' (and/or his agents') provision of excessive and medically unnecessary services to patients of Phoenix Medical Services rendered Phoenix Medical Services completely ineligible for No-Fault reimbursement under New York law.

725. Melgar's and Tubens' domination and control over Phoenix Medical Services—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Phoenix Medical Services completely ineligible for No-Fault reimbursement under New York law.

726. Because Phoenix Medical Services was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Jones, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused Phoenix Medical Services to make a misrepresentation each and every time that Phoenix Medical Services mailed a document to Allstate claiming eligibility for reimbursement.

727. Therefore, because (a) Phoenix Medical Services was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Jones, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused Phoenix Medical Services to seek No-Fault reimbursement from Allstate even though Phoenix Medical Services was not entitled to such reimbursements, and (c) Phoenix Medical Services used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Phoenix Medical Services.

728. At all relevant times, Jones and these Defendants knew that Phoenix Medical Services (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be

caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Phoenix Medical Services.

729. Allstate estimates that the unlawful operation of the Phoenix Medical Services enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 14 and incorporated by reference as if set forth in its entirety.

### M. DEER PARK ORTHOPEDICS, P.C. ENTERPRISE

730. Seldes, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Deer Park Orthopedics to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

731. Seldes and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Deer Park Orthopedics to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Deer Park Orthopedics mailed a demand for payment (i.e., invoice) to Allstate.

732. Seldes' (and/or his agents') provision of excessive and medically unnecessary services to patients of Deer Park Orthopedics rendered Deer Park Orthopedics completely ineligible for No-Fault reimbursement under New York law.

733. Melgar's and Tubens' domination and control over Deer Park Orthopedics—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Deer Park Orthopedics completely ineligible for No-Fault reimbursement under New York law.

734. Because Deer Park Orthopedics was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Seldes, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused Deer Park Orthopedics to make a misrepresentation each and every time that Deer Park Orthopedics mailed a document to Allstate claiming eligibility for reimbursement.

735. Therefore, because (a) Deer Park Orthopedics was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Seldes, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused Deer Park Orthopedics to seek No-Fault reimbursement from Allstate even though Deer Park Orthopedics was not entitled to such reimbursements, and (c) Deer Park Orthopedics used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Deer Park Orthopedics.

736. At all relevant times, Seldes and these Defendants knew that Deer Park Orthopedics (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Deer Park Orthopedics.

737. Allstate estimates that the unlawful operation of the Deer Park Orthopedics enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 15 and incorporated by reference as if set forth in its entirety.

## N. STATION MEDICAL SERVICES, P.C. ENTERPRISE

738. Seldes, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Station Medical Services to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

739. Seldes and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Station Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Station Medical Services mailed a demand for payment (i.e., invoice) to Allstate.

740. Seldes' (and/or his agents') provision of excessive and medically unnecessary services to patients of Station Medical Services rendered Station Medical Services completely ineligible for No-Fault reimbursement under New York law.

741. Melgar's and Tubens' domination and control over Station Medical Services—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Station Medical Services completely ineligible for No-Fault reimbursement under New York law.

742. Because Station Medical Services was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Seldes, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused Station Medical Services to make a misrepresentation each and every time that Station Medical Services mailed a document to Allstate claiming eligibility for reimbursement.

743. Therefore, because (a) Station Medical Services was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Seldes, Melgar, and Tubens (and/or other persons

working at their direction and/or on their behalf) caused Station Medical Services to seek No-Fault reimbursement from Allstate even though Station Medical Services was not entitled to such reimbursements, and (c) Station Medical Services used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Station Medical Services.

744. At all relevant times, Seldes and these defendants knew that Station Medical Services (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Station Medical Services.

745. Allstate estimates that the unlawful operation of the Station Medical Services enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 16 and incorporated by reference as if set forth in its entirety.

### O. DRD MEDICAL, P.C. ENTERPRISE

746. Dynof, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from DRD Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

747. Dynof and these Defendants (and/or other persons working at their direction and/or on their behalf) caused DRD Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that DRD Medical mailed a demand for payment (i.e., invoice) to Allstate.

748. Dynof's (and/or his agents') provision of excessive and medically unnecessary services to patients of DRD Medical rendered DRD Medical completely ineligible for No-Fault reimbursement under New York law.

749. Melgar's and Tubens' domination and control over DRD Medical—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered DRD Medical completely ineligible for No-Fault reimbursement under New York law.

750. Because DRD Medical was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Dynof, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused DRD Medical to make a misrepresentation each and every time that DRD Medical mailed a document to Allstate claiming eligibility for reimbursement.

751. Therefore, because (a) DRD Medical was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Dynof, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused DRD Medical to seek No-Fault reimbursement from Allstate even though DRD Medical was not entitled to such reimbursements, and (c) DRD Medical used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through DRD Medical.

752. At all relevant times, Dynof and these Defendants knew that DRD Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by DRD Medical.

753. Allstate estimates that the unlawful operation of the DRD Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 17 and incorporated by reference as if set forth in its entirety.

**P. ORTHOCARE SURGICAL ENTERPRISE**

754. Ehrlich, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from OrthoCare Surgical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

755. Ehrlich and these Defendants (and/or other persons working at their direction and/or on their behalf) caused OrthoCare Surgical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that OrthoCare Surgical mailed a demand for payment (i.e., invoice) to Allstate.

756. Ehrlich's (and/or his agents') provision of excessive and medically unnecessary services to patients of OrthoCare Surgical rendered OrthoCare Surgical completely ineligible for No-Fault reimbursement under New York law.

757. Melgar's and Tubens' domination and control over OrthoCare Surgical—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered OrthoCare Surgical completely ineligible for No-Fault reimbursement under New York law.

758. Because OrthoCare Surgical was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Ehrlich, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused OrthoCare Surgical to

make a misrepresentation each and every time that OrthoCare Surgical mailed a document to Allstate claiming eligibility for reimbursement.

759. Therefore, because (a) OrthoCare Surgical was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Ehrlich, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused OrthoCare Surgical to seek No-Fault reimbursement from Allstate even though OrthoCare Surgical was not entitled to such reimbursements, and (c) OrthoCare Surgical used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through OrthoCare Surgical.

760. At all relevant times, Ehrlich and these defendants knew that OrthoCare Surgical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by OrthoCare Surgical.

761. Allstate estimates that the unlawful operation of the OrthoCare Surgical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 18 and incorporated by reference as if set forth in its entirety.

### Q. EAST POINT ACUPUNCTURE, P.C. ENTERPRISE

762. Matatov, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from East Point Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

763. Matatov and these Defendants (and/or other persons working at their direction and/or on their behalf) caused East Point Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that East Point Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

764. Matatov's (and/or her agents') provision of excessive and medically unnecessary services to patients of East Point Acupuncture rendered East Point Acupuncture completely ineligible for No-Fault reimbursement under New York law.

765. Melgar's and Tubens' domination and control over East Point Acupuncture—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered East Point Acupuncture completely ineligible for No-Fault reimbursement under New York law.

766. Because East Point Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Matatov, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused East Point Acupuncture to make a misrepresentation each and every time that East Point Acupuncture mailed a document to Allstate claiming eligibility for reimbursement.

767. Therefore, because (a) East Point Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Matatov, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused East Point Acupuncture to seek No-Fault reimbursement from Allstate even though East Point Acupuncture was not entitled to such reimbursements, and (c) East Point Acupuncture used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through East Point Acupuncture.

768. At all relevant times, Matatov and these Defendants knew that East Point Acupuncture (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by East Point Acupuncture.

769. Allstate estimates that the unlawful operation of the East Point Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 19 and incorporated by reference as if set forth in its entirety.

**R. DA ACUPUNCTURE, P.C. ENTERPRISE**

770. Abramchayeva, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from DA Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

771. Abramchayeva and these Defendants (and/or other persons working at their direction and/or on their behalf) caused DA Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that DA Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

772. Abramchayeva's (and/or her agents') provision of excessive and medically unnecessary services to DA Acupuncture rendered DA Acupuncture completely ineligible for No-Fault reimbursement under New York law.

773. Melgar's and Tubens' domination and control over DA Acupuncture—including receipt and distribution of fees and proceeds derived from professional services that these

defendants were not lawfully authorized to administer, control, or profit from—also rendered DA Acupuncture completely ineligible for No-Fault reimbursement under New York law.

774. Because DA Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Abramchayeva, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused DA Acupuncture to make a misrepresentation each and every time that DA Acupuncture mailed a document to Allstate claiming eligibility for reimbursement.

775. Therefore, because (a) DA Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Abramchayeva, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) caused DA Acupuncture to seek No-Fault reimbursement from Allstate even though DA Acupuncture was not entitled to such reimbursements, and (c) DA Acupuncture used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through DA Acupuncture.

776. At all relevant times, Abramchayeva and these Defendants knew that DA Acupuncture (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate (or be caused to use) would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by DA Acupuncture.

777. Allstate estimates that the unlawful operation of the DA Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 20 and incorporated by reference as if set forth in its entirety.

### S. PONCE ACUPUNCTURE, P.C. ENTERPRISE

778. Romero, Melgar, Tubens, and Island Regional Management used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Ponce Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

779. Romero and these Defendants (and/or other persons working at their direction and/or on their behalf) caused Ponce Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Ponce Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

780. Romero's (and/or her agents') provision of excessive and medically unnecessary services to Ponce Acupuncture rendered Ponce Acupuncture completely ineligible for No-Fault reimbursement under New York law.

781. Melgar's and Tubens' domination and control over Ponce Acupuncture—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from—also rendered Ponce Acupuncture completely ineligible for No-Fault reimbursement under New York law.

782. Because Ponce Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Romero, Melgar, and Tubens (and/or other persons working at their direction and/or on their behalf) purposely caused Ponce Acupuncture to make a misrepresentation each and every time that Ponce Acupuncture mailed a document to Allstate claiming eligibility for reimbursement.

783. Therefore, because (a) Ponce Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Romero, Melgar, and Tubens (and/or other persons working

at their direction and/or on their behalf) caused Ponce Acupuncture to seek No-Fault reimbursement from Allstate even though Ponce Acupuncture was not entitled to such reimbursements, and (c) Ponce Acupuncture used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through Ponce Acupuncture.

784. At all relevant times, Romero and these Defendants knew that Ponce Acupuncture, P.C. (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Ponce Acupuncture.

785. Allstate estimates that the unlawful operation of the Ponce Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of a scheme is annexed at Exhibit 21 and incorporated by reference as if set forth in its entirety.

### T. ISLAND REGIONAL MANAGEMENT, LLC ENTERPRISE

786. Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) used the U.S. Mail (or caused the U.S. Mail to be used) to further the defendants' fraudulent scheme by causing medical bills and records from Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine,

Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture through Island Regional Management to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge that the use of U.S. Mail would follow in the ordinary course of business.

787. Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that demand for payment (i.e., invoiced) was mailed to Allstate.

788. During the entire course of this scheme, Melgar's and Tubens' domination and control over Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from— rendered Maximum Orthopaedics and

Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture completely ineligible for No-Fault reimbursement under New York law.

789. Melgar PT's, Brentwood Regional Chiropractic's, Hempstead Regional Chiropractic's, Huntington Regional Chiropractic's, and Liberty Regional Chiropractic's illegal financial and referral arrangement also rendered Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, and Liberty Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

790. Because Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station

Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to make a misrepresentation each and every time that Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

791. Therefore, because (a) Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not lawfully eligible to seek or collect No-Fault benefits, (b) Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to seek No-Fault reimbursement from Allstate, by and through Island Regional Management, even though

Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not entitled to such reimbursement, and (c) Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture used (or caused Island Regional Management to use) the U.S. Mail to seek No-Fault reimbursement on behalf of Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture, it is clear that Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture committed mail fraud.

792. At all times relevant, Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional

Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture.

793. Allstate estimate that the unlawful operation of the Melgar PT, Brentwood Regional Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Pavilion Medical, Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture enterprises generated hundreds of mailing by and through Island Regional Management. Tables highlighting selected examples of mailings made in furtherance of this scheme are annexed at Exhibits 3-4, 7-9, 11-13, 15-16, and 19-21 and incorporated by references as if set forth in their entirety.

### U. G&A OFFICE MANAGEMENT, INC. ENTERPRISE

794. Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their

behalf) used the U.S. Mail (or caused the U.S. Mail to be used) to further the defendants' fraudulent scheme by causing medical bills and records from Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture through G&A Office Management to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge that the use of U.S. Mail would follow in the ordinary course of business.

795. Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that demand for payment (i.e., invoiced) was mailed to Allstate.

796. During the entire course of this scheme, Melgar's and Tubens' domination and control over Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture—including receipt and distribution of fees and proceeds derived from professional services that these defendants were not lawfully authorized to administer, control, or profit from— rendered Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point

Acupuncture, Ponce Acupuncture, and DA Acupuncture completely ineligible for No-Fault reimbursement under New York law.

797. Melgar PT's, Eastern Suffolk Chiropractic's, and Huntington Regional Chiropractic's illegal financial and referral arrangement also rendered Melgar PT, Eastern Suffolk Chiropractic, and Huntington Regional Chiropractic completely ineligible for No-Fault reimbursement under New York law.

798. Because Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to make a misrepresentation each and every time that Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

799. Therefore, because (a) Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not lawfully eligible to seek or collect No-Fault benefits, (b) Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (and/or persons working at their direction and/or on their behalf) caused Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture to seek No-Fault reimbursement from Allstate, by and through G&A Office Management, even though Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture were not entitled to such reimbursement, and (c) Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture used (or caused G&A Office Management to use) the U.S. Mail to seek No-Fault reimbursement on behalf of Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, OrthoCare Surgical, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture, it is clear that

Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture committed mail fraud.

800. At all times relevant, Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture (including its employees, contractors, and agents), a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare providers, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Melgar, Tubens, Tyorkin, Apazidis, Jones, Seldes, Ehrlich, Matatov, Romero, Abramchayeva, Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture.

801. Allstate estimate that the unlawful operation of the Melgar PT, Eastern Suffolk Chiropractic, Huntington Regional Chiropractic, Maximum Orthopaedics and Sports Medicine, Apazidis PC, Phoenix Medical Services, Station Medical Services, East Point Acupuncture, Ponce Acupuncture, and DA Acupuncture enterprises generated hundreds of mailing by and through G&A Office Management. Tables highlighting selected examples of mailings made in furtherance of this scheme are annexed at Exhibits 5, 8, 13-14, and 19-21 and incorporated by references as if set forth in their entirety.

## VII. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A. FRAUDULENT CONCEALMENT—MELGAR PT ENTERPRISE

802. At all relevant times during the operation of the Melgar PT enterprise, Melgar purposely caused Melgar PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary physical therapy treatment and services purportedly provided to Allstate Insureds.

803. Melgar (along with those individuals working under his control) purposely concealed the lack of medical necessity for the physical therapy treatments and services purportedly provided and charged for by Melgar PT.

804. Melgar (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the physical therapy treatments and services purportedly provided by Melgar PT to Allstate Insureds.

805. Because Melgar was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Melgar PT, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary physical therapy treatments, tests, and services purportedly rendered to Allstate Insureds through Melgar PT, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws,

Melgar PT was caused to falsely claim eligibility each and every time that Melgar PT sought No-Fault reimbursement from Allstate.

806. As alleged above, Melgar (or those persons working under his control) caused Melgar PT to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

807. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

808. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

809. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

810. Thus, every time that Melgar (along with those individuals working under his control) caused Melgar PT to submit No-Fault reimbursement demands to Allstate, Melgar (and those individuals working under his control) necessarily certified that Melgar PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

811. The full extent of Melgar's fraudulent and unlawful acts relative to their participation in the Melgar PT enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### B. FRAUDULENT CONCEALMENT—BRENTWOOD REGIONAL CHIROPRACTIC ENTERPRISE

812. At all relevant times during the operation of the Brentwood Regional Chiropractic enterprise, Tubens purposely caused Brentwood Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

813. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Brentwood Regional Chiropractic.

814. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Brentwood Regional Chiropractic to Allstate Insureds.

815. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Brentwood Regional Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Brentwood Regional Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Brentwood Regional Chiropractic was caused to falsely claim eligibility each and every time that Brentwood Regional Chiropractic sought No-Fault reimbursement from Allstate.

816. As alleged above, Tubens (or those persons working under his control) caused Brentwood Regional to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

817. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

818. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

819. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

820. Thus, every time that Tubens (along with those individuals working under his control) caused Brentwood Regional Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Brentwood Regional Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

821. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Brentwood Regional Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C. FRAUDULENT CONCEALMENT—EASTERN SUFFOLK CHIROPRACTIC ENTERPRISE

822. At all relevant times during the operation of the Eastern Suffolk Chiropractic enterprise, Tubens purposely caused Eastern Suffolk Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

823. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Eastern Suffolk Chiropractic.

824. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Eastern Suffolk Chiropractic to Allstate Insureds.

825. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Eastern Suffolk Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Eastern Suffolk Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Eastern Suffolk Chiropractic was caused to falsely claim eligibility each and every time that Eastern Suffolk Chiropractic sought No-Fault reimbursement from Allstate.

826. As alleged above, Tubens (or those persons working under his control) caused Eastern Suffolk Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

827. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

828. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

829. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

830. Thus, every time that Tubens (along with those individuals working under his control) caused Eastern Suffolk Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Eastern Suffolk Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

831. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Eastern Suffolk Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D. FRAUDULENT CONCEALMENT—FRONT ST. CHIROPRACTIC ENTERPRISE

832. At all relevant times during the operation of the Front St. Chiropractic enterprise, Tubens purposely caused Front St. Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

833. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Front St. Chiropractic.

834. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Front St. Chiropractic to Allstate Insureds.

835. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Front St. Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Front St. Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Front St. Chiropractic was caused to falsely claim eligibility each and every time that Front St. Chiropractic sought No-Fault reimbursement from Allstate.

836. As alleged above, Tubens (or those persons working under his control) caused Front St. Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

837. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

838. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

839. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

840. Thus, every time that Tubens (along with those individuals working under his control) caused Front St. Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Front St. Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

841. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Front St. Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### E. FRAUDULENT CONCEALMENT—HEMPSTEAD REGIONAL CHIROPRACTIC ENTERPRISE

842. At all relevant times during the operation of the Hempstead Regional Chiropractic enterprise, Tubens purposely caused Hempstead Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

843. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Hempstead Regional Chiropractic.

844. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Hempstead Regional Chiropractic to Allstate Insureds.

845. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Hempstead Regional Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Hempstead Regional Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Hempstead Regional Chiropractic was caused to falsely claim eligibility each and every time that Hempstead Regional Chiropractic sought No-Fault reimbursement from Allstate.

846. As alleged above, Tubens (or those persons working under his control) caused Hempstead Regional Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

847. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

848. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

849. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

850. Thus, every time that Tubens (along with those individuals working under his control) caused Hempstead Regional Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Hempstead Regional Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

851. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Hempstead Regional Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### F. FRAUDULENT CONCEALMENT—HUNTINGTON REGIONAL CHIROPRACTIC ENTERPRISE

852. At all relevant times during the operation of the Huntington Regional Chiropractic enterprise, Tubens purposely caused Huntington Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

853. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Huntington Regional Chiropractic.

854. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Huntington Regional Chiropractic to Allstate Insureds.

855. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Huntington Regional Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Huntington Regional Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Huntington Regional Chiropractic was caused to falsely claim eligibility each and every time that Huntington Regional Chiropractic sought No-Fault reimbursement from Allstate.

856. As alleged above, Tubens (or those persons working under his control) caused Huntington Regional Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

857. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

858. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

859. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

860. Thus, every time that Tubens (along with those individuals working under his control) caused Huntington Regional Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Huntington Regional Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

861. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Huntington Regional Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### G. FRAUDULENT CONCEALMENT—LIBERTY REGIONAL CHIROPRACTIC ENTERPRISE

862. At all relevant times during the operation of the Liberty Regional Chiropractic enterprise, Tubens purposely caused Liberty Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

863. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Liberty Regional Chiropractic.

864. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Liberty Regional Chiropractic to Allstate Insureds.

865. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Liberty Regional Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Liberty Regional Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Liberty Regional Chiropractic was caused to falsely claim eligibility each and every time that Liberty Regional Chiropractic sought No-Fault reimbursement from Allstate.

866. As alleged above, Tubens (or those persons working under his control) caused Liberty Regional Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

867. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

868. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

869. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

870. Thus, every time that Tubens (along with those individuals working under his control) caused Liberty Regional Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Liberty Regional Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

871. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Liberty Regional Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### H. FRAUDULENT CONCEALMENT—PATCHOGUE REGIONAL CHIROPRACTIC ENTERPRISE

872. At all relevant times during the operation of the Patchogue Regional Chiropractic enterprise, Tubens purposely caused Patchogue Regional Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Insureds.

873. Tubens (along with those individuals working under his control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Patchogue Regional Chiropractic.

874. Tubens (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Patchogue Regional Chiropractic to Allstate Insureds.

875. Because Tubens was responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Insureds through Patchogue Regional Chiropractic, (b) creating treatments records submitted to Allstate in support of services purportedly rendered to Allstate Insureds, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Insureds through Patchogue Regional Chiropractic, and (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, Patchogue Regional Chiropractic was caused to falsely claim eligibility each and every time that Patchogue Regional Chiropractic sought No-Fault reimbursement from Allstate.

876. As alleged above, Tubens (or those persons working under his control) caused Patchogue Regional Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not actually provided.

877. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

878. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evidence within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

879. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

880. Thus, every time that Tubens (along with those individuals working under his control) caused Patchogue Regional Chiropractic to submit No-Fault reimbursement demands to Allstate, Tubens (and those individuals working under his control) necessarily certified that Patchogue Regional Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

881. The full extent of Tubens' fraudulent and unlawful acts relative to their participation in the Patchogue Regional Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### I. Fraudulent Concealment—Maximum Orthopaedics and Sports Medicine Enterprise

882. In furtherance of this scheme, Tyorkin was induced to do business as Maximum Orthopaedics and Sports Medicine.

883. Tyorkin also was induced to hold himself out as the owner of a purported entity named "Maximum Orthopedics PC" even though Tyorkin has never been the owner of a professional corporation bearing this name and no entity has been registered with the State of New York under this name.

884. By holding Tyorkin out as the owner of an entity that does not actually exist, Tyorkin, Melgar, and Tubens deliberately concealed Melgar's and Tubens' involvement with or control over Tyorkin and the Maximum Orthopaedics and Sports Medicine enterprise.

885. Tyorkin further publicly held himself out as the "founder/owner" of Maximum Orthopaedics and Sports Medicine during the relevant period.

886. Therefore, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Tyorkin and the Maximum Orthopaedics and Sports Medicine enterprise.

887. Melgar's and Tubens' purposeful concealment of their controlling interest in the Maximum Orthopaedics and Sports Medicine enterprise —including their control over the Maximum Orthopaedics and Sports Medicine enterprise's professional fees, profits, and company finances, and their participation in the operation, management, and control of the Maximum Orthopaedics and Sports Medicine enterprise —allowed Tyorkin's orthopedic medicine business to be unlawfully controlled without detection.

888. At all relevant times during the operation of the Maximum Orthopaedics and Sports Medicine enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly

provided to patients who received treatment through the Maximum Orthopaedics and Sports Medicine enterprise, Melgar and Tubens caused Tyorkin to falsely certify that he (and by extension, the Maximum Orthopaedics and Sports Medicine enterprise) was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

889. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through the Maximum Orthopaedics and Sports Medicine enterprise and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Tyorkin's claims for No-Fault reimbursement while doing business as the Maximum Orthopaedics and Sports Medicine enterprise.

890. Further, Tyorkin attested (or caused the attestation) to the medical necessity of the services that Tyorkin (or persons under his direction and control) allegedly administered in connection with the treatment and testing of patients of the Maximum Orthopaedics and Sports Medicine enterprise, as well as the validity of charges submitted to Allstate for such services.

891. At all relevant times, Tyorkin, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

892. At all relevant times, Tyorkin, Melgar, and Tubens actively concealed from Allstate facts regarding the Maximum Orthopaedics and Sports Medicine enterprise's true control to prevent Allstate from discovering that the Maximum Orthopaedics and Sports Medicine enterprise was unlawfully operated and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

893. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of the Maximum Orthopaedics and Sports Medicine enterprise's patients, and (b) the Maximum Orthopaedics and Sports Medicine enterprise's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

894. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

895. Thus, every time that Melgar and Tubens (along with those individuals working under their control) caused Tyorkin to submit No-Fault reimbursement demands to Allstate, Tyorkin, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Tyorkin, doing business as the Maximum Orthopaedics and Sports Medicine enterprise, was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

896. The full extent of Tyorkin's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Maximum Orthopaedics and Sports Medicine enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Tyorkin's patients, (b) Melgar's and Tubens' participation in the operation and control of the Maximum Orthopaedics and Sports Medicine enterprise, and (c) the unlawful channeling of Tyorkin's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Tyorkin and Melgar and Tubens (and/or entities

controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### J. FRAUDULENT CONCEALMENT—PAVILION MEDICAL ENTERPRISE

897. Mosomillo registered himself with the State of New York as Pavilion Medical's sole officer, director, and shareholder.

898. At all relevant times, the documents created and filed with the State of New York related to Pavilion Medical deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Mosomillo or Pavilion Medical.

899. The documents created and filed with the State of New York related to Pavilion Medical gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Pavilion Medical, or in any way participated in the operation, management, and control of Pavilion Medical.

900. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Pavilion Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Mosomillo and Pavilion Medical.

901. Melgar's and Tubens' purposeful concealment of their controlling interest in Pavilion Medical—including their control over Pavilion Medical's professional fees, profits, and company finances, and their participation in the operation, management, and control of Pavilion Medical—allowed Pavilion Medical to be unlawfully controlled without detection.

902. At all relevant times during the operation of the Pavilion Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Pavilion Medical, Mosomillo, Melgar, and Tubens caused

Pavilion Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

903. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Pavilion Medical and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Pavilion Medical's claims for No-Fault reimbursement.

904. Further, Mosomillo attested (or caused the attestation) to the medical necessity of the services that Mosomillo (or persons under his direction and control) allegedly administered in connection with the treatment and testing of Pavilion Medical patients, as well as the validity of charges submitted to Allstate for such services.

905. At all relevant times, Mosomillo, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

906. At all relevant times, Mosomillo, Melgar, and Tubens actively concealed from Allstate facts regarding Pavilion Medical's true ownership and control to prevent Allstate from discovering that Pavilion Medical was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

907. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Pavilion Medical's patients, and (b) Pavilion Medical's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants

and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

908. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

909. Thus, every time that Mosomillo, Melgar, and Tubens (along with those individuals working under their control) caused Pavilion Medical to submit No-Fault reimbursement demands to Allstate, Mosomillo, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Pavilion Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

910. The full extent of Mosomillo's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Pavilion Medical enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Pavilion Medical's patients, (b) Melgar's and Tubens' participation in the operation and control of Pavilion Medical, and (c) the unlawful channeling of Pavilion Medical's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Pavilion Medical and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### K. FRAUDULENT CONCEALMENT—APAZIDIS P.C. ENTERPRISE

911. Apazidis registered himself with the State of New York as Apazidis P.C.'s sole officer, director, and shareholder.

912. At all relevant times, the documents created and filed with the State of New York related to Apazidis P.C. deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Apazidis or Apazidis P.C.

913. The documents created and filed with the State of New York related to Apazidis P.C. gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Apazidis P.C., or in any way participated in the operation, management, and control of Apazidis P.C.

914. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Apazidis P.C., Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Apazidis and Apazidis P.C.

915. Melgar's and Tubens' purposeful concealment of their controlling interest in Apazidis P.C.—including their control over Apazidis P.C.'s professional fees, profits, and company finances, and their participation in the operation, management, and control of Apazidis P.C.—allowed Apazidis P.C. to be unlawfully controlled without detection.

916. At all relevant times during the operation of the Pavilion Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Apazidis P.C., Apazidis, Melgar, and Tubens caused Apazidis P.C. to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

917. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Apazidis P.C. and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare

services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Apazidis P.C.'s claims for No-Fault reimbursement.

918. Further, Apazidis attested (or caused the attestation) to the medical necessity of the services that Apazidis (or persons under his direction and control) allegedly administered in connection with the treatment and testing of Apazidis P.C. patients, as well as the validity of charges submitted to Allstate for such services.

919. At all relevant times, Apazidis, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

920. At all relevant times, Apazidis, Melgar, and Tubens actively concealed from Allstate facts regarding Apazidis P.C.'s true ownership and control to prevent Allstate from discovering that Apazidis P.C. was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

921. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Apazidis P.C.'s patients, and (b) Apazidis P.C.'s unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

922. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

923. Thus, every time that Apazidis, Melgar, and Tubens (along with those individuals working under their control) caused Pavilion Medical to submit No-Fault reimbursement demands to Allstate, Apazidis, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Apazidis P.C. was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

924. The full extent of Apazidis', Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Pavilion Medical enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Apazidis P.C.'s patients, (b) Melgar's and Tubens' participation in the operation and control of Apazidis P.C., and (c) the unlawful channeling of Apazidis P.C.'s professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Apazidis P.C. and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### L. FRAUDULENT CONCEALMENT—PHOENIX MEDICAL SERVICES ENTERPRISE

925. Jones registered himself with the State of New York as Phoenix Medical Services' sole officer, director, and shareholder.

926. At all relevant times, the documents created and filed with the State of New York related to Phoenix Medical Services deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Jones or Phoenix Medical Services.

927. The documents created and filed with the State of New York related to Phoenix Medical Services gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Phoenix Medical Services, or in any way participated in the operation, management, and control of Phoenix Medical Services.

928. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Phoenix Medical Services, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Jones and Phoenix Medical Services.

929. Melgar's and Tubens' purposeful concealment of their controlling interest in Phoenix Medical Services —including their control over Phoenix Medical Services' professional fees, profits, and company finances, and their participation in the operation, management, and control of Phoenix Medical Services—allowed Phoenix Medical Services to be unlawfully controlled without detection.

930. At all relevant times during the operation of the Phoenix Medical Services enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Phoenix Medical Services, Jones, Melgar, and Tubens caused Phoenix Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

931. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Phoenix Medical Services and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Phoenix Medical Services' claims for No-Fault reimbursement.

932. Further, Jones attested (or caused the attestation) to the medical necessity of the services that Jones (or persons under his direction and control) allegedly administered in

connection with the treatment and testing of Phoenix Medical Services patients, as well as the validity of charges submitted to Allstate for such services.

933. At all relevant times, Jones, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

934. At all relevant times, Jones, Melgar, and Tubens actively concealed from Allstate facts regarding Phoenix Medical Services' true ownership and control to prevent Allstate from discovering that Phoenix Medical Services was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

935. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Phoenix Medical Services' patients, and (b) Phoenix Medical Services' unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

936. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

937. Thus, every time that Jones, Melgar, and Tubens (along with those individuals working under their control) caused Phoenix Medical Services to submit No-Fault reimbursement demands to Allstate, Jones, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Phoenix Medical Services was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

938. The full extent of Jones', Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Phoenix Medical Services enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Phoenix Medical Services' patients, (b) Melgar's and Tubens' participation in the operation and control of Phoenix Medical Services, and (c) the unlawful channeling of Phoenix Medical Services' professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Phoenix Medical Services and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

## M. FRAUDULENT CONCEALMENT—DEER PARK ORTHOPEDICS ENTERPRISE

939. Seldes registered himself with the State of New York as Deer Park Orthopedics' sole officer, director, and shareholder.

940. At all relevant times, the documents created and filed with the State of New York related to Deer Park Orthopedics deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Seldes or Deer Park Orthopedics.

941. The documents created and filed with the State of New York related to Deer Park Orthopedics gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Deer Park Orthopedics, or in any way participated in the operation, management, and control of Deer Park Orthopedics.

942. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Deer Park Orthopedics, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Seldes and Deer Park Orthopedics.

943. Melgar's and Tubens' purposeful concealment of their controlling interest in Deer Park Orthopedics —including their control over Deer Park Orthopedics' professional fees, profits, and company finances, and their participation in the operation, management, and control of Deer Park Orthopedics—allowed Deer Park Orthopedics to be unlawfully controlled without detection.

944. At all relevant times during the operation of the Deer Park Orthopedics enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Deer Park Orthopedics, Seldes, Melgar, and Tubens caused Deer Park Orthopedics to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

945. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Deer Park Orthopedics and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Deer Park Orthopedics' claims for No-Fault reimbursement.

946. Further, Seldes attested (or caused the attestation) to the medical necessity of the services that Seldes (or persons under his direction and control) allegedly administered in connection with the treatment and testing of Deer Park Orthopedics patients, as well as the validity of charges submitted to Allstate for such services.

947. At all relevant times, Seldes, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

948. At all relevant times, Seldes, Melgar, and Tubens actively concealed from Allstate facts regarding Deer Park Orthopedics' true ownership and control to prevent Allstate from discovering that Deer Park Orthopedics was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

949. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Deer Park Orthopedics' patients, and (b) Deer Park Orthopedics' unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

950. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

951. Thus, every time that Seldes, Melgar, and Tubens (along with those individuals working under their control) caused Deer Park Orthopedics to submit No-Fault reimbursement demands to Allstate, Seldes, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Deer Park Orthopedics was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

952. The full extent of Seldes', Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Deer Park Orthopedics enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Deer Park Orthopedics' patients, (b) Melgar's and Tubens' participation in the operation and control of Deer Park Orthopedics, and (c) the unlawful channeling of Deer Park Orthopedics' professional fees

and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Deer Park Orthopedics and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### N. Fraudulent Concealment—Station Medical Services Enterprise

953. Seldes registered himself with the State of New York as Station Medical Services' sole officer, director, and shareholder.

954. At all relvant times, documents created and filed with the State of New York related to Station Medical Services deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Seldes or Station Medical Services.

955. The documents created and filed with the State of New York related to Station Medical Services gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Station Medical Services, or in any way participated in the operation, management, and control of Station Medical Services.

956. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Station Medical Services, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Seldes and Station Medical Services.

957. Melgar's and Tubens' purposeful concealment of their controlling interest in Station Medical Services —including their control over Station Medical Services' professional fees, profits, and company finances, and their participation in the operation, management, and control of Station Medical Services—allowed Station Medical Services to be unlawfully controlled without detection.

958. At all relevant times during the operation of the Station Medical Services enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Station Medical Services, Seldes, Melgar, and Tubens caused Station Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

959. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Station Medical Services and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Station Medical Services' claims for No-Fault reimbursement.

960. Further, Seldes attested (or caused the attestation) to the medical necessity of the services that Seldes (or persons under his direction and control) allegedly administered in connection with the treatment and testing of Station Medical Services patients, as well as the validity of charges submitted to Allstate for such services.

961. At all relevant times, Seldes, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

962. At all relevant times, Seldes, Melgar, and Tubens actively concealed from Allstate facts regarding Station Medical Services' true ownership and control to prevent Allstate from discovering that Station Medical Services was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

963. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Station Medical Services' patients, and (b) Station Medical Services' unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

964. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

965. Thus, every time that Seldes, Melgar, and Tubens (along with those individuals working under their control) caused Station Medical Services to submit No-Fault reimbursement demands to Allstate, Seldes, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Station Medical Services was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

966. The full extent of Seldes', Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Station Medical Services enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Station Medical Services' patients, (b) Melgar's and Tubens' participation in the operation and control of Station Medical Services, and (c) the unlawful channeling of Station Medical Services' professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Station Medical Services and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### O. FRAUDULENT CONCEALMENT—DRD MEDICAL ENTERPRISE

967. Dynof registered himself with the State of New York as DRD Medical's sole officer, director, and shareholder.

968. At all relevant times, the documents created and filed with the State of New York related to DRD Medical deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Dynof or DRD Medical.

969. The documents created and filed with the State of New York related to DRD Medical gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in DRD Medical, or in any way participated in the operation, management, and control of DRD Medical.

970. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of DRD Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Dynof and DRD Medical.

971. Melgar's and Tubens' purposeful concealment of their controlling interest in DRD Medical —including their control over DRD Medical's professional fees, profits, and company finances, and their participation in the operation, management, and control of DRD Medical—allowed DRD Medical to be unlawfully controlled without detection.

972. At all relevant times during the operation of the DRD Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through DRD Medical, Dynof, Melgar, and Tubens caused DRD Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

973. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through DRD Medical and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of DRD Medical's claims for No-Fault reimbursement.

974. Further, Dynof attested (or caused the attestation) to the medical necessity of the services that Dynof (or persons under his direction and control) allegedly administered in connection with the treatment and testing of DRD Medical patients, as well as the validity of charges submitted to Allstate for such services.

975. At all relevant times, Dynof, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

976. At all relevant times, Dynof, Melgar, and Tubens actively concealed from Allstate facts regarding DRD Medical's true ownership and control to prevent Allstate from discovering that DRD Medical was unlawfully incorporated, operated, and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

977. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of DRD Medical's patients, and (b) DRD Medical's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

978. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

979. Thus, every time that Dynof, Melgar, and Tubens (along with those individuals working under their control) caused DRD Medical to submit No-Fault reimbursement demands to Allstate, Dynof, Melgar, and Tubens (and those individuals working under their control) necessarily certified that DRD Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

980. The full extent of Dynof's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the DRD Medical enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of DRD Medical's patients, (b) Melgar's and Tubens' participation in the operation and control of DRD Medical, and (c) the unlawful channeling of DRD Medical's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between DRD Medical and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### P. FRAUDULENT CONCEALMENT—ORTHOCARE SURGICAL ENTERPRISE

981. In furtherance of this scheme, Ehrlich was induced to do business as OrthoCare Surgical.

982. By holding Ehrlich out as the owner of a fictitious business, Ehrlich, Melgar, and Tubens deliberately concealed Melgar's and Tubens' involvement with or control over Ehrlich and the OrthoCare Surgical enterprise.

983. Therefore, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Ehrlich and the OrthoCare Surgical enterprise.

984. Melgar's and Tubens' purposeful concealment of their controlling interest in the OrthoCare Surgical enterprise —including their control over the OrthoCare Surgical enterprise's professional fees, profits, and company finances, and their participation in the operation, management, and control of the OrthoCare Surgical enterprise —allowed Ehrlich's orthopedic medicine business to be unlawfully controlled without detection.

985. At all relevant times during the operation of the OrthoCare Surgical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through the OrthoCare Surgical enterprise, Melgar and Tubens caused Ehrlich to falsely certify that he (and by extension, the OrthoCare Surgical enterprise) was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

986. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through the OrthoCare Surgical enterprise and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Ehrlich's claims for No-Fault reimbursement while doing business as the OrthoCare Surgical enterprise.

987. Further, Ehrlich attested (or caused the attestation) to the medical necessity of the services that Ehrlich (or persons under his direction and control) allegedly administered in

connection with the treatment and testing of patients of the OrthoCare Surgical enterprise, as well as the validity of charges submitted to Allstate for such services.

988. At all relevant times, Ehrlich, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

989. At all relevant times, Ehrlich, Melgar, and Tubens actively concealed from Allstate facts regarding the OrthoCare Surgical enterprise's true control to prevent Allstate from discovering that the OrthoCare Surgical enterprise was unlawfully operated and controlled by non-physicians, and therefore ineligible to seek or collect No-Fault benefit payments.

990. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of the OrthoCare Surgical enterprise's patients, and (b) the OrthoCare Surgical enterprise's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

991. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

992. Thus, every time that Melgar and Tubens (along with those individuals working under their control) caused Ehrlich to submit No-Fault reimbursement demands to Allstate, Ehrlich, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Ehrlich, doing business as the OrthoCare Surgical enterprise, was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

993. The full extent of Ehrlich's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the OrthoCare Surgical enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Ehrlich's patients, (b) Melgar's and Tubens' participation in the operation and control of the OrthoCare Surgical enterprise, and (c) the unlawful channeling of Ehrlich's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Ehrlich and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### Q. FRAUDULENT CONCEALMENT—EAST POINT ACUPUNCTURE ENTERPRISE

994. Matatov registered herself with the State of New York as East Point Acupuncture's sole officer, director, and shareholder.

995. At all relevant times, the documents created and filed with the State of New York related to East Point Acupuncture deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Matatov or East Point Acupuncture.

996. The documents created and filed with the State of New York related to East Point Acupuncture gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in East Point Acupuncture, or in any way participated in the operation, management, and control of East Point Acupuncture.

997. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of East Point Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Matatov and East Point Acupuncture.

998. Melgar's and Tubens' purposeful concealment of their controlling interest in East Point Acupuncture—including their control over East Point Acupuncture's professional fees, profits, and company finances, and their participation in the operation, management, and control of East Point Acupuncture—allowed East Point Acupuncture to be unlawfully controlled without detection.

999. At all relevant times during the operation of the East Point Acupuncture enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through East Point Acupuncture, Matatov, Melgar, and Tubens caused East Point Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1000. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through East Point Acupuncture and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of East Point Acupuncture's claims for No-Fault reimbursement.

1001. Further, Matatov attested (or caused the attestation) to the medical necessity of the services that Matatov (or persons under her direction and control) allegedly administered in connection with the treatment of East Point Acupuncture patients, as well as the validity of charges submitted to Allstate for such services.

1002. At all relevant times, Matatov, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of her oath as a licensed healthcare professional.

1003. At all relevant times, Matatov, Melgar, and Tubens actively concealed from Allstate facts regarding East Point Acupuncture's true ownership and control to prevent Allstate from discovering that East Point Acupuncture was unlawfully incorporated, operated, and controlled by individuals that were not licensed acupuncturists, and therefore ineligible to seek or collect No-Fault benefit payments.

1004. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment of East Point Acupuncture's patients, and (b) East Point Acupuncture's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1005. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1006. Thus, every time that Matatov, Melgar, and Tubens (along with those individuals working under their control) caused East Point Acupuncture Medical to submit No-Fault reimbursement demands to Allstate, Matatov, Melgar, and Tubens (and those individuals working under their control) necessarily certified that East Point Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1007. The full extent of Matatov's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the East Point Acupuncture enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of East Point Acupuncture's patients, (b) Melgar's and Tubens' participation in the operation and control of East

Point Acupuncture, and (c) the unlawful channeling of East Point Acupuncture's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between East Point Acupuncture and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### R. FRAUDULENT CONCEALMENT—DA ACUPUNCTURE ENTERPRISE

1008. Abramchayeva registered herself with the State of New York as DA Acupuncture's sole officer, director, and shareholder.

1009. At all relevant times, the documents created and filed with the State of New York related to DA Acupuncture deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Abramchayeva or DA Acupuncture.

1010. The documents created and filed with the State of New York related to DA Acupuncture gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in DA Acupuncture, or in any way participated in the operation, management, and control of DA Acupuncture.

1011. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of DA Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Abramchayeva and DA Acupuncture.

1012. Melgar's and Tubens' purposeful concealment of their controlling interest in DA Acupuncture—including their control over DA Acupuncture's professional fees, profits, and company finances, and their participation in the operation, management, and control of DA Acupuncture—allowed DA Acupuncture to be unlawfully controlled without detection.

1013. At all relevant times during the operation of the DA Acupuncture enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through DA Acupuncture, Abramchayeva, Melgar, and Tubens caused DA Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1014. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through DA Acupuncture and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of DA Acupuncture's claims for No-Fault reimbursement.

1015. Further, Abramchayeva attested (or caused the attestation) to the medical necessity of the services that Abramchayeva (or persons under her direction and control) allegedly administered in connection with the treatment of DA Acupuncture patients, as well as the validity of charges submitted to Allstate for such services.

1016. At all relevant times, Abramchayeva, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of her oath as a licensed healthcare professional.

1017. At all relevant times, Abramchayeva, Melgar, and Tubens actively concealed from Allstate facts regarding DA Acupuncture's true ownership and control to prevent Allstate from discovering that DA Acupuncture was unlawfully incorporated, operated, and controlled by

individuals that were not licensed acupuncturists, and therefore ineligible to seek or collect No-Fault benefit payments.

1018. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment of DA Acupuncture's patients, and (b) DA Acupuncture's unlawful sharing of professional fees and profits with Melgar and Tubens—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1019. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1020. Thus, every time that Abramchayeva, Melgar, and Tubens (along with those individuals working under their control) caused DA Acupuncture Medical to submit No-Fault reimbursement demands to Allstate, Abramchayeva, Melgar, and Tubens (and those individuals working under their control) necessarily certified that DA Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1021. The full extent of Abramchayeva's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the DA Acupuncture enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of DA Acupuncture's patients, (b) Melgar's and Tubens' participation in the operation and control of DA Acupuncture, and (c) the unlawful channeling of DA Acupuncture's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between DA

Acupuncture and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### S. FRAUDULENT CONCEALMENT—PONCE ACUPUNCTURE ENTERPRISE

1022. Romero registered herself with the State of New York as Ponce Acupuncture's sole officer, director, and shareholder.

1023. At all relevant times, the documents created and filed with the State of New York related to Ponce Acupuncture deliberately omitted any reference to Melgar's or Tubens' involvement with or control over Romero or Ponce Acupuncture.

1024. The documents created and filed with the State of New York related to Ponce Acupuncture gave no indication to Allstate or the general public that Melgar and Tubens in any way maintained a controlling interest in Ponce Acupuncture, or in any way participated in the operation, management, and control of Ponce Acupuncture.

1025. Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Ponce Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Melgar's and Tubens' domination and control over Romero and Ponce Acupuncture.

1026. Melgar's and Tubens' purposeful concealment of their controlling interest in Ponce Acupuncture—including their control over Ponce Acupuncture's professional fees, profits, and company finances, and their participation in the operation, management, and control of Ponce Acupuncture—allowed Ponce Acupuncture to be unlawfully controlled without detection.

1027. At all relevant times during the operation of the Ponce Acupuncture enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Ponce Acupuncture, Romero, Melgar, and Tubens caused Ponce

Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1028. To further induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Ponce Acupuncture and to further conceal the nature of or the lack of justification for these healthcare services, or that the healthcare services were never rendered at all, Melgar and Tubens created (or caused the creation of) false and fraudulent treatment records that were submitted to Allstate in support of Ponce Acupuncture's claims for No-Fault reimbursement.

1029. Further, Romero attested (or caused the attestation) to the medical necessity of the services that Romero (or persons under his direction and control) allegedly administered in connection with the treatment of Ponce Acupuncture patients, as well as the validity of charges submitted to Allstate for such services.

1030. At all relevant times, Romero, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of her oath as a licensed healthcare professional.

1031. At all relevant times, Romero, Melgar, and Tubens actively concealed from Allstate facts regarding Ponce Acupuncture's true ownership and control to prevent Allstate from discovering that Ponce Acupuncture was unlawfully incorporated, operated, and controlled by individuals that were not licensed acupuncturists, and therefore ineligible to seek or collect No-Fault benefit payments.

1032. Many of these facts—particularly (a) Melgar's and Tubens' involvement in the direction and control of the treatment of Ponce Acupuncture's patients, and (b) Ponce Acupuncture's unlawful sharing of professional fees and profits with Melgar and Tubens—are not

readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1033. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1034. Thus, every time that Romero, Melgar, and Tubens (along with those individuals working under their control) caused Ponce Acupuncture Medical to submit No-Fault reimbursement demands to Allstate, Romero, Melgar, and Tubens (and those individuals working under their control) necessarily certified that Ponce Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1035. The full extent of Romero's, Melgar's, and Tubens' fraudulent and unlawful acts relative to their control over the Ponce Acupuncture enterprise—including (a) Melgar's and Tubens' involvement in the direction and control of the treatment and testing of Ponce Acupuncture's patients, (b) Melgar's and Tubens' participation in the operation and control of Ponce Acupuncture, and (c) the unlawful channeling of Ponce Acupuncture's professional fees and profits to Melgar and Tubens through sham agreements and transactions arranged and consummated between Ponce Acupuncture and Melgar and Tubens (and/or entities controlled by Melgar and Tubens)—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

## VIII. ALLSTATE'S JUSTIFIABLE RELIANCE

1036. Each claim submitted to Allstate by or on behalf of Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional

Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and/or Ponce Acupuncture was verified pursuant to Insurance Law § 403.

1037. At all relevant times, Melgar, Tubens, Tyorkin, Apazidis, Mosomillo, Jones, Matatov, Abramchayeva, and Romero, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

1038. To induce Allstate to promptly pay Melgar PT's, Brentwood Regional Chiropractic's, Eastern Suffolk Chiropractic's, Front St. Chiropractic's, Hempstead Regional Chiropractic's, Huntington Regional Chiropractic's, Liberty Regional Chiropractic's, Patchogue Regional Chiropractic's, Tyorkin's, Pavilion Medical's, Apazidis P.C.'s, Phoenix Medical Services', Deer Park Orthopedics', Station Medical Services', Ehrlich's, East Point Acupuncture's, DA Acupuncture's and Ponce Acupuncture's invoices for services rendered to patients, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture were eligible to be reimbursed under New York's No-Fault Laws.

1039. Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services and surgeries purportedly provided to patients of Melgar PT,

Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming lawsuits and arbitration matters against Allstate in the event that Melgar PT's, Brentwood Regional Chiropractic's, Eastern Suffolk Chiropractic's, Front St. Chiropractic's, Hempstead Regional Chiropractic's, Huntington Regional Chiropractic's, Liberty Regional Chiropractic's, Patchogue Regional Chiropractic's, Tyorkin's, Pavilion Medical's, Apazidis P.C.'s, Phoenix Medical Services', Deer Park Orthopedics', Station Medical Services', Ehrlich's, East Point Acupuncture's, DA Acupuncture's and Ponce Acupuncture's invoices are not promptly paid in full.

1040. Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1041. At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Melgar PT's, Brentwood Regional Chiropractic's, Eastern Suffolk Chiropractic's, Front St. Chiropractic's, Hempstead Regional Chiropractic's, Huntington Regional Chiropractic's, Liberty Regional Chiropractic's, Patchogue Regional Chiropractic's, Tyorkin's, Pavilion Medical's, Apazidis P.C.'s, Phoenix Medical Services', Deer Park Orthopedics', Station Medical

Services', Ehrlich's, East Point Acupuncture's, DA Acupuncture's and Ponce Acupuncture's reimbursement eligibility under New York law.

1042. Acting in reasonable reliance on these misrepresentations, Allstate paid money to Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture to its detriment.

1043. Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about Melgar PT's, Brentwood Regional Chiropractic's, Eastern Suffolk Chiropractic's, Front St. Chiropractic's, Hempstead Regional Chiropractic's, Huntington Regional Chiropractic's, Liberty Regional Chiropractic's, Patchogue Regional Chiropractic's, Tyorkin's, Pavilion Medical's, Apazidis P.C.'s, Phoenix Medical Services', Deer Park Orthopedics', Station Medical Services', Ehrlich's, East Point Acupuncture's, DA Acupuncture's and Ponce Acupuncture's reimbursement eligibility under New York law, including the operation of the entities and the fact and necessity of the services provided.

1044. As a result of the defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the defendants' false healthcare documentation and false representations regarding the defendants' eligibility for reimbursement under New York's No-Fault Laws.

1045. Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX. DAMAGES

1046. The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made by Allstate to Melgar PT, Brentwood Regional Chiropractic, Eastern Suffolk Chiropractic, Front St. Chiropractic, Hempstead Regional Chiropractic, Huntington Regional Chiropractic, Liberty Regional Chiropractic, Patchogue Regional Chiropractic, Tyorkin, Pavilion Medical, Apazidis P.C., Phoenix Medical Services, Deer Park Orthopedics, Station Medical Services, Ehrlich, East Point Acupuncture, DA Acupuncture, and Ponce Acupuncture in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a) Payments made to Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation in connection with first-party claims in excess of $1,730,554.77, the exact amount to be determined at trial. The chart at Exhibit 22 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(b) Payments made to Brentwood Regional Chiropractic, P.C. in connection with first-party claims in excess of $42,162.44, the exact amount to be determined at trial. The chart at Exhibit 23 and incorporated herein as if set forth in its entirety, identifies Allstate's payments

Brentwood Regional Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(c) Payments made to Eastern Suffolk Chiropractic, P.C. in connection with first-party claims in excess of $133,024.19, the exact amount to be determined at trial. The chart at Exhibit 24 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Eastern Suffolk Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(d) Payments made to Front St. Chiropractic, P.C. in connection with first-party claims in excess of $87,771.29, the exact amount to be determined at trial. The chart at Exhibit 25 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Front St. Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(e) Payments made to Hempstead Regional Chiropractic, P.C. in connection with first-party claims in excess of $80,848.22, the exact amount to be determined at trial. The chart at Exhibit 26 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Hempstead Regional Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(f) Payments made to Huntington Regional Chiropractic, P.C. in connection with first-party claims in excess of $362,019.82, the exact amount to be determined at trial. The chart at Exhibit 27 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Huntington Regional Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(g) Payments made to Liberty Regional Chiropractic, P.C. in connection with first-party claims in excess of $25,845.71, the exact amount to be determined at trial. The chart at Exhibit 28 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Liberty Regional Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(h) Payments made to Patchogue Regional Chiropractic, P.C. in connection with first-party claims in excess of $12,454.92, the exact amount to be determined at trial. The chart at Exhibit 29 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Patchogue Regional Chiropractic, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(i) Payments made to Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine in connection with first-party claims in excess of $116,883.27, the exact amount to be determined at trial. The chart at Exhibit 30 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Maxim Tyorkin, M.D. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(j) Payments made to Pavilion Medical, P.C. in connection with first-party claims in excess of $2,710.87, the exact amount to be determined at trial. The chart at Exhibit 31 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Pavilion Medical, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(k) Payments made to Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care in connection with first-party claims in excess of $106,440.12, the exact amount to be determined at trial. The chart at Exhibit 32 and incorporated herein as if set forth in

its entirety, identifies Allstate's payments Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(l) Payments made to Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation in connection with first-party claims in excess of $77,031.89, the exact amount to be determined at trial. The chart at Exhibit 33 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(m) Payments made to Deer Park Orthopedics, P.C. in connection with first-party claims in excess of $4,651.41, the exact amount to be determined at trial. The chart at Exhibit 34 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Deer Park Orthopedics, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(n) Payments made to Station Medical Services, P.C. in connection with first-party claims in excess of $168,347.39, the exact amount to be determined at trial. The chart at Exhibit 35 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Station Medical Services, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(o) Payments made to Randall Ehrlich, M.D. d/b/a OrthoCare Surgical in connection with first-party claims in excess of $24,767.71, the exact amount to be determined at trial. The chart at Exhibit 36 and incorporated herein as if set forth in its entirety, identifies Allstate's

payments Randall Ehrlich, M.D. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(p) Payments made to East Point Acupuncture, P.C. in connection with first-party claims in excess of $34,344.41, the exact amount to be determined at trial. The chart at Exhibit 37 and incorporated herein as if set forth in its entirety, identifies Allstate's payments East Point Acupuncture, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(q) Payments made to DA Acupuncture, P.C. in connection with first-party claims in excess of $113,166.70, the exact amount to be determined at trial. The chart at Exhibit 38 and incorporated herein as if set forth in its entirety, identifies Allstate's payments DA Acupuncture, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(r) Payments made to Ponce Acupuncture, P.C. in connection with first-party claims in excess of $95,813.52, the exact amount to be determined at trial. The chart at Exhibit 39 and incorporated herein as if set forth in its entirety, identifies Allstate's payments Ponce Acupuncture, P.C. in connection with first-party claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## X. CAUSES OF ACTION

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HECTOR MELGAR, PT, P.C. d/b/a EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, and BRENTWOOD PHYSICAL REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1047. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1048. Hector Melgar, PT, P.c. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Therapy ("Melgar PT") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1049. In connection with the operation and management of the Melgar PT enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical

Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count I Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Melgar PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Melgar PT would occur, in furtherance of the scheme to defraud.

1050. The Count I Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 3.

1051. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1052. Policies of insurance were delivered to insureds through the U.S. Mail.

1053. Payments made by Allstate to Melgar PT traveled through the U.S. Mail.

1054. As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Melgar PT—payments that the Count I Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were

purportedly provided by Melgar PT, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1055. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Melgar PT for the benefit of the Count I Defendants that would not otherwise have been made.

1056. The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1057. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1058. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1059. The Count I Defendants participated in the conduct of the Melgar PT enterprise through a pattern of racketeering activities.

1060. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Melgar PT for the benefit of the Count I Defendants.

1061. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

1062. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1063. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1064. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1065. By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION 18 U.S.C. § 1962(d)**
**HECTOR MELGAR, PT, P.C. d/b/a EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, and BRENTWOOD PHYSICAL REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1066. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1067. Defendants Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum

Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Hector Melgar, PT, P.c. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Therapy ("Melgar PT").

1068. The Count II Defendants each agreed to further, facilitate, support, and operate the Melgar PT enterprise.

1069. As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

1070. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Melgar PT even though Melgar PT was not eligible to collect such benefits by virtue of its unlawful conduct.

1071. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1072. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count II Defendants' unlawful conduct described herein.

1073. By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BRENTWOOD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1074. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1075. Brentwood Regional Chiropractic, P.C. ("Brentwood Regional Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1076. In connection with the operation and management of the Brentwood Regional Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac.,

Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count III Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Brentwood Regional Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Brentwood Regional Chiropractic would occur, in furtherance of the scheme to defraud.

1077. The Count III Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 4.

1078. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1079. Policies of insurance were delivered to insureds through the U.S. Mail.

1080. Payments made by Allstate to Brentwood Regional Chiropractic traveled through the U.S. Mail.

1081. As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Brentwood Regional Chiropractic—payments that the Count III Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Brentwood Regional Chiropractic, to collect

payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1082. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Brentwood Regional Chiropractic for the benefit of the Count III Defendants that would not otherwise have been made.

1083. The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1084. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1085. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1086. The Count III Defendants participated in the conduct of the Brentwood Regional Chiropractic enterprise through a pattern of racketeering activities.

1087. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Brentwood Regional Chiropractic for the benefit of the Count III Defendants.

1088. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

1089. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1090. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1091. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1092. By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION 18 U.S.C. § 1962(d)
## BRENTWOOD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1093. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1094. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count IV

Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Brentwood Regional Chiropractic, P.C. ("Brentwood Regional Chiropractic").

1095. The Count IV Defendants each agreed to further, facilitate, support, and operate the Brentwood Regional Chiropractic enterprise.

1096. As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

1097. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Brentwood Regional Chiropractic even though Brentwood Regional Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1098. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1099. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

1100. By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EASTERN SUFFOLK CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1101. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1102. Eastern Suffolk Chiropractic, P.C. ("Eastern Suffolk Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1103. In connection with the operation and management of the Eastern Suffolk Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count V Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that

such false medical documentation would be mailed in the ordinary course of Eastern Suffolk Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Eastern Suffolk Chiropractic would occur, in furtherance of the scheme to defraud.

1104. The Count V Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

1105. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1106. Policies of insurance were delivered to insureds through the U.S. Mail.

1107. Payments made by Allstate to Eastern Suffolk Chiropractic traveled through the U.S. Mail.

1108. As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Eastern Suffolk Chiropractic—payments that the Count V Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Eastern Suffolk Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1109. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Eastern Suffolk Chiropractic for the benefit of the Count V Defendants that would not otherwise have been made.

1110. The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1111. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1112. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1113. The Count V Defendants participated in the conduct of the Eastern Suffolk Chiropractic enterprise through a pattern of racketeering activities.

1114. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Eastern Suffolk Chiropractic for the benefit of the Count V Defendants.

1115. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

1116. The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1117. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1118. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1119. By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION 18 U.S.C. § 1962(d)
## EASTERN SUFFOLK CHIROPRACTIC, P.C. ENTERPRISE
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1120. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1121. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count VI Defendants") willfully conspired with one

another to violate 18 U.S.C. § 1962(c) through the operation of Eastern Suffolk Chiropractic, P.C. ("Eastern Suffolk Chiropractic").

1122. The Count VI Defendants each agreed to further, facilitate, support, and operate the Eastern Suffolk Chiropractic enterprise.

1123. As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

1124. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Eastern Suffolk Chiropractic even though Eastern Suffolk Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1125. The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1126. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VI Defendants' unlawful conduct described herein.

1127. By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FRONT ST. CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

1128. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1129. Front St. Chiropractic, P.C. ("Front St. Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1130. In connection with the operation and management of the Front St. Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical (collectively "Count VII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Front St. Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Front St. Chiropractic would occur, in furtherance of the scheme to defraud.

1131. The Count VII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

1132. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1133. Policies of insurance were delivered to insureds through the U.S. Mail.

1134. Payments made by Allstate to Front St. Chiropractic traveled through the U.S. Mail.

1135. As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Front St. Chiropractic—payments that the Count VII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Front St. Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1136. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Front St. Chiropractic for the benefit of the Count VII Defendants that would not otherwise have been made.

1137. The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1138. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1139. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1140. The Count VII Defendants participated in the conduct of the Front St. Chiropractic enterprise through a pattern of racketeering activities.

1141. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Front St. Chiropractic for the benefit of the Count VII Defendants.

1142. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

1143. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1144. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1145. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1146. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**FRONT ST. CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

1147. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1148. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical (collectively "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Front St. Chiropractic, P.C. ("Front St. Chiropractic").

1149. The Count VIII Defendants each agreed to further, facilitate, support, and operate the Front St. Chiropractic enterprise.

1150. As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1151. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Front St. Chiropractic even though Front St. Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1152. The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1153. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VIII Defendants' unlawful conduct described herein.

1154. By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## HEMPSTEAD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

1155. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1156. Hempstead Regional Chiropractic, P.C. ("Hempstead Regional Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1157. In connection with the operation and management of the Hempstead Regional Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC (collectively "Count IX Defendants") intentionally caused to be prepared and mailed, false medical

documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Hempstead Regional Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Hempstead Regional Chiropractic would occur, in furtherance of the scheme to defraud.

1158. The Count IX Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

1159. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1160. Policies of insurance were delivered to insureds through the U.S. Mail.

1161. Payments made by Allstate to Hempstead Regional Chiropractic traveled through the U.S. Mail.

1162. As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Hempstead Regional Chiropractic—payments that the Count IX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Hempstead Regional Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1163. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Hempstead Regional Chiropractic for the benefit of the Count IX Defendants that would not otherwise have been made.

1164. The Count IX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1165. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1166. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1167. The Count IX Defendants participated in the conduct of the Hempstead Regional Chiropractic enterprise through a pattern of racketeering activities.

1168. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hempstead Regional Chiropractic for the benefit of the Count IX Defendants.

1169. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1170. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1171. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1172. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1173. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATION 18 U.S.C. § 1962(d)**
**HEMPSTEAD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

1174. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1175. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC (collectively "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Hempstead Regional Chiropractic, P.C. ("Hempstead Regional Chiropractic").

1176. The Count X Defendants each agreed to further, facilitate, support, and operate the Hempstead Regional Chiropractic enterprise.

1177. As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1178. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Hempstead Regional Chiropractic even though Hempstead Regional Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1179. The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1180. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count X Defendants' unlawful conduct described herein.

1181. By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HUNTINGTON REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1182. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1183. Huntington Regional Chiropractic, P.C. ("Huntington Regional Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1184. In connection with the operation and management of the Huntington Regional Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count XI Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Huntington Regional Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Huntington Regional Chiropractic would occur, in furtherance of the scheme to defraud.

1185. The Count XI Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

1186. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1187. Policies of insurance were delivered to insureds through the U.S. Mail.

1188. Payments made by Allstate to Huntington Regional Chiropractic traveled through the U.S. Mail.

1189. As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Huntington Regional Chiropractic—payments that the Count XI Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Huntington Regional Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1190. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Huntington Regional Chiropractic for the benefit of the Count XI Defendants that would not otherwise have been made.

1191. The Count XI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1192. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1193. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1194. The Count XI Defendants participated in the conduct of the Huntington Regional Chiropractic enterprise through a pattern of racketeering activities.

1195. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Huntington Regional Chiropractic for the benefit of the Count XI Defendants.

1196. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1197. The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1198. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1199. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1200. By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION 18 U.S.C. § 1962(d)**
**HUNTINGTON REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

1201. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1202. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC (collectively "Count XII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Huntington Regional Chiropractic, P.C. ("Huntington Regional Chiropractic").

1203. The Count XII Defendants each agreed to further, facilitate, support, and operate the Huntington Regional Chiropractic enterprise.

1204. As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1205. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Huntington Regional Chiropractic even though Huntington Regional Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1206. The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1207. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XII Defendants' unlawful conduct described herein.

1208. By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## LIBERTY REGIONAL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

1209. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1210. Liberty Regional Chiropractic, P.C. ("Liberty Regional Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1211. In connection with the operation and management of the Liberty Regional Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC (collectively "Count XIII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Liberty Regional Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Liberty Regional Chiropractic would occur, in furtherance of the scheme to defraud.

1212. The Count XIII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

1213. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1214. Policies of insurance were delivered to insureds through the U.S. Mail.

1215. Payments made by Allstate to Liberty Regional Chiropractic traveled through the U.S. Mail.

1216. As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to

patients through Liberty Regional Chiropractic—payments that the Count XIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Liberty Regional Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1217. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Liberty Regional Chiropractic for the benefit of the Count XIII Defendants that would not otherwise have been made.

1218. The Count XIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1219. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1220. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1221. The Count XIII Defendants participated in the conduct of the Liberty Regional Chiropractic enterprise through a pattern of racketeering activities.

1222. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Liberty Regional Chiropractic for the benefit of the Count XIII Defendants.

1223. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

1224. The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1225. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1226. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1227. By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**LIBERTY REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

1228. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1229. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., and Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC (collectively "Count XIV Defendants") willfully conspired with one another

to violate 18 U.S.C. § 1962(c) through the operation of Liberty Regional Chiropractic, P.C. ("Liberty Regional Chiropractic").

1230. The Count XIV Defendants each agreed to further, facilitate, support, and operate the Liberty Regional Chiropractic enterprise.

1231. As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1232. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Liberty Regional Chiropractic even though Liberty Regional Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1233. The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1234. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XIV Defendants' unlawful conduct described herein.

1235. By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PATCHOGUE REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

1236. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1237. Patchogue Regional Chiropractic, P.C. ("Patchogue Regional Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1238. In connection with the operation and management of the Patchogue Regional Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical (collectively "Count XV Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Patchogue Regional Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Patchogue Regional Chiropractic would occur, in furtherance of the scheme to defraud.

1239. The Count XV Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

1240. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1241. Policies of insurance were delivered to insureds through the U.S. Mail.

1242. Payments made by Allstate to Patchogue Regional Chiropractic traveled through the U.S. Mail.

1243. As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Patchogue Regional Chiropractic—payments that the Count XV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Patchogue Regional Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1244. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Patchogue Regional Chiropractic for the benefit of the Count XV Defendants that would not otherwise have been made.

1245. The Count XV Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1246. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1247. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1248. The Count XV Defendants participated in the conduct of the Patchogue Regional Chiropractic enterprise through a pattern of racketeering activities.

1249. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Patchogue Regional Chiropractic for the benefit of the Count XV Defendants.

1250. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

1251. The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1252. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1253. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1254. By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**PATCHOGUE REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

1255. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1256. Defendants Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical (collectively "Count XVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Patchogue Regional Chiropractic, P.C. ("Patchogue Regional Chiropractic").

1257. The Count XVI Defendants each agreed to further, facilitate, support, and operate the Patchogue Regional Chiropractic enterprise.

1258. As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1259. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Patchogue Regional Chiropractic even though Patchogue Regional Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

1260. The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1261. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XVI Defendants' unlawful conduct described herein.

1262. By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC)**

1263. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1264. Maximum Orthopaedics and Sports Medicine constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1265. In connection with the operation and management of the Maximum Orthopaedics and Sports Medicine enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC (collectively "Count XVII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Maximum

Orthopaedics and Sports Medicine's business, or should have reasonably foreseen that the mailing of such false medical documentation by Maximum Orthopaedics and Sports Medicine would occur, in furtherance of the scheme to defraud.

1266. The Count XVII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

1267. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1268. Policies of insurance were delivered to insureds through the U.S. Mail.

1269. Payments made by Allstate to Maximum Orthopaedics and Sports Medicine traveled through the U.S. Mail.

1270. As documented above, the Count XVII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Maximum Orthopaedics and Sports Medicine—payments that the Count XVII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Maximum Orthopaedics and Sports Medicine, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1271. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Maximum

Orthopaedics and Sports Medicine for the benefit of the Count XVII Defendants that would not otherwise have been made.

1272. The Count XVII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1273. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1274. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1275. The Count XVII Defendants participated in the conduct of the Maximum Orthopaedics and Sports Medicine enterprise through a pattern of racketeering activities.

1276. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Maximum Orthopaedics and Sports Medicine for the benefit of the Count XVII Defendants.

1277. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII Defendants' conduct.

1278. The Count XVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1279. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1280. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1281. By virtue of the Count XVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC)**

1282. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1283. Defendants Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC (collectively "Count XVIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Maximum Orthopaedics and Sports Medicine.

1284. The Count XVIII Defendants each agreed to further, facilitate, support, and operate the Maximum Orthopaedics and Sports Medicine enterprise.

1285. As such, the Count XVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1286. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Maximum Orthopaedics and Sports Medicine even though Maximum Orthopaedics and Sports Medicine was not eligible to collect such benefits by virtue of its unlawful conduct.

1287. The Count XVIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1288. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XVIII Defendants' unlawful conduct described herein.

1289. By virtue of the Count XVIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PAVILION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC)**

1290. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1291. Pavilion Medical, P.C. ("Pavilion Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1292. In connection with the operation and management of the Pavilion Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC (collectively "Count XIX Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Pavilion Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Pavilion Medical would occur, in furtherance of the scheme to defraud.

1293. The Count XIX Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 12.

1294. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1295. Policies of insurance were delivered to insureds through the U.S. Mail.

1296. Payments made by Allstate to Pavilion Medical traveled through the U.S. Mail.

1297. As documented above, the Count XIX Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Pavilion Medical—payments that the Count XIX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Pavilion Medical, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1298. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Pavilion Medical for the benefit of the Count XIX Defendants that would not otherwise have been made.

1299. The Count XIX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1300. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1301. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1302. The Count XIX Defendants participated in the conduct of the Pavilion Medical enterprise through a pattern of racketeering activities.

1303. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Pavilion Medical for the benefit of the Count XIX Defendants.

1304. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX Defendants' conduct.

1305. The Count XIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1306. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1307. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1308. By virtue of the Count XIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XX**
**VIOLATION 18 U.S.C. § 1962(d)**
**PAVILION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC)**

1309. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1310. Defendants Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC (collectively "Count XX Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Pavilion Medical, P.C. ("Pavilion Medical").

1311. The Count XX Defendants each agreed to further, facilitate, support, and operate the Pavilion Medical enterprise.

1312. As such, the Count XX Defendants conspired to violate 18 U.S.C. § 1962(c).

1313. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Pavilion Medical even though Pavilion Medical was not eligible to collect such benefits by virtue of its unlawful conduct.

1314. The Count XX Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1315. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XX Defendants' unlawful conduct described herein.

1316. By virtue of the Count XX Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ALEXIOS APAZIDIS, M.D., P.C. D/B/A ADVANCED SPINE CARE AND TOTAL SPINE & SPORTS CARE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC)**

1317. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1318. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care ("Apazidis P.C.") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1319. In connection with the operation and management of the Apazidis P.C. enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC (collectively "Count XXI Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Apazidis P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Apazidis P.C. would occur, in furtherance of the scheme to defraud.

1320. The Count XXI Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

1321. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1322. Policies of insurance were delivered to insureds through the U.S. Mail.

1323. Payments made by Allstate to Apazidis P.C. traveled through the U.S. Mail.

1324. As documented above, the Count XXI Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Apazidis P.C.—payments that the Count XXI Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Apazidis P.C., to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1325. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Apazidis P.C. for the benefit of the Count XXI Defendants that would not otherwise have been made.

1326. The Count XXI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1327. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1328. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1329. The Count XXI Defendants participated in the conduct of the Apazidis P.C. enterprise through a pattern of racketeering activities.

1330. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Apazidis P.C. for the benefit of the Count XXI Defendants.

1331. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXI Defendants' conduct.

1332. The Count XXI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1333. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1334. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1335. By virtue of the Count XXI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXII**
**VIOLATION 18 U.S.C. § 1962(d)**
**ALEXIOS APAZIDIS, M.D., P.C. D/B/A ADVANCED SPINE CARE AND TOTAL SPINE & SPORTS CARE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC)**

1336. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1337. Defendants Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC (collectively "Count XXII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care ("Apazidis P.C.").

1338. The Count XXII Defendants each agreed to further, facilitate, support, and operate the Apazidis P.C. enterprise.

1339. As such, the Count XXII Defendants conspired to violate 18 U.S.C. § 1962(c).

1340. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Apazidis P.C. even though Apazidis P.C. was not eligible to collect such benefits by virtue of its unlawful conduct.

1341. The Count XXII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1342. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXII Defendants' unlawful conduct described herein.

1343. By virtue of the Count XXII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC)**

1344. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1345. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix Medical Services") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1346. In connection with the operation and management of the Phoenix Medical Services enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC (collectively "Count XXIII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Phoenix Medical Services' business, or should have reasonably foreseen that the mailing of such false medical documentation by Phoenix Medical Services would occur, in furtherance of the scheme to defraud.

1347. The Count XXIII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

1348. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1349. Policies of insurance were delivered to insureds through the U.S. Mail.

1350. Payments made by Allstate to Phoenix Medical Services traveled through the U.S. Mail.

1351. As documented above, the Count XXIII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Phoenix Medical Services—payments that the Count XXIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Phoenix Medical Services, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1352. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Phoenix Medical Services for the benefit of the Count XXIII Defendants that would not otherwise have been made.

1353. The Count XXIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1354. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1355. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1356. The Count XXIII Defendants participated in the conduct of the Phoenix Medical Services enterprise through a pattern of racketeering activities.

1357. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Phoenix Medical Services for the benefit of the Count XXIII Defendants.

1358. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXIII Defendants' conduct.

1359. The Count XXIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1360. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1361. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1362. By virtue of the Count XXIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC)**

1363. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1364. Defendants Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC (collectively "Count XXIV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ("Phoenix Medical Services").

1365. The Count XXIV Defendants each agreed to further, facilitate, support, and operate the Phoenix Medical Services enterprise.

1366. As such, the Count XXIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1367. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Phoenix Medical Services even though Phoenix Medical Services was not eligible to collect such benefits by virtue of its unlawful conduct.

1368. The Count XXIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1369. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXIV Defendants' unlawful conduct described herein.

1370. By virtue of the Count XXIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages

sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DEER PARK ORTHOPEDICS, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

1371. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1372. Deer Park Orthopedics, P.C. ("Deer Park Orthopedics") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1373. In connection with the operation and management of the Deer Park Orthopedics enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC (collectively "Count XXV Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Deer Park Orthopedics' business, or should have reasonably foreseen that the mailing of such false medical documentation by Deer Park Orthopedics would occur, in furtherance of the scheme to defraud.

1374. The Count XXV Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 15.

1375. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1376. Policies of insurance were delivered to insureds through the U.S. Mail.

1377. Payments made by Allstate to Deer Park Orthopedics traveled through the U.S. Mail.

1378. As documented above, the Count XXV Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Deer Park Orthopedics—payments that the Count XXV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Deer Park Orthopedics, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1379. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Deer Park Orthopedics for the benefit of the Count XXV Defendants that would not otherwise have been made.

1380. The Count XXV Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1381. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1382. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1383. The Count XXV Defendants participated in the conduct of the Deer Park Orthopedics enterprise through a pattern of racketeering activities.

1384. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Deer Park Orthopedics for the benefit of the Count XXV Defendants.

1385. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXV Defendants' conduct.

1386. The Count XXV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1387. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1388. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1389. By virtue of the Count XXV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**DEER PARK ORTHOPEDICS, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

1390. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1391. Defendants Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC (collectively "Count XXVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Deer Park Orthopedics, P.C. ("Deer Park Orthopedics").

1392. The Count XXVI Defendants each agreed to further, facilitate, support, and operate the Deer Park Orthopedics enterprise.

1393. As such, the Count XXVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1394. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Deer Park Orthopedics even though Deer Park Orthopedics was not eligible to collect such benefits by virtue of its unlawful conduct.

1395. The Count XXVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1396. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXVI Defendants' unlawful conduct described herein.

1397. By virtue of the Count XXVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages

sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**STATION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

1398. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1399. Station Medical, P.C. ("Station Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1400. In connection with the operation and management of the Station Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC (collectively "Count XXVII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Station Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Station Medical would occur, in furtherance of the scheme to defraud.

1401. The Count XXVII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 16.

1402. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1403. Policies of insurance were delivered to insureds through the U.S. Mail.

1404. Payments made by Allstate to Station Medical traveled through the U.S. Mail.

1405. As documented above, the Count XXVII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Station Medical—payments that the Count XXVII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Station Medical, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1406. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Station Medical for the benefit of the Count XXVII Defendants that would not otherwise have been made.

1407. The Count XXVII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1408. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1409. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1410. The Count XXVII Defendants participated in the conduct of the Station Medical enterprise through a pattern of racketeering activities.

1411. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Station Medical for the benefit of the Count XXVII Defendants.

1412. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXVII Defendants' conduct.

1413. The Count XXVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1414. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1415. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1416. By virtue of the Count XXVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**STATION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

1417. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1418. Defendants Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC (collectively "Count XXVIII Defendants") willfully conspired with

one another to violate 18 U.S.C. § 1962(c) through the operation of Station Medical, P.C. ("Station Medical").

1419. The Count XXVIII Defendants each agreed to further, facilitate, support, and operate the Station Medical enterprise.

1420. As such, the Count XXVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1421. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Station Medical even though Station Medical was not eligible to collect such benefits by virtue of its unlawful conduct.

1422. The Count XXVIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1423. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXVIII Defendants' unlawful conduct described herein.

1424. By virtue of the Count XXVIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ORTHOCARE SURGICAL**
**(Against Hector Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and Island Regional Management, LLC)**

1425. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1426. OrthoCare Surgical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1427. In connection with the operation and management of the OrthoCare Surgical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and Island Regional Management, LLC (collectively "Count XXIX Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of OrthoCare Surgical's business, or should have reasonably foreseen that the mailing of such false medical documentation by OrthoCare Surgical would occur, in furtherance of the scheme to defraud.

1428. The Count XXIX Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 18.

1429. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1430. Policies of insurance were delivered to insureds through the U.S. Mail.

1431. Payments made by Allstate to OrthoCare Surgical traveled through the U.S. Mail.

1432. As documented above, the Count XXIX Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through OrthoCare Surgical—payments that the Count XXIX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate

automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by OrthoCare Surgical, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1433. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to OrthoCare Surgical for the benefit of the Count XXIX Defendants that would not otherwise have been made.

1434. The Count XXIX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1435. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1436. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1437. The Count XXIX Defendants participated in the conduct of the OrthoCare Surgical enterprise through a pattern of racketeering activities.

1438. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to OrthoCare Surgical for the benefit of the Count XXIX Defendants.

1439. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXIX Defendants' conduct.

1440. The Count XXIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1441. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1442. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1443. By virtue of the Count XXIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXX
## VIOLATION 18 U.S.C. § 1962(d)
## ORTHOCARE SURGICAL, P.C. ENTERPRISE
## (Against Hector Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and Island Regional Management, LLC)

1444. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1445. Defendants Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and and Island Regional Management, LLC (collectively "Count XXX Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of OrthoCare Surgical.

1446. The Count XXX Defendants each agreed to further, facilitate, support, and operate the OrthoCare Surgical enterprise.

1447. As such, the Count XXX Defendants conspired to violate 18 U.S.C. § 1962(c).

1448. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of OrthoCare Surgical even though OrthoCare Surgical was not eligible to collect such benefits by virtue of its unlawful conduct.

1449. The Count XXX Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1450. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXX Defendants' unlawful conduct described herein.

1451. By virtue of the Count XXX Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EAST POINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC)**

1452. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1453. East Point Acupuncture, P.C. ("East Point Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1454. In connection with the operation and management of the East Point Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector

Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC (collectively "Count XXXI Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of East Point Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by East Point Acupuncture would occur, in furtherance of the scheme to defraud.

1455. The Count XXXI Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 19.

1456. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1457. Policies of insurance were delivered to insureds through the U.S. Mail.

1458. Payments made by Allstate to East Point Acupuncture traveled through the U.S. Mail.

1459. As documented above, the Count XXXI Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through East Point Acupuncture—payments that the Count XXXI Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by East Point Acupuncture, to collect payment from Allstate under the

Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1460. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to East Point Acupuncture for the benefit of the Count XXXI Defendants that would not otherwise have been made.

1461. The Count XXXI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1462. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1463. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXXI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1464. The Count XXXI Defendants participated in the conduct of the East Point Acupuncture enterprise through a pattern of racketeering activities.

1465. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to East Point Acupuncture for the benefit of the Count XXXI Defendants.

1466. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXI Defendants' conduct.

1467. The Count XXXI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1468. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1469. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1470. By virtue of the Count XXXI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXII**
**VIOLATION 18 U.S.C. § 1962(d)**
**EAST POINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC)**

1471. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1472. Defendants Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC (collectively "Count XXXII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of East Point Acupuncture, P.C. ("East Point Acupuncture").

1473. The Count XXXII Defendants each agreed to further, facilitate, support, and operate the East Point Acupuncture enterprise.

1474. As such, the Count XXXII Defendants conspired to violate 18 U.S.C. § 1962(c).

1475. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of East Point Acupuncture even though East Point Acupuncture was not eligible to collect such benefits by virtue of its unlawful conduct.

1476. The Count XXXII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1477. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXXII Defendants' unlawful conduct described herein.

1478. By virtue of the Count XXXII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXXIII
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## DA ACUPUNCTURE, P.C. ENTERPRISE
## (Against Hector Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC)

1479. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1480. DA Acupuncture, P.C. ("DA Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1481. In connection with the operation and management of the DA Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC (collectively "Count XXXIII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of DA

Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by DA Acupuncture would occur, in furtherance of the scheme to defraud.

1482. The Count XXXIII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 20.

1483. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1484. Policies of insurance were delivered to insureds through the U.S. Mail.

1485. Payments made by Allstate to DA Acupuncture traveled through the U.S. Mail.

1486. As documented above, the Count XXXIII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through DA Acupuncture—payments that the Count XXXIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by DA Acupuncture, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1487. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to DA Acupuncture for the benefit of the Count XXXIII Defendants that would not otherwise have been made.

1488. The Count XXXIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1489. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1490. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXXIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1491. The Count XXXIII Defendants participated in the conduct of the DA Acupuncture enterprise through a pattern of racketeering activities.

1492. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to DA Acupuncture for the benefit of the Count XXXIII Defendants.

1493. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXIII Defendants' conduct.

1494. The Count XXXIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1495. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1496. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1497. By virtue of the Count XXXIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**DA ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC)**

1498. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1499. Defendants Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC (collectively "Count XXXIV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of DA Acupuncture, P.C. ("DA Acupuncture").

1500. The Count XXXIV Defendants each agreed to further, facilitate, support, and operate the DA Acupuncture enterprise.

1501. As such, the Count XXXIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1502. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of DA Acupuncture even though DA Acupuncture was not eligible to collect such benefits by virtue of its unlawful conduct.

1503. The Count XXXIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1504. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXXIV Defendants' unlawful conduct described herein.

1505. By virtue of the Count XXXIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PONCE ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC)**

1506. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1507. Ponce Acupuncture, P.C. ("Ponce Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1508. In connection with the operation and management of the Ponce Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC (collectively "Count XXXV Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Ponce Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by Ponce Acupuncture would occur, in furtherance of the scheme to defraud.

1509. The Count XXXV Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 21.

1510. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1511. Policies of insurance were delivered to insureds through the U.S. Mail.

1512. Payments made by Allstate to Ponce Acupuncture traveled through the U.S. Mail.

1513. As documented above, the Count XXXV Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Ponce Acupuncture—payments that the Count XXXV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by Ponce Acupuncture, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1514. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Ponce Acupuncture for the benefit of the Count XXXV Defendants that would not otherwise have been made.

1515. The Count XXXV Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1516. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1517. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXXV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1518. The Count XXXV Defendants participated in the conduct of the Ponce Acupuncture enterprise through a pattern of racketeering activities.

1519. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to Ponce Acupuncture for the benefit of the Count XXXV Defendants.

1520. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXV Defendants' conduct.

1521. The Count XXXV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1522. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1523. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1524. By virtue of the Count XXXV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**PONCE ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC)**

1525. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1526. Defendants Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC (collectively "Count XXXVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Ponce Acupuncture, P.C. ("Ponce Acupuncture").

1527. The Count XXXVI Defendants each agreed to further, facilitate, support, and operate the Ponce Acupuncture enterprise.

1528. As such, the Count XXXVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1529. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Ponce Acupuncture even though Ponce Acupuncture was not eligible to collect such benefits by virtue of its unlawful conduct.

1530. The Count XXXVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1531. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXXVI Defendants' unlawful conduct described herein.

1532. By virtue of the Count XXXVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages

sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DRD MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C.,**
**and Island Regional Management, LLC)**

1533. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1534. DRD Medical, P.C. ("DRD") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1535. In connection with the operation and management of the DRD enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively "Count XXXVII Defendants") intentionally caused to be prepared and mailed, false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of DRD's business, or should have reasonably foreseen that the mailing of such false medical documentation by DRD would occur, in furtherance of the scheme to defraud.

1536. The Count XXXVII Defendants knew, or should have foreseen two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 17.

1537. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1538. Policies of insurance were delivered to insureds through the U.S. Mail.

1539. Payments made by Allstate to DRD traveled through the U.S. Mail.

1540. As documented above, the Count XXXVII Defendants repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through DRD—payments that the Count XXXVII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law, for medical services and treatments that were purportedly provided by DRD, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1541. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to DRD for the benefit of the Count XXXVII Defendants that would not otherwise have been made.

1542. The Count XXXVII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

1543. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1544. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXXVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1545. The Count XXXVII Defendants participated in the conduct of the DRD enterprise through a pattern of racketeering activities.

1546. The unlawful activities and other misconduct alleged in this case had the direct effect of causing funds to be transferred from Allstate to DRD for the benefit of the Count XXXVII Defendants.

1547. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXVIIII Defendants' conduct.

1548. The Count XXXVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1549. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1550. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1551. By virtue of the Count XXXVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**DRD MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C.,**
**and Island Regional Management, LLC)**

1552. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1553. Defendants Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively "Count XXXVIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of DRD Medical, P.C. ("DRD").

1554. The Count XXXVIII Defendants each agreed to further, facilitate, support, and operate the DRD enterprise.

1555. As such, the Count XXXVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1556. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of DRD even though DRD was not eligible to collect such benefits by virtue of its unlawful conduct.

1557. The Count XXXVIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1558. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XXXVIII Defendants' unlawful conduct described herein.

1559. By virtue of the Count XXXVIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ISLAND REGIONAL MANAGEMENT, LLC ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

1560. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1561. In connection with each of the claims identified in the plaintiffs' Complaint, the Defendants Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C. (collectively, "Count XXXIX Defendants")

intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1562. The Count XXXIX Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 3-4, 7-9, 11-13, 15-16, and 19-21.

1563. Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1564. Policies of insurance were delivered to insureds through the U.S. Mail.

1565. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

1566. As documented above, the Count XXXIX Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., Deer Park Orthopedics, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1567. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., Deer Park Orthopedics, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. for the benefit of the Count XXXIX Defendants, which would not otherwise have been paid.

1568. The Count XXXIX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1569. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

1570. By filing numerous fraudulent claims in an ongoing scheme, the Count XXXIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

1571. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis,

M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., Deer Park Orthopedics, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. for the benefit of the Count XXXIX Defendants.

1572. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1573. Island Regional Management, LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1574. The Count XXXIX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1575. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXIX Defendants' conduct.

1576. The Count XXXIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1577. By virtue of the Count XXXIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XL**
**VIOLATION 18 U.S.C. § 1962(d)**
**ISLAND REGIONAL MANAGEMENT, LLC ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

1578. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1579. Defendants Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C. (collectively, "Count XL Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Island Regional Management, LLC ("Island Regional Management").

1580. The Count XL Defendants each agreed to further, facilitate, support, and operate the Island Regional Management enterprise.

1581. As such, the Count XL Defendants conspired to violate 18 U.S.C. § 1962(c).

1582. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., Deer Park Orthopedics, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. which were not eligible to collect such benefits by virtue of their unlawful conduct.

1583. The purpose of this conspiracy was also to unlawfully channel to Tubens and Melgar, through Island Regional Management, LLC, the professional fees and profits of Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., Deer Park Orthopedics, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C.

1584. The Count XL Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1585. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XL Defendants' unlawful conduct described herein.

1586. By virtue of the Count XL Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XLI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**G&A OFFICE MANAGEMENT, INC. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

1587. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1588. In connection with each of the claims identified in the plaintiffs' Complaint, the Defendants Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a

Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C. (collectively, "Count XLI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1589. The Count XLI Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 5, 8, 13-14, and 19-21.

1590. Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1591. Policies of insurance were delivered to insureds through the U.S. Mail.

1592. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

1593. As documented above, the Count XLI Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Eastern Suffolk Chiropractic, P.C. Huntington Regional Chiropractic, P.C., Maximum Orthopaedics and Sports

Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1594. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Eastern Suffolk Chiropractic, P.C. Huntington Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. for the benefit of the Count XLI Defendants, which would not otherwise have been paid.

1595. The Count XLI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1596. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

1597. By filing numerous fraudulent claims in an ongoing scheme, the Count XLI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

1598. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Eastern Suffolk Chiropractic, P.C. Huntington Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C. for the benefit of the Count XLI Defendants.

1599. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1600. G&A Office Management, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1601. The Count XLI Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1602. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XLI Defendants' conduct.

1603. The Count XLI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1604. By virtue of the Count XLI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XLII**
**VIOLATION 18 U.S.C. § 1962(d)**
**G&A OFFICE MANAGEMENT, INC. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

1605. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1606. Defendants Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C. (collectively, "Count XLII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of G&A Office Management, Inc. ("G&A Office Management").

1607. The Count XLII Defendants each agreed to further, facilitate, support, and operate the Island Regional Management enterprise.

1608. As such, the Count XLII Defendants conspired to violate 18 U.S.C. § 1962(c).

1609. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of XLII, which were not eligible to collect such benefits by virtue of their unlawful conduct.

1610. The purpose of this conspiracy was also to unlawfully channel to Tubens and Melgar, through G&A Office Management, Inc., the professional fees and profits of Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Eastern Suffolk Chiropractic, P.C. Huntington Regional Chiropractic, P.C., Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Pavilion Medical, P.C., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Station Medical Services, P.C., OrthoCare Surgical, East Point Acupuncture, P.C., Ponce Acupuncture, P.C., and DA Acupuncture, P.C.

1611. The Count XLII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1612. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XLII Defendants' unlawful conduct described herein.

1613. By virtue of the Count XLII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XLIII**
**COMMON LAW FRAUD**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, Brentwood Physical Rehabilitation, Hector Melgar, P.T., and Island Regional Management, LLC)**

1614. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1615. Defendants Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, Brentwood Physical Rehabilitation, Hector Melgar, P.T., and Island Regional Management, LLC (collectively, "Count XLIII Defendants") conspired to defraud Allstate through their unlawful operation of Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation.

1616. The Count XLIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation was entitled to receive No-Fault reimbursement under New York law.

1617. These misrepresentations of fact by the Count XLIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLIII Defendants' reports, invoices and collection documentation.

1618. The Count XLIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1619. These misrepresentations were intentionally made by the Count XLIII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Hector Melgar, PT,

P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation for payment of No-Fault insurance benefits.

1620. The Count XLIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1621. Allstate reasonably relied, to its detriment, upon the Count XLIII Defendants' material misrepresentations concerning Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1622. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation totaling at least $1,730,554.77, even though Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## <u>COUNT XLIV</u>
## COMMON LAW FRAUD
## (Against Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)

1623. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1624. Defendants Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count XLIV Defendants") conspired to defraud Allstate through their unlawful operation of Brentwood Regional Chiropractic, P.C.

1625. The Count XLIV Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Brentwood Regional Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1626. These misrepresentations of fact by the Count XLIV Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLIV Defendants' reports, invoices and collection documentation.

1627. The Count XLIV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1628. These misrepresentations were intentionally made by the Count XLIV Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Brentwood Regional Chiropractic, P.C. for payment of No-Fault insurance benefits.

1629. The Count XLIV Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1630. Allstate reasonably relied, to its detriment, upon the Count XLIV Defendants' material misrepresentations concerning Brentwood Regional Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1631. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Brentwood Regional Chiropractic, P.C. totaling at least $42,162.44, even though Brentwood Regional Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLV**
**COMMON LAW FRAUD**
**(Against Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1632. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1633. Defendants Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count XLV Defendants") conspired to defraud Allstate through their unlawful operation of Eastern Suffolk Chiropractic, P.C.

1634. The Count XLV Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Eastern Suffolk Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1635. These misrepresentations of fact by the Count XLV Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLV Defendants' reports, invoices and collection documentation.

1636. The Count XLV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1637. These misrepresentations were intentionally made by the Count XLV Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Eastern Suffolk Chiropractic, P.C. for payment of No-Fault insurance benefits.

1638. The Count XLV Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1639. Allstate reasonably relied, to its detriment, upon the Count XLV Defendants' material misrepresentations concerning Eastern Suffolk Chiropractic, P.C.'s eligibility to receive

No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1640. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Eastern Suffolk Chiropractic, P.C. totaling at least $133,024.19, even though Eastern Suffolk Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XLVI
## COMMON LAW FRAUD
## (Against Front St. Chiropractic, P.C. and David Tubens, D.C.)

1641. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1642. Defendants Front St. Chiropractic, P.C. and David Tubens, D.C. (collectively, "Count XLVI Defendants") conspired to defraud Allstate through their unlawful operation of Front St. Chiropractic, P.C.

1643. The Count XLVI Defendants ' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Front St. Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1644. These misrepresentations of fact by the Count XLVI Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLVI Defendants' reports, invoices and collection documentation.

1645. The Count XLVI Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1646. These misrepresentations were intentionally made by the Count XLVI Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Front St. Chiropractic, P.C. for payment of No-Fault insurance benefits.

1647. The Count XLVI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1648. Allstate reasonably relied, to its detriment, upon the Count XLVI Defendants' material misrepresentations concerning Front St. Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1649. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Front St. Chiropractic, P.C. totaling at least $87,771.29, even though Front St. Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XLVII
## COMMON LAW FRAUD
## (Against Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)

1650. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1651. Defendants Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC(collectively, "Count XLVII Defendants") conspired to defraud Allstate through their unlawful operation of Hempstead Regional Chiropractic, P.C.

1652. The Count XLVII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Hempstead Regional Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1653. These misrepresentations of fact by the Count XLVII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLVII Defendants' reports, invoices and collection documentation.

1654. The Count XLVII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1655. These misrepresentations were intentionally made by the Count XLVII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Hempstead Regional Chiropractic, P.C. for payment of No-Fault insurance benefits.

1656. The Count XLVII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1657. Allstate reasonably relied, to its detriment, upon the Count XLVII Defendants' material misrepresentations concerning Hempstead Regional Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1658. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Hempstead Regional Chiropractic, P.C. totaling at least $80,848.22, even though Hempstead Regional Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLVIII**
**COMMON LAW FRAUD**
**(Against Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1659. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1660. Defendants Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count XLVIII Defendants") conspired to defraud Allstate through their unlawful operation of Huntington Regional Chiropractic, P.C.

1661. The Count XLVIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Huntington Regional Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1662. These misrepresentations of fact by the Count XLVIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLVIII Defendants' reports, invoices and collection documentation.

1663. The Count XLVIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1664. These misrepresentations were intentionally made by the Count XLVIII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Huntington Regional Chiropractic, P.C. for payment of No-Fault insurance benefits.

1665. The Count XLVIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1666. Allstate reasonably relied, to its detriment, upon the Count XLVIII Defendants' material misrepresentations concerning Huntington Regional Chiropractic, P.C.'s eligibility to

receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1667. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Huntington Regional Chiropractic, P.C. totaling at least $362,019.82, even though Huntington Regional Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLIX**
**COMMON LAW FRAUD**
**(Against Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1668. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1669. Defendants Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count XLIX Defendants") conspired to defraud Allstate through their unlawful operation of Liberty Regional Chiropractic, P.C.

1670. The Count XLIX Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Liberty Regional Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1671. These misrepresentations of fact by the Count XLIX Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XLIX Defendants' reports, invoices and collection documentation.

1672. The Count XLIX Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1673. These misrepresentations were intentionally made by the Count XLIX Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Liberty Regional Chiropractic, P.C. for payment of No-Fault insurance benefits.

1674. The Count XLIX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1675. Allstate reasonably relied, to its detriment, upon the Count XLIX Defendants' material misrepresentations concerning Liberty Regional Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1676. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Liberty Regional Chiropractic, P.C. totaling at least $25,845.71, even though Liberty Regional Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT L
## COMMON LAW FRAUD
## (Against Patchogue Regional Chiropractic, P.C. and David Tubens, D.C.)

1677. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1678. Defendants Patchogue Regional Chiropractic, P.C. and David Tubens, D.C. (collectively, "Count L Defendants") conspired to defraud Allstate through their unlawful operation of Patchogue Regional Chiropractic, P.C.

1679. The Count L Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Patchogue Regional Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1680. These misrepresentations of fact by the Count L Defendants included, but were not limited to, the material misrepresentations of fact made in the Count L Defendants' reports, invoices and collection documentation.

1681. The Count L Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1682. These misrepresentations were intentionally made by the Count L Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Patchogue Regional Chiropractic, P.C. for payment of No-Fault insurance benefits.

1683. The Count L Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1684. Allstate reasonably relied, to its detriment, upon the Count L Defendants' material misrepresentations concerning Patchogue Regional Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1685. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Patchogue Regional Chiropractic, P.C. totaling at least $12,454.92, even though Patchogue Regional Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LI**
**COMMON LAW FRAUD**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1686. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1687. Defendants Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LI Defendants") conspired to defraud Allstate through their unlawful operation and control of, and sharing in the professional physician fees of, Maxim Tyorkin, M.D.'s Brentwood Clinic practice operating under the name "Maximum Orthopaedics and Sports Medicine."

1688. The Count LI Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Maxim Tyorkin, M.D., operating under the name Maximum Orthopaedics and Sports Medicine Brentwood Clinic at the Brentwood Clinic, was entitled to receive No-Fault reimbursement under New York law.

1689. These misrepresentations of fact by the Count LI Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LI Defendants' reports, invoices and collection documentation.

1690. The Count LI Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1691. These misrepresentations were intentionally made by the Count LI Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Maxim Tyorkin, M.D.'s Brentwood Clinic practice—which practice was unlawfully operated and controlled by Melgar and Tubens—for payment of No-Fault insurance benefits.

1692. The Count LI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1693. Allstate reasonably relied, to its detriment, upon the Count LI Defendants' material misrepresentations concerning Maxim Tyorkin, M.D.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1694. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Maxim Tyorkin, M.D. totaling at least $116,883.27 for medical expenses and services rendered to Allstate claimants, even though Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LII**
**COMMON LAW FRAUD**
**(Against Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1695. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1696. Defendants Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LII Defendants") conspired to defraud Allstate through their unlawful management and control of Pavilion Medical, P.C.

1697. The Count LII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Pavilion Medical, P.C. was entitled to receive No-Fault reimbursement under New York law.

1698. These misrepresentations of fact by the Count LII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LII Defendants' reports, invoices and collection documentation.

1699. The Count LII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1700. These misrepresentations were intentionally made by the Count LII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Pavilion Medical, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1701. The Count LII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1702. Allstate reasonably relied, to its detriment, upon the Count LII Defendants' material misrepresentations concerning Pavilion Medical, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1703. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Pavilion Medical, P.C. totaling at least $2,710.87, even though Pavilion Medical, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LIII**
**COMMON LAW FRAUD**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1704. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1705. Defendants Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LIII Defendants") conspired to defraud Allstate through their unlawful management and control of Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

1706. The Count LIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care was entitled to receive No-Fault reimbursement under New York law.

1707. These misrepresentations of fact by the Count LIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LIII Defendants' reports, invoices and collection documentation.

1708. The Count LIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1709. These misrepresentations were intentionally made by the Count LIII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1710. The Count LIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1711. Allstate reasonably relied, to its detriment, upon the Count LIII Defendants' material misrepresentations concerning Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1712. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care totaling at least $106,440.12, even though Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT LIV
## COMMON LAW FRAUD
## (Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)

1713. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1714. Defendants Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LIV Defendants") conspired to defraud Allstate through their unlawful management and control of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

1715. The Count LIV Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation was entitled to receive No-Fault reimbursement under New York law.

1716. These misrepresentations of fact by the Count LIV Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LIV Defendants' reports, invoices and collection documentation.

1717. The Count LIV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1718. These misrepresentations were intentionally made by the Count LIV Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1719. The Count LIV Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1720. Allstate reasonably relied, to its detriment, upon the Count LIV Defendants' material misrepresentations concerning Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1721. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation totaling at least $77,031.89, even though Phoenix Medical Services,

P.C. d/b/a Rockville Centre Pain Management & Rehabilitation was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LV**
**COMMON LAW FRAUD**
**(Against Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1722. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1723. Defendants Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LV Defendants") conspired to defraud Allstate through their unlawful management and control of Deer Park Orthopedics, P.C.

1724. The Count LV Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Deer Park Orthopedics, P.C. was entitled to receive No-Fault reimbursement under New York law.

1725. These misrepresentations of fact by the Count LV Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LV Defendants' reports, invoices and collection documentation.

1726. The Count LV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1727. These misrepresentations were intentionally made by the Count LV Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Deer Park Orthopedics, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1728. The Count LV Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1729. Allstate reasonably relied, to its detriment, upon the Count LV Defendants' material misrepresentations concerning Deer Park Orthopedics, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1730. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Deer Park Orthopedics, P.C. totaling at least $4,651.41, even though Deer Park Orthopedics, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT LVI
## COMMON LAW FRAUD
## (Against Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)

1731. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1732. Defendants Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LVI Defendants") conspired to defraud Allstate through their unlawful management and control of Station Medical Services, P.C.

1733. The Count LVI Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Station Medical Services, P.C. was entitled to receive No-Fault reimbursement under New York law.

1734. These misrepresentations of fact by the Count LVI Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LVI Defendants' reports, invoices and collection documentation.

1735. The Count LVI Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1736. These misrepresentations were intentionally made by the Count LVI Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Station Medical Services, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1737. The Count LVI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1738. Allstate reasonably relied, to its detriment, upon the Count LVI Defendants' material misrepresentations concerning Station Medical Services, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1739. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Station Medical Services, P.C. totaling at least $168,347.39, even though Station Medical Services, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT LVII
## COMMON LAW FRAUD
## (Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)

1740. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1741. Defendants Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LVII Defendants") conspired to defraud Allstate through their unlawful management and control of Randall Ehrlich, M.D. d/b/a OrthoCare Surgical.

1742. The Count LVII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Randall Ehrlich, M.D. d/b/a OrthoCare Surgical was entitled to receive No-Fault reimbursement under New York law.

1743. These misrepresentations of fact by the Count LVII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LVII Defendants' reports, invoices and collection documentation.

1744. The Count LVII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1745. These misrepresentations were intentionally made by the Count LVII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Randall Ehrlich, M.D. d/b/a OrthoCare Surgical—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1746. The Count LVII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1747. Allstate reasonably relied, to its detriment, upon the Count LVII Defendants' material misrepresentations concerning Randall Ehrlich, M.D. d/b/a OrthoCare Surgical's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1748. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Randall Ehrlich, M.D. d/b/a OrthoCare Surgical totaling at least $24,767.71, even though Randall Ehrlich, M.D. d/b/a OrthoCare Surgical was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LVIII**
**COMMON LAW FRAUD**
**(Against East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1749. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1750. Defendants East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LVIII Defendants") conspired to defraud Allstate through their unlawful management and control of East Point Acupuncture, P.C.

1751. The Count LVIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that East Point Acupuncture, P.C. was entitled to receive No-Fault reimbursement under New York law.

1752. These misrepresentations of fact by the Count LVIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LVIII Defendants' reports, invoices and collection documentation.

1753. The Count LVIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1754. These misrepresentations were intentionally made by the Count LVIII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from East Point Acupuncture, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1755. The Count LVIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1756. Allstate reasonably relied, to its detriment, upon the Count LVIII Defendants' material misrepresentations concerning East Point Acupuncture, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1757. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to East Point Acupuncture, P.C. totaling at least $34,344.41, even though East Point Acupuncture, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LIX**
**COMMON LAW FRAUD**
**(Against DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Mangement, LLC)**

1758. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1759. Defendants DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LIX

Defendants") conspired to defraud Allstate through their unlawful management and control of DA Acupuncture, P.C.

1760. The Count LIX Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that DA Acupuncture, P.C. was entitled to receive No-Fault reimbursement under New York law.

1761. These misrepresentations of fact by the Count LIX Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LIX Defendants' reports, invoices and collection documentation.

1762. The Count LIX representations were false or required disclosure of additional facts to render the information furnished not misleading.

1763. These misrepresentations were intentionally made by the Count LIX Defendants in furtherance of the scheme to defraud Allstate by submitting claims from DA Acupuncture, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1764. The Count LIX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1765. Allstate reasonably relied, to its detriment, upon the Count LIX Defendants' material misrepresentations concerning DA Acupuncture, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1766. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to DA Acupuncture, P.C. totaling at least $113,166.70, even though

DA Acupuncture, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LX**
**COMMON LAW FRAUD**
**(Against Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1767. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1768. Defendants Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LX Defendants") conspired to defraud Allstate through their unlawful management and control of Ponce Acupuncture, P.C.

1769. The Count LX Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Ponce Acupuncture, P.C. was entitled to receive No-Fault reimbursement under New York law.

1770. These misrepresentations of fact by the Count LX Defendants included, but were not limited to, the material misrepresentations of fact made in the Count LX Defendants' reports, invoices and collection documentation.

1771. The Count LX Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1772. These misrepresentations were intentionally made by the Count LX Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Ponce Acupuncture, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1773. The Count LX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1774. Allstate reasonably relied, to its detriment, upon the Count LX Defendants' material misrepresentations concerning Ponce Acupuncture, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1775. Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Ponce Acupuncture, P.C. totaling at least $95,813.52, even though Ponce Acupuncture, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LXI**
**UNJUST ENRICHMENT**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Hector Melgar, P.T., and Island Regional Management, LLC)**

1776. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1777. As alleged herein, Defendants Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Hector Melgar, P.T., and Island Regional Management, LLC (collectively, "Count LXI Defendants") conspired to induce Allstate to make numerous and substantial payments to Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation.

1778. As alleged herein, Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Hector Melgar,

PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation was unlawfully operated in violation of New York law.

1779. When Allstate paid Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXI Defendants, or those persons working under their control, made concerning Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation's reimbursement eligibility under New York's No-Fault Laws.

1780. Each and every No-Fault reimbursement payment that Allstate was caused to make to Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation during the course of the scheme constitutes a benefit that the Count LXI Defendants aggressively caused Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation to seek and voluntarily accept.

1781. Throughout the course of their scheme, the Count LXI Defendants caused Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $1,730,554.77 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1782. Retention of those benefits by the Count LXI Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXII**
**UNJUST ENRICHMENT**
**(Against Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1783. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1784. As alleged herein, Defendants Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively "Count LXII Defendants") conspired to induce Allstate to make numerous and substantial payments to Brentwood Regional Chiropractic, P.C.

1785. As alleged herein, Brentwood Regional Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Brentwood Regional Chiropractic, P.C. was unlawfully operated in violation of New York law.

1786. When Allstate paid Brentwood Regional Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXII Defendants, or those persons working under their control, made concerning Brentwood Regional Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1787. Each and every No-Fault reimbursement payment that Allstate was caused to make to Brentwood Regional Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXII Defendants aggressively caused Brentwood Regional Chiropractic, P.C. to seek and voluntarily accept.

1788. Throughout the course of their scheme, the Count LXII Defendants caused Brentwood Regional Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit

payments totaling at least $42,162.44 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1789. Retention of those benefits by the Count LXII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXIII**
**UNJUST ENRICHMENT**
**(Against Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1790. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1791. As alleged herein, Defendants Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Eastern Suffolk Chiropractic, P.C.

1792. As alleged herein, Eastern Suffolk Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Eastern Suffolk Chiropractic, P.C. was unlawfully operated in violation of New York law.

1793. When Allstate paid Eastern Suffolk Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXIII Defendants, or those persons working under their control, made concerning Eastern Suffolk Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1794. Each and every No-Fault reimbursement payment that Allstate was caused to make to Eastern Suffolk Chiropractic, P.C. during the course of the scheme constitutes a benefit that the

Count LXIII Defendants aggressively caused Eastern Suffolk Chiropractic, P.C. to seek and voluntarily accept.

1795. Throughout the course of their scheme, the Count LXIII Defendants caused Eastern Suffolk Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $133,024.19 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1796. Retention of those benefits by the Count LXIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXIV**
**UNJUST ENRICHMENT**
**(Against Front St. Chiropractic, P.C. and David Tubens, D.C.)**

1797. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1798. As alleged herein, Defendants Front St. Chiropractic, P.C. and David Tubens, D.C. (collectively "Count LXIV Defendants") conspired to induce Allstate to make numerous and substantial payments to Front St. Chiropractic, P.C.

1799. As alleged herein, Front St. Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Front St. Chiropractic, P.C. was unlawfully operated in violation of New York law.

1800. When Allstate paid Front St. Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXIV Defendants, or those persons working under their control, made concerning Front St. Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1801. Each and every No-Fault reimbursement payment that Allstate was caused to make to Front St. Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXIV Defendants aggressively caused Front St. Chiropractic, P.C. to seek and voluntarily accept.

1802. Throughout the course of their scheme, the Count LXIV Defendants caused Front St. Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $87,771.29 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1803. Retention of those benefits by the Count LXIV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXV**
**UNJUST ENRICHMENT**
**(Against Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1804. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1805. As alleged herein, Defendants Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXV Defendants") conspired to induce Allstate to make numerous and substantial payments to Hempstead Regional Chiropractic, P.C.

1806. As alleged herein, Hempstead Regional Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Hempstead Regional Chiropractic, P.C. was unlawfully operated in violation of New York law.

1807. When Allstate paid Hempstead Regional Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXV Defendants, or those persons working under their control, made

concerning Hempstead Regional Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1808. Each and every No-Fault reimbursement payment that Allstate was caused to make to Hempstead Regional Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXV Defendants aggressively caused Hempstead Regional Chiropractic, P.C. to seek and voluntarily accept.

1809. Throughout the course of their scheme, the Count LXV Defendants caused Hempstead Regional Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $80,848.22 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1810. Retention of those benefits by the Count LXV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXVI**
**UNJUST ENRICHMENT**
**(Against Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1811. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1812. As alleged herein, Defendants Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXVI Defendants") conspired to induce Allstate to make numerous and substantial payments to Huntington Regional Chiropractic, P.C.

1813. As alleged herein, Huntington Regional Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Huntington Regional Chiropractic, P.C. was unlawfully operated in violation of New York law.

1814. When Allstate paid Huntington Regional Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVI Defendants, or those persons working under their control, made concerning Huntington Regional Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1815. Each and every No-Fault reimbursement payment that Allstate was caused to make to Huntington Regional Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXVI Defendants aggressively caused Huntington Regional Chiropractic, P.C. to seek and voluntarily accept.

1816. Throughout the course of their scheme, the Count LXVI Defendants caused Huntington Regional Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $362,019.82 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1817. Retention of those benefits by the Count LXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXVII**
**UNJUST ENRICHMENT**
**(Against Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

1818. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1819. As alleged herein, Defendants Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXVII Defendants") conspired to induce Allstate to make numerous and substantial payments to Liberty Regional Chiropractic, P.C.

1820. As alleged herein, Liberty Regional Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Liberty Regional Chiropractic, P.C. was unlawfully operated in violation of New York law.

1821. When Allstate paid Liberty Regional Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVII Defendants, or those persons working under their control, made concerning Liberty Regional Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1822. Each and every No-Fault reimbursement payment that Allstate was caused to make to Liberty Regional Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXVII Defendants aggressively caused Liberty Regional Chiropractic, P.C. to seek and voluntarily accept.

1823. Throughout the course of their scheme, the Count LXVII Defendants caused Liberty Regional Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $25,845.71 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1824. Retention of those benefits by the Count LXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

**<u>COUNT LXVIII</u>**
**UNJUST ENRICHMENT**
**(Against Patchogue Regional Chiropractic, P.C. and David Tubens, D.C.)**

1825. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1826. As alleged herein, Defendants Patchogue Regional Chiropractic, P.C. and David Tubens, D.C. (collectively, "Count LXVIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Patchogue Regional Chiropractic, P.C.

1827. As alleged herein, Patchogue Regional Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Patchogue Regional Chiropractic, P.C. was unlawfully operated in violation of New York law.

1828. When Allstate paid Patchogue Regional Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVIII Defendants, or those persons working under their control, made concerning Patchogue Regional Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1829. Each and every No-Fault reimbursement payment that Allstate was caused to make to Patchogue Regional Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count LXVI Defendants aggressively caused Patchogue Regional Chiropractic, P.C. to seek and voluntarily accept.

1830. Throughout the course of their scheme, the Count LXVIII Defendants caused Patchogue Regional Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $12,454.92 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1831. Retention of those benefits by the Count LXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXIX**
**UNJUST ENRICHMENT**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1832. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1833. As alleged herein, Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXIX Defendants") conspired to induce Allstate to make numerous and substantial payments to Maxim Tyorkin, M.D. pursuant to New York's No-Fault Laws.

1834. As alleged herein, Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine was unlawfully operated in violation of New York law.

1835. When Allstate paid Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXIX Defendants, or those persons working under their control, made concerning Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine's reimbursement eligibility under New York's No-Fault Laws.

1836. Each and every No-Fault reimbursement payment that Allstate was caused to make to Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine during the course of the scheme constitutes a benefit that the Count LXIX Defendants aggressively caused Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine to seek and voluntarily accept.

1837. Throughout the course of their scheme, the Count LXIX Defendants caused Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine to wrongfully obtain from

Allstate No-Fault benefit payments totaling at least $116,883.27 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1838. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine or to participate in the operation and management of Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine

1839. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine and/or participation in the operation and management of Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, at no point was Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine ever eligible for reimbursement under New York's No-Fault Laws.

1840. Throughout the duration of this scheme, the Count LXIX Defendants obtained substantial monetary benefits totaling at least $116,883.27 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine

1841. Retention of those benefits by the Count LXIX Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXX**
**UNJUST ENRICHMENT**
**(Against Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1842. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1843. As alleged herein, Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXX Defendants") conspired to defraud Allstate through their unlawful management and control of Pavilion Medical, P.C.

1844. As alleged herein, Pavilion Medical, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Pavilion Medical, P.C. was unlawfully operated in violation of New York law.

1845. When Allstate paid Pavilion Medical, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXX Defendants, or those persons working under their control, made concerning Pavilion Medical, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1846. Each and every No-Fault reimbursement payment that Allstate was caused to make to Pavilion Medical, P.C. during the course of the scheme constitutes a benefit that the Count LXX Defendants aggressively caused Pavilion Medical, P.C. to seek and voluntarily accept.

1847. Throughout the course of their scheme, the Count LXX Defendants caused Pavilion Medical, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $2,710.87 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1848. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Pavilion Medical, P.C., including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by Pavilion Medical, P.C. or to participate in the operation and management of Pavilion Medical, P.C.

1849. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Pavilion Medical, P.C. and/or participation in the operation and management of Pavilion Medical, P.C., at no point was Pavilion Medical, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

1850. Throughout the duration of this scheme, the Count LXX Defendants obtained substantial monetary benefits totaling at least $2,710.87 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Pavilion Medical, P.C.

1851. Retention of those benefits by the Count LXX Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXI**
**UNJUST ENRICHMENT**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1852. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1853. As alleged herein, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXI Defendants") conspired to

defraud Allstate through their unlawful management and control of Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

1854. As alleged herein, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care was unlawfully operated in violation of New York law.

1855. When Allstate paid Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXI Defendants, or those persons working under their control, made concerning Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care's reimbursement eligibility under New York's No-Fault Laws.

1856. Each and every No-Fault reimbursement payment that Allstate was caused to make to Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care during the course of the scheme constitutes a benefit that the Count LXXI Defendants aggressively caused Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care to seek and voluntarily accept.

1857. Throughout the course of their scheme, the Count LXXI Defendants caused Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $106,440.12 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1858. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never

had any legal right to control Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care or to participate in the operation and management of Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

1859. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care and/or participation in the operation and management of Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, at no point was Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care ever eligible for reimbursement under New York's No-Fault Laws.

1860. Throughout the duration of this scheme, the Count LXXI Defendants obtained substantial monetary benefits totaling at least $106,440.12 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

1861. Retention of those benefits by the Count LXXI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT LXXII
## UNJUST ENRICHMENT
## (Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)

1862. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1863. As alleged herein, Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXII Defendants") conspired to defraud Allstate through their unlawful management and control of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

1864. As alleged herein, Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation was unlawfully operated in violation of New York law.

1865. When Allstate paid Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXII Defendants, or those persons working under their control, made concerning Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation's reimbursement eligibility under New York's No-Fault Laws.

1866. Each and every No-Fault reimbursement payment that Allstate was caused to make to Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation during the course of the scheme constitutes a benefit that the Count LXXII Defendants aggressively caused Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation to seek and voluntarily accept.

1867. Throughout the course of their scheme, the Count LXXII Defendants caused Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation to

wrongfully obtain from Allstate No-Fault benefit payments totaling at least $77,031.89 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1868. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation or to participate in the operation and management of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

1869. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation and/or participation in the operation and management of Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, at no point was Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation ever eligible for reimbursement under New York's No-Fault Laws.

1870. Throughout the duration of this scheme, the Count LXXII Defendants obtained substantial monetary benefits totaling at least $77,031.89 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

1871. Retention of those benefits by the Count LXXII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXIII**
**UNJUST ENRICHMENT**
**(Against Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., and David Tubens, D.C., and Island Regional Management, LLC)**

1872. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1873. As alleged herein, Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXIII Defendants") conspired to defraud Allstate through their unlawful management and control of Deer Park Orthopedics, P.C.

1874. As alleged herein, Deer Park Orthopedics, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Deer Park Orthopedics, P.C. was unlawfully operated in violation of New York law.

1875. When Allstate paid Deer Park Orthopedics, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXIII Defendants, or those persons working under their control, made concerning Deer Park Orthopedics, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1876. Each and every No-Fault reimbursement payment that Allstate was caused to make to Deer Park Orthopedics, P.C. during the course of the scheme constitutes a benefit that the Count LXXIII Defendants aggressively caused Deer Park Orthopedics, P.C. to seek and voluntarily accept.

1877. Throughout the course of their scheme, the Count LXXIII Defendants caused Deer Park Orthopedics, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $4,651.41 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1878. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Deer Park Orthopedics, P.C., including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by Deer Park Orthopedics, P.C. or to participate in the operation and management of Deer Park Orthopedics, P.C.

1879. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Deer Park Orthopedics, P.C. and/or participation in the operation and management of Deer Park Orthopedics, P.C., at no point was Deer Park Orthopedics, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

1880. Throughout the duration of this scheme, the Count LXXIII Defendants obtained substantial monetary benefits totaling at least $4,651.41 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Deer Park Orthopedics, P.C.

1881. Retention of those benefits by the Count LXXIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXIV**
**UNJUST ENRICHMENT**
**(Against Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1882. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1883. As alleged herein, Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count

LXXIV Defendants") conspired to defraud Allstate through their unlawful management and control of Station Medical Services, P.C.

1884. As alleged herein, Station Medical Services, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Station Medical Services, P.C. was unlawfully operated in violation of New York law.

1885. When Allstate paid Station Medical Services, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXIV Defendants, or those persons working under their control, made concerning Station Medical Services, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1886. Each and every No-Fault reimbursement payment that Allstate was caused to make to Station Medical Services, P.C. during the course of the scheme constitutes a benefit that the Count LXXIV Defendants aggressively caused Station Medical Services, P.C. to seek and voluntarily accept.

1887. Throughout the course of their scheme, the Count LXXIV Defendants caused Station Medical Services, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $168,347.39 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1888. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Station Medical Services, P.C., including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by

Station Medical Services, P.C. or to participate in the operation and management of Station Medical Services, P.C.

1889. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Station Medical Services, P.C. and/or participation in the operation and management of Station Medical Services, P.C., at no point was Station Medical Services, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

1890. Throughout the duration of this scheme, the Count LXXIV Defendants obtained substantial monetary benefits totaling at least $168,347.39 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Station Medical Services, P.C.

1891. Retention of those benefits by the Count LXXIV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXV**
**UNJUST ENRICHMENT**
**(Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1892. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1893. As alleged herein, Randall Ehrlich, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXV Defendants") conspired to defraud Allstate through their unlawful management and control of OrthoCare Surgical.

1894. As alleged herein, OrthoCare Surgical was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, OrthoCare Surgical was unlawfully operated in violation of New York law.

1895. When Allstate paid OrthoCare Surgical, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXV Defendants, or those persons working under their control, made concerning OrthoCare Surgical's reimbursement eligibility under New York's No-Fault Laws.

1896. Each and every No-Fault reimbursement payment that Allstate was caused to make to OrthoCare Surgical during the course of the scheme constitutes a benefit that the Count LXXV Defendants aggressively caused OrthoCare Surgical to seek and voluntarily accept.

1897. Throughout the course of their scheme, the Count LXXV Defendants caused OrthoCare Surgical to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $24,767.71 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1898. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control OrthoCare Surgical, including its accounts receivable and/or the receipt and disbursement of any professional physician fees and profits obtained by OrthoCare Surgical or to participate in the operation and management of OrthoCare Surgical.

1899. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over OrthoCare Surgical and/or participation in the operation and management of OrthoCare Surgical, at no point was OrthoCare Surgical ever eligible for reimbursement under New York's No-Fault Laws.

1900. Throughout the duration of this scheme, the Count LXXV Defendants obtained substantial monetary benefits totaling at least $24,767.71 as the result of their unlawful conduct,

benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to OrthoCare Surgical.

1901. Retention of those benefits by the Count LXXV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXVI**
**UNJUST ENRICHMENT**
**(Against East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1902. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1903. As alleged herein, East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXVI Defendants") conspired to defraud Allstate through their unlawful management and control of East Point Acupuncture, P.C.

1904. As alleged herein, East Point Acupuncture, P.C was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, East Point Acupuncture, P.C was unlawfully operated in violation of New York law.

1905. When Allstate paid East Point Acupuncture, P.C, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXVI Defendants, or those persons working under their control, made concerning East Point Acupuncture, P.C's reimbursement eligibility under New York's No-Fault Laws.

1906. Each and every No-Fault reimbursement payment that Allstate was caused to make to East Point Acupuncture, P.C. during the course of the scheme constitutes a benefit that the Count LXXVI Defendants aggressively caused East Point Acupuncture, P.C to seek and voluntarily accept.

1907. Throughout the course of their scheme, the Count LXXVI Defendants caused East Point Acupuncture, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $34,344.41 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1908. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for professional acupuncture services, never had any legal right to control East Point Acupuncture, P.C., including its accounts receivable and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by East Point Acupuncture, P.C. or to participate in the operation and management of East Point Acupuncture, P.C.

1909. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over East Point Acupuncture, P.C. and/or participation in the operation and management of East Point Acupuncture, P.C., at no point was East Point Acupuncture, P.C ever eligible for reimbursement under New York's No-Fault Laws.

1910. Throughout the duration of this scheme, the Count LXXVI Defendants obtained substantial monetary benefits totaling at least $34,344.41 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to East Point Acupuncture, P.C.

1911. Retention of those benefits by the Count LXXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXVII**
**UNJUST ENRICHMENT**
**(Against DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1912. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1913. As alleged herein, DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count LXXVII Defendants") conspired to defraud Allstate through their unlawful management and control of DA Acupuncture, P.C.

1914. As alleged herein, DA Acupuncture, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, DA Acupuncture, P.C. was unlawfully operated in violation of New York law.

1915. When Allstate paid DA Acupuncture, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXVII Defendants, or those persons working under their control, made concerning DA Acupuncture, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1916. Each and every No-Fault reimbursement payment that Allstate was caused to make to DA Acupuncture, P.C. during the course of the scheme constitutes a benefit that the Count LXXVII Defendants aggressively caused DA Acupuncture, P.C. to seek and voluntarily accept.

1917. Throughout the course of their scheme, the Count LXXVII Defendants caused DA Acupuncture, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $113,166.70 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1918. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for professional acupuncture services, never had any legal right to control DA Acupuncture, P.C., including its accounts receivable and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by DA Acupuncture, P.C. or to participate in the operation and management of DA Acupuncture, P.C.

1919. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over DA Acupuncture, P.C. and/or operation in the operation and management of DA Acupuncture, P.C., at no point was DA Acupuncture, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

1920. Throughout the duration of this scheme, the Count LXXVII Defendants obtained substantial monetary benefits totaling at least $113,166.70 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to DA Acupuncture, P.C.

1921. Retention of those benefits by the Count LXXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXVIII**
**UNJUST ENRICHMENT**
**(Against Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

1922. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1923. As alleged herein, Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC (collectively, "Count

LXXVIII Defendants") conspired to defraud Allstate through their unlawful management and control of Ponce Acupuncture, P.C.

1924. As alleged herein, Ponce Acupuncture, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Ponce Acupuncture, P.C. was unlawfully operated in violation of New York law.

1925. When Allstate paid Ponce Acupuncture, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXXVIII Defendants, or those persons working under their control, made concerning Ponce Acupuncture, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1926. Each and every No-Fault reimbursement payment that Allstate was caused to make to Ponce Acupuncture, P.C. during the course of the scheme constitutes a benefit that the Count LXXVIII Defendants aggressively caused Ponce Acupuncture, P.C. to seek and voluntarily accept.

1927. Throughout the course of their scheme, the Count LXXVIII Defendants caused Ponce Acupuncture, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $95,813.52 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1928. Under New York law, Hector Melgar, P.T. and David Tubens, D.C., as persons lacking legal authorization to provide, dictate, or receive payment for professional acupuncture services, never had any legal right to control Ponce Acupuncture, P.C., including its accounts receivable and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Ponce Acupuncture, P.C. or to participate in the operation and management of Ponce Acupuncture, P.C.

1929. As a direct and proximate result of Hector Melgar, P.T.'s and David Tubens, D.C.'s unlawful control over Ponce Acupuncture, P.C. and/or participation in the operation and management of Ponce Acupuncture, P.C., at no point was Ponce Acupuncture, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

1930. Throughout the duration of this scheme, the LXXVIII Defendants obtained substantial monetary benefits totaling at least $95,813.52 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Ponce Acupuncture, P.C.

1931. Retention of those benefits by the Count LXXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT LXXIX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation)**

1932. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1933. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1934. In view of its billing for medically unnecessary and excessive healthcare services, Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1935. Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1936. Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation continues to challenge Allstate's prior claim denials.

1937. Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1938. A justifiable controversy exists between Allstate and Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation because Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation rejects Allstate's ability to deny such claims.

1939. Allstate has no adequate remedy at law.

1940. Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation.

1941. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Hector Melgar, PT, P.C. d/b/a Excelso Physical

Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation.

**COUNT LXXX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Brentwood Regional Chiropractic, P.C.)**

1942. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1943. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1944. Brentwood Regional Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Brentwood Regional Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1945. Brentwood Regional Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1946. Brentwood Regional Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1947. Brentwood Regional Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1948. A justifiable controversy exists between Allstate and Brentwood Regional Chiropractic, P.C. because Brentwood Regional Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1949. Allstate has no adequate remedy at law.

1950. Brentwood Regional Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Brentwood Regional Chiropractic, P.C.

1951. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Brentwood Regional Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Brentwood Regional Chiropractic, P.C.

**COUNT LXXXI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Eastern Suffolk Chiropractic, P.C.)**

1952. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1953. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1954. Eastern Suffolk Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Eastern Suffolk Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1955. Eastern Suffolk Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1956. Eastern Suffolk Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1957. Eastern Suffolk Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1958. A justifiable controversy exists between Allstate and Eastern Suffolk Chiropractic, P.C. because Eastern Suffolk Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1959. Allstate has no adequate remedy at law.

1960. Eastern Suffolk Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Eastern Suffolk Chiropractic, P.C.

1961. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Eastern Suffolk Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-

Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Eastern Suffolk Chiropractic, P.C.

**COUNT LXXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Front St. Chiropractic, P.C.)**

1962. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1963. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1964. Front St. Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Front St. Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1965. Front St. Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1966. Front St. Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1967. Front St. Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1968. A justifiable controversy exists between Allstate and Front St. Chiropractic, P.C. because Front St. Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1969. Allstate has no adequate remedy at law.

1970. Front St. Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Front St. Chiropractic, P.C.

1971. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Front St. Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Front St. Chiropractic, P.C.

**COUNT LXXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Hempstead Regional Chiropractic, P.C.)**

1972. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1973. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1974. Hempstead Regional Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Hempstead Regional Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1975. Hempstead Regional Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1976. Hempstead Regional Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1977. Hempstead Regional Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1978. A justifiable controversy exists between Allstate and Hempstead Regional Chiropractic, P.C. because Hempstead Regional Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1979. Allstate has no adequate remedy at law.

1980. Hempstead Regional Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Hempstead Regional Chiropractic, P.C.

1981. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Hempstead Regional Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Hempstead Regional Chiropractic, P.C.

## COUNT LXXXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## (Against Huntington Regional Chiropractic, P.C.)

1982. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1983. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1984. Huntington Regional Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Huntington Regional Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1985. Huntington Regional Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1986. Huntington Regional Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1987. Huntington Regional Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1988. A justifiable controversy exists between Allstate and Huntington Regional Chiropractic, P.C. because Huntington Regional Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1989. Allstate has no adequate remedy at law.

1990. Huntington Regional Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Huntington Regional Chiropractic, P.C.

1991. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Huntington Regional Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Huntington Regional Chiropractic, P.C.

**COUNT LXXXV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Liberty Regional Chiropractic, P.C.)**

1992. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

1993. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1994. Liberty Regional Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Liberty Regional Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

1995. Liberty Regional Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1996. Liberty Regional Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1997. Liberty Regional Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1998. A justifiable controversy exists between Allstate and Liberty Regional Chiropractic, P.C. because Liberty Regional Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1999. Allstate has no adequate remedy at law.

2000. Liberty Regional Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Liberty Regional Chiropractic, P.C.

2001. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Liberty Regional Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Liberty Regional Chiropractic, P.C.

**COUNT LXXXVI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Patchogue Regional Chiropractic, P.C.)**

2002. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2003. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2004. Patchogue Regional Chiropractic, P.C. engaged in the following unlawful activity: (a) providing treatment and services in violation of applicable regulatory and licensing requirements, and (b) submitting charges for treatment and services with the knowledge that such treatment and services were not lawfully reimbursable under New York law. Patchogue Regional Chiropractic, P.C. was, at all times relevant, completely ineligible for reimbursement under New York law, and thus has no standing to submit or receive insurance benefits from Allstate.

2005. Patchogue Regional Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2006. Patchogue Regional Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

2007. Patchogue Regional Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2008. A justifiable controversy exists between Allstate and Patchogue Regional Chiropractic, P.C. because Patchogue Regional Chiropractic, P.C. rejects Allstate's ability to deny such claims.

2009. Allstate has no adequate remedy at law.

2010. Patchogue Regional Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Patchogue Regional Chiropractic, P.C.

2011. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Patchogue Regional Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Patchogue Regional Chiropractic, P.C.

**COUNT LXXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine)**

2012. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2013. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2014. In view of the (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Maxim Tyorkin, M.D., practicing through the Brentwood Clinic under the name of Maximum Orthopedics and Sports Medicine, has, at all relevant times, been operating in violation of one or more New York State law (including,

but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2015. Maxim Tyorkin, M.D. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2016. Maxim Tyorkin, M.D. continues to challenge Allstate's prior claim denials.

2017. Maxim Tyorkin, M.D. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2018. A justifiable controversy exists between Allstate and Maxim Tyorkin, M.D. because Maxim Tyorkin, M.D. rejects Allstate's ability to deny such claims.

2019. Allstate has no adequate remedy at law.

2020. Maxim Tyorkin, M.D. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Maxim Tyorkin, M.D.

2021. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Maxim Tyorkin, M.D. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Maxim Tyorkin, M.D.

**COUNT LXXXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Pavilion Medical, P.C.)**

2022. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2023. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2024. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Pavilion Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2025. Pavilion Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2026. Pavilion Medical, P.C. continues to challenge Allstate's prior claim denials.

2027. Pavilion Medical, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2028. A justifiable controversy exists between Allstate and Pavilion Medical, P.C. because Pavilion Medical, P.C. rejects Allstate's ability to deny such claims.

2029. Allstate has no adequate remedy at law.

2030. Pavilion Medical, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Pavilion Medical, P.C.

2031. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Pavilion Medical, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Pavilion Medical, P.C.

**COUNT LXXXIX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care)**

2032. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2033. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2034. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2035. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2036. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care continues to challenge Allstate's prior claim denials.

2037. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2038. A justifiable controversy exists between Allstate and Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care because Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care rejects Allstate's ability to deny such claims.

2039. Allstate has no adequate remedy at law.

2040. Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

2041. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal

obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care.

**COUNT XC**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)**

2042. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2043. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2044. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2045. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2046. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation continues to challenge Allstate's prior claim denials.

2047. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2048. A justifiable controversy exists between Allstate and Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation because Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation rejects Allstate's ability to deny such claims.

2049. Allstate has no adequate remedy at law.

2050. Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

2051. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation.

**COUNT XCI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Deer Park Orthopedics, P.C.)**

2052. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2053. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2054. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Deer Park Orthopedics, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2055. Deer Park Orthopedics, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2056. Deer Park Orthopedics, P.C. continues to challenge Allstate's prior claim denials.

2057. Deer Park Orthopedics, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2058. A justifiable controversy exists between Allstate and Deer Park Orthopedics, P.C. because Deer Park Orthopedics, P.C. rejects Allstate's ability to deny such claims.

2059. Allstate has no adequate remedy at law.

2060. Deer Park Orthopedics, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Deer Park Orthopedics, P.C.

2061. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Deer Park Orthopedics, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Deer Park Orthopedics, P.C.

**COUNT XCII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Station Medical Services, P.C.)**

2062. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2063. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2064. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Station Medical Services, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and

other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2065. Station Medical Services, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2066. Station Medical Services, P.C. continues to challenge Allstate's prior claim denials.

2067. Station Medical Services, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2068. A justifiable controversy exists between Allstate and Station Medical Services, P.C. because Station Medical Services, P.C. rejects Allstate's ability to deny such claims.

2069. Allstate has no adequate remedy at law.

2070. Station Medical Services, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Station Medical Services, P.C.

2071. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Station Medical Services, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Station Medical Services, P.C.

## COUNT XCIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## (Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)

2072. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2073. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2074. In view of its (a) unlawful control by one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2075. Randall Ehrlich, M.D. d/b/a OrthoCare Surgical continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2076. Randall Ehrlich, M.D. d/b/a OrthoCare Surgical continues to challenge Allstate's prior claim denials.

2077. Randall Ehrlich, M.D. d/b/a OrthoCare Surgical continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2078. A justifiable controversy exists between Allstate and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical because Randall Ehrlich, M.D. d/b/a OrthoCare Surgical rejects Allstate's ability to deny such claims.

2079. Allstate has no adequate remedy at law.

2080. Randall Ehrlich, M.D. d/b/a OrthoCare Surgical also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Randall Ehrlich, M.D. d/b/a OrthoCare Surgical.

2081. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Randall Ehrlich, M.D. d/b/a OrthoCare Surgical has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical.

## COUNT XCIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## (Against East Point Acupuncture, P.C.)

2082. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2083. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2084. In view of its (a) unlawful control by one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional acupuncture fees with one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing

for medically unnecessary and excessive healthcare services, East Point Acupuncture, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2085. East Point Acupuncture, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2086. East Point Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

2087. East Point Acupuncture, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2088. A justifiable controversy exists between Allstate and East Point Acupuncture, P.C. because East Point Acupuncture, P.C. rejects Allstate's ability to deny such claims.

2089. Allstate has no adequate remedy at law.

2090. East Point Acupuncture, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by East Point Acupuncture, P.C.

2091. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) East Point Acupuncture, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or

otherwise pending bills that have been submitted to Allstate by, or on behalf of, East Point Acupuncture, P.C.

**COUNT XCV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against DA Acupuncture, P.C.)**

2092. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2093. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2094. In view of its (a) unlawful control by one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional acupuncture fees with one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, East Point Acupuncture, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2095. East Point Acupuncture, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2096. East Point Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

2097. East Point Acupuncture, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2098. A justifiable controversy exists between Allstate and East Point Acupuncture, P.C. because East Point Acupuncture, P.C. rejects Allstate's ability to deny such claims.

2099. Allstate has no adequate remedy at law.

2100. East Point Acupuncture, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by East Point Acupuncture, P.C.

2101. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) East Point Acupuncture, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, East Point Acupuncture, P.C.

**COUNT XCVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Ponce Acupuncture, P.C.)**

2102. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1046 as if set forth fully herein.

2103. An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

2104. In view of its (a) unlawful control by one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), (b) unlawful sharing of professional acupuncture fees with one or more non-acupuncturist (i.e., Hector Melgar, P.T. and David Tubens, D.C.), and (c) billing for medically unnecessary and excessive healthcare services, Ponce Acupuncture, P.C. has, at all

relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2105. Ponce Acupuncture, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2106. Ponce Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

2107. Ponce Acupuncture, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2108. A justifiable controversy exists between Allstate and Ponce Acupuncture, P.C. because Ponce Acupuncture, P.C. rejects Allstate's ability to deny such claims.

2109. Allstate has no adequate remedy at law.

2110. Ponce Acupuncture, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Ponce Acupuncture, P.C.

2111. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Ponce Acupuncture, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Ponce Acupuncture, P.C.

## XI. DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HECTOR MELGAR, PT, P.C. d/b/a EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, and BRENTWOOD PHYSICAL REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION 18 U.S.C. § 1962(d)**
**HECTOR MELGAR, PT, P.C. d/b/a EXCELSO PHYSICAL THERAPY, TRIMOTION PHYSICAL THERAPY, and BRENTWOOD PHYSICAL REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Eastern Suffolk Chiropractic, P.C., Front St. Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Patchogue Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BRENTWOOD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATION 18 U.S.C. § 1962(d)**
**BRENTWOOD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(d) AWARD Allstate's actual and consequential damages to be established at trial;

(e) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(f) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EASTERN SUFFOLK CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT VI**
**VIOLATION 18 U.S.C. § 1962(d)**
**EASTERN SUFFOLK CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(g) AWARD Allstate's actual and consequential damages to be established at trial;

(h) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(i) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FRONT ST. CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**FRONT ST. CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Patchogue Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HEMPSTEAD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATION 18 U.S.C. § 1962(d)**
**HEMPSTEAD REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HUNTINGTON REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATION 18 U.S.C. § 1962(d)**
**HUNTINGTON REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Timothy Mosomillo, D.O., Pavilion Medical, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, William B. Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Point Acupuncture, P.C., Diana Abramchayeva, L.AC., DA Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**LIBERTY REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**LIBERTY REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Hempstead Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PATCHOGUE REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, and Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**PATCHOGUE REGIONAL CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Front St. Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**MAXIMUM ORTHOPAEDICS AND SPORTS MEDICINE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maxim Tyorkin, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PAVILION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XX**
**VIOLATION 18 U.S.C. § 1962(d)**
**PAVILION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Timothy Mosomillo, D.O., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ALEXIOS APAZIDIS, M.D., P.C. D/B/A ADVANCED SPINE CARE AND TOTAL SPINE & SPORTS CARE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXII**
**VIOLATION 18 U.S.C. § 1962(d)**
**ALEXIOS APAZIDIS, M.D., P.C. D/B/A ADVANCED SPINE CARE AND TOTAL SPINE & SPORTS CARE ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Alexios Apazidis, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTRE PAIN MANAGEMENT & REHABILITATION ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., William B. Jones, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DEER PARK ORTHOPEDICS, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**DEER PARK ORTHOPEDICS, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**STATION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**STATION MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Richard Seldes, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ORTHOCARE SURGICAL**
**(Against Hector Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXX**
**VIOLATION 18 U.S.C. § 1962(d)**
**ORTHOCARE SURGICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Randall Ehrlich, M.D., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EAST POINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXII**
**VIOLATION 18 U.S.C. § 1962(d)**
**EAST POINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Ella Matatov, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DA ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**DA ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Diana Abramchayeva, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PONCE ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**PONCE ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., Maittes Romero, L.Ac., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DRD MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**DRD MEDICAL, P.C. ENTERPRISE**
**(Against Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ISLAND REGIONAL MANAGEMENT, LLC ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.))**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XL**
**VIOLATION 18 U.S.C. § 1962(d)**
**ISLAND REGIONAL MANAGEMENT, LLC ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Brentwood Regional Chiropractic, P.C., Hempstead Regional Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Liberty Regional Chiropractic, P.C., Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Deer Park Orthopedics, P.C., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.))**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXLI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**G&A OFFICE MANAGEMENT, INC. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XLII**
**VIOLATION 18 U.S.C. § 1962(d)**
**G&A OFFICE MANAGEMENT, INC. ENTERPRISE**
**(Against Hector Melgar, P.T., Hector Melgar, P.T., P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, David Tubens, D.C., Eastern Suffolk Chiropractic, P.C., Huntington Regional Chiropractic, P.C., Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Alexios Apazidis, M.D., Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Timothy Mosomillo, M.D., Pavilion Medical, P.C., William Jones, M.D., Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, Richard Seldes, M.D., Station Medical Services, P.C., Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Ella Matatov, L.Ac., East Pont Acupuncture, P.C., Maittes Romero, L.Ac., Ponce Acupuncture, P.C., Diana Abramchayeva, L.Ac., and DA Acupuncture, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XLIII**
**COMMON LAW FRAUD**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, Brentwood Physical Rehabilitation and Hector Melgar, P.T., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLIV**
**COMMON LAW FRAUD**
**(Against Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLV**
**COMMON LAW FRAUD**
**(Against Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLVI**
**COMMON LAW FRAUD**
**(Against Front St. Chiropractic, P.C. and David Tubens, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLVII**
**COMMON LAW FRAUD**
**(Against Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLVIII**
**COMMON LAW FRAUD**
**(Against Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLIX**
**COMMON LAW FRAUD**
**(Against Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT L**
**COMMON LAW FRAUD**
**(Against Patchogue Regional Chiropractic, P.C. and David Tubens, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LI**
**COMMON LAW FRAUD**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., and David Tubens, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LII**
**COMMON LAW FRAUD**
**(Against Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LIII**
**COMMON LAW FRAUD**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LIV**
**COMMON LAW FRAUD**
**(Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LV**
**COMMON LAW FRAUD**
**(Against Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LVI**
**COMMON LAW FRAUD**
**(Against Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LVII**
**COMMON LAW FRAUD**
**(Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LVIII**
**COMMON LAW FRAUD**
**(Against East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LIX**
**COMMON LAW FRAUD**
**(Against DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LX**
**COMMON LAW FRAUD**
**(Against Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT LXI**
**UNJUST ENRICHMENT**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, Hector Melgar, P.T., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXII**
**UNJUST ENRICHMENT**
**(Against Brentwood Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXIII**
**UNJUST ENRICHMENT**
**(Against Eastern Suffolk Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXIV**
**UNJUST ENRICHMENT**
**(Against Front St. Chiropractic, P.C. and David Tubens, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXV**
**UNJUST ENRICHMENT**
**(Against Hempstead Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXVI**
**UNJUST ENRICHMENT**
**(Against Huntington Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXVII**
**UNJUST ENRICHMENT**
**(Against Liberty Regional Chiropractic, P.C., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXVIII**
**UNJUST ENRICHMENT**
**(Against Patchogue Regional Chiropractic, P.C. and David Tubens, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXIX**
**UNJUST ENRICHMENT**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXX**
**UNJUST ENRICHMENT**
**(Against Pavilion Medical, P.C., Timothy Mosomillo, DO, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXI**
**UNJUST ENRICHMENT**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care, Alexios Apazidis, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXII**
**UNJUST ENRICHMENT**
**(Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, William Jones, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXIII**
**UNJUST ENRICHMENT**
**(Against Deer Park Orthopedics, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXIV**
**UNJUST ENRICHMENT**
**(Against Station Medical Services, P.C., Richard Seldes, M.D., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXV**
**UNJUST ENRICHMENT**
**(Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXVI**
**UNJUST ENRICHMENT**
**(Against East Point Acupuncture, P.C., Ella Matatov, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXVII**
**UNJUST ENRICHMENT**
**(Against DA Acupuncture, P.C., Diana Abramchayeva, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXVIII**
**UNJUST ENRICHMENT**
**(Against Ponce Acupuncture, P.C., Maittes Romero, L.Ac., Hector Melgar, P.T., David Tubens, D.C., and Island Regional Management, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT LXXIX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation)**

(a) DECLARE that Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation, at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at

least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Hector Melgar, PT, P.C. d/b/a Excelso Physical Therapy, Trimotion Physical Therapy, and Brentwood Physical Rehabilitation; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Brentwood Regional Chiropractic, P.C.)**

(a) DECLARE that Brentwood Regional Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Brentwood Regional Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Brentwood Regional Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Eastern Suffolk Chiropractic, P.C.)**

(a) DECLARE that Eastern Suffolk Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New

York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Eastern Suffolk Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Eastern Suffolk Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Front St. Chiropractic, P.C.)**

(a) DECLARE that Front St. Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Front St. Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Front St. Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Hempstead Regional Chiropractic, P.C.)**

(a) DECLARE that Hempstead Regional Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Hempstead Regional Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Hempstead Regional Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXIV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Huntington Regional Chiropractic, P.C.)**

(a) DECLARE that Huntington Regional Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Huntington Regional Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Huntington Regional Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Liberty Regional Chiropractic, P.C.)**

(a) DECLARE that Liberty Regional Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Liberty Regional Chiropractic, P.C.,'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Liberty Regional Chiropractic, P.C.,; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXVI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Patchogue Regional Chiropractic, P.C.)**

(a) DECLARE that Patchogue Regional Chiropractic, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Patchogue Regional Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Patchogue Regional Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine)**

(a) DECLARE that Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine, at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Maxim Tyorkin, M.D. d/b/a Maximum Orthopaedics and Sports Medicine; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Pavilion Medical, P.C.)**

(a) DECLARE that Pavilion Medical, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Pavilion Medical, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Pavilion Medical, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXIX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Alexios Apazidis, M.D., P.C. d/b/a Advanced Spine Care and Total Spine & Sports Care)**

(a) DECLARE that Alexios Apazidis, M.D. P.C. dba Apazidis P.C. and Total Spine & Sports Care, at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Alexios Apazidis, M.D. P.C. dba Apazidis P.C. and Total Spine & Sports Care's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Alexios Apazidis, M.D. P.C. dba Apazidis P.C. and Total Spine & Sports Care; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XC**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation)**

(a) DECLARE that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation, at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Phoenix Medical Services, P.C. d/b/a Rockville Centre Pain Management & Rehabilitation; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Deer Park Orthopedics, P.C.)**

(a) DECLARE that Deer Park Orthopedics, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Deer Park Orthopedics, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Deer Park Orthopedics, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Station Medical Services, P.C.)**

(a) DECLARE that Station Medical Services, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Station Medical Services, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Station Medical Services, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Randall Ehrlich, M.D. d/b/a OrthoCare Surgical)**

(a) DECLARE that Randall Ehrlich, M.D. d/b/a OrthoCare Surgical, at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Randall Ehrlich, M.D. d/b/a OrthoCare Surgical's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Randall Ehrlich, M.D. d/b/a OrthoCare Surgical; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCIV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against East Point Acupuncture, P.C.)**

(a) DECLARE that East Point Acupuncture, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that East Point Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by East Point Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against DA Acupuncture, P.C.)**

(a) DECLARE that DA Acupuncture, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that DA Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by DA Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XCVI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Ponce Acupuncture, P.C.)**

(a) DECLARE that Ponce Acupuncture, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Ponce Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Ponce Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*

______________________

Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C.M. Brady (HB4724)
hbrady@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company*

Dated: December 15, 2022